Claudia Center, State Bar No. 158255
Shelley A. Gregory, State Bar No. 215442
Elizabeth Kristen, State Bar No. 218227
Lori Rifkin, State Bar No. 244081
LEGAL AID SOCIETY-
EMPLOYMENT LAW CENTER
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848
Facsimile:  (415) 864-8199
Email:       ccenter@las-elc.org
                sgregory@las-elc.org
                ekristen@las-elc.org
                lrifkin@las-elc.org

Daniel S. Mason, State Bar No. 54065
Patrick Clayton, State Bar No. 240191
Zelle Hofmann Voelbel & Mason LLP
44 Montgomery St Ste 3400
San Francisco, CA 94104
Telephone:  (415) 693-0700
Facsimile:  (415) 693-0770
Email:       pclayton@zelle.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA (OAKLAND DIVISION)

MICHAEL DRAGOVICH, MICHAEL GAITLEY, ELIZABETH LITTERAL, PATRICIA FITZSIMMONS, CAROLYN LIGHT, and CHERYL LIGHT, on behalf of themselves and all others similarly situated,

     Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF THE TREASURY, TIMOTHY GEITHNER, in his official capacity as Secretary of the Treasury, United States Department of the Treasury, INTERNAL REVENUE SERVICE, DOUGLAS SHULMAN, in his official capacity as Commissioner of the Internal Revenue Service, BOARD OF ADMINISTRATION OF CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, and ANNE STAUSBOLL, in her official capacity as Chief Executive Officer, CalPERS,

    Defendants.

Case No. CV 4:10-01564-CW

**PLAINTIFFS' OPPOSITION TO THE FEDERAL DEFENDANTS' MOTION TO DISMISS**

DATE:  September 9, 2010
TIME:  2:00 p.m.
PLACE:  Courtroom of the Honorable Claudia Wilkin, U.S. District Court, Northern District of California, 1301 Clay Street, Courtroom 2

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................. iii

INTRODUCTION .............................................................................................. 1

BACKGROUND AND STATEMENT OF FACTS ........................................... 1

    The Importance of Long-Term Care to Families ................................... 2

    The Enactment of 26 U.S.C. § 7702b(f) .............................................. 2

    The Reenactment of 26 U.S.C. § 7702B(f) .......................................... 6

    The CalPERS Long-Term Care Insurance Program ............................. 6

ARGUMENT ................................................................................................... 7

    I.   THE COMPLAINT ESTABLISHES PLAINTIFFS' STANDING ....... 7

        A.  Plaintiffs Have Alleged an "Injury In Fact" Based on the Categorical Exclusion Same-Sex Spouses and Domestic Partners ................. 8

            1.  Plaintiffs Have Established Their Intent to Apply for Enrollment in the Long-Term Care Plan When They are Deemed Eligible ................. 9

            2.  Because the Long-Term Care Plan Policy Categorically Excludes Same-Sex Spouses and Domestic Partners From Enrollment, Plaintiffs Need Not Apply ................. 10

            3.  Plaintiffs Need Not Demonstrate the Unavailability of Economic Alternatives ................. 12

        B.  Plaintiffs Satisfy the Remaining Elements of the Standing Inquiry ................. 13

    II.  PLAINTIFFS HAVE STATED A CLAIM AGAINST THE FEDERAL DEFENDANTS FOR VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE OF EQUAL PROTECTION ................. 15

        A.  Standard of Review For Purposes of This Motion ................. 15

        B.  The Challenged Law Bears No Rational Relationship to Any Legitimate Interest ................. 16

            Congress's Stated Interests in Procreation, Child-Rearing, Traditional Marriage, and Traditional Morality ................. 16

            Congress's State Interest in Preserving Government Resources ................. 18

            The Federal Defendants' Post-Hoc Interest in Preserving the Status Quo, and Allowing the States to Decide ................. 19

C.  The Challenged Law Impermissibly Excludes Same-Sex Spouses and Domestic Partners Based Upon Animus Against Lesbians and Gay Men and Their Relationships ........................................................................22

**III. PLAINTIFFS HAVE STATED A CLAIM AGAINST THE FEDERAL DEFENDANTS FOR SELECTIVELY BURDENING PLAITNIFFS' EXERCISE OF A FUNDAMENTAL RIGHT ON THE BASIS OF SEXUAL ORIENTATION IN VIOLATION OF THE DUE PROCESS CLAUSE** ........................................................................22

**CONCLUSION** ........................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aetna Cas. & Sur. Co. v. British Petroleum*, No. Civ. A. Nos. 90-4595, 90-5003,
   1991 WL 148140 (E.D. La., July 30, 1991) ..........................................................................4

*Allen v. Wright*, 468 U.S. 737 (1984) ..............................................................................8, 13

*Arlington County v. White*, 259 Va. 708 (2000) ......................................................................4

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ....................................9

*Assoc. of Amer. Medical Colleges v. United States*, 217 F. 3d 770 (9th Cir. 2000) ............10

*Belodoff v. Netlist, Inc.*, No. SA CV 07-00677 DOC (MLGx), 2008 WL 2356699
   (C.D. Cal. May 30, 2008) ....................................................................................................12

*Black Faculty Ass'n of Mesa Coll. v. San Diego Cmty. Coll. Dis.t*, 664 F.2d 1153
   (9th Cir. 1981) .....................................................................................................................11

*Bolling v. Sharpe*, 347 U.S. 497 (1954) .................................................................................15

*Bouman v. Block*, 940 F.2d 1211 (9th Cir. 1991) ..................................................................11

*Breiner v. Nev. Dep't of Corr.*, --- F.3d ----, 2010 WL 2681730 at *2
   (9th Cir. July 8, 2010) .........................................................................................................11

*Carey v. Population Services Int'l*, 431 U.S. 678 (1977) ......................................................24

*CC Distrib., Inc. v. United States*, 883 F.2d 146 (D.C. Cir. 1989) .........................................9

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ..............................15, 16, 19, 22

*Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632 (1974) ......................................................23

*Commonwealth of Massachusetts v. United States Dep't of Health and Human Services*,
   698 F. Supp. 2d 234 (D. Mass. 2010) .................................................................................21

*Department of Agriculture v. Moreno*, 413 U.S. 528 (1973) .................................................22

*Ellison v. Connor*, 153 F.3d 247 (5th Cir. 1998) ...................................................................10

*Gill v. Office of Personnel Management*, 699 F. Supp. 2d 374 (D. Mass. 2010) ..........*passim*

*Gordon v. State Bar*, No. C08-3341 SI, 2008 U.S. Dist. LEXIS 94672
    (N.D. Cal. Nov. 20, 2008)............................................................................10

*Gratz v. Bollinger*, 539 U.S. 244 (2003)..................................................................9

*Griswold v. Connecticut*, 381 U.S. 479 (1965).......................................................24

*Hartfield v. C.I.R.*, T.C. Summ. Op. 2006-77, 2006 WL 1280961
    (U.S. Tax Ct., 2006)...............................................................................4

*High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563
    (9th Cir. 1990).....................................................................................15

*In re Golinski*, 587 F.3d 956 (9th Cir. 2009) .....................................................9, 13

*In re Levenson*, 560 F.3d 1145 (9th Cir. Judicial Council, 2009) ........................*passim*

*In re Wet Seal, Inc. Secs. Litig.*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007)....................12

*Lawrence v. Texas*, 539 U.S. 558 (2003)................................................................*passim*

*Lorrillard v. Pons*, 434 U.S. 575 (1978)..................................................................6

*Loving v. Virginia*, 388 U.S. 1 (1967) ...................................................................24

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..............................................8

*Madsen v. Boise State Univ.*, 976 F.2d 1219 (9th Cir. 1992) ...................................11

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ...............................................................23

*Moore v. East Cleveland*, 431 U.S. 494 (1977) .......................................................23

*Ne. Fla. Chapter of Assoc'd Gen. Contractors of Am. v. Jacksonville*,
    508 U.S. 656 (1993)..............................................................................9

*Palmore v. Sidoti*, 466 U.S. 429 (1984)..................................................................22

*Perry v. Schwarzenegger*, 591 F.3d 1147 (2010) ...................................................*passim*

*Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925).......................................................24

*Plessy v. Ferguson*, 163 U.S. 537 (1896) ...............................................................15

*Plyler v. Doe*, 457 U.S. 202 (1982) .......................................................................19

*Prince v. Massachusetts*, 321 U.S. 158 (1944) ............................................................................23

*Pruitt v. Cheney*, 963 F.2d 1160 (9th Cir.1992) ..........................................................................22

*Rasco v. C.I.R.*, T.C. Memo. 1999-169, 1999 WL 311796
  (U.S. Tax Ct., 1999)................................................................................................4

*Reed v. Reed*, 404 U.S. 71 (1971) ................................................................................................19

*Regan v. Taxation with Representation of Wash.*, 461 U.S. 540 (1983) ......................................24

*Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)..........................................................9

*Romer v. Evans*, 517 U.S. 620 (1996) ...................................................................................*passim*

*Savage v. Glendale Union High School Dist.*, 343 F.3d 1036 (9th Cir. 2003)..............................10

*Southwest Marine, Inc. v. U.S.*, 535 F.3d 1012 (9th Cir. 2008)......................................................6

*St. Clair v. City of Chico*, 880 F.2d 199 (9th Cir. 1989)...............................................................10

*Stanton v. Stanton*, 421 U.S. 7 (1975) .........................................................................................18

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ...................................................8, 14

*Taniguchi v. Schultz*, 303 F.3d 950 (9th Cir. 2002).....................................................................11

*Tucson Woman's Clinic v. Eden*, 371 F.3d 1173 (9th Cir. 2004)..................................................22

*United States v. Baugh*, 187 F.3d 1037 (9th Cir. 1999)...............................................................10

*United States v. Dunifer*, 997 F. Supp. 1235 (N.D. Cal. 1998) ...................................................11

*United States v. Hugs*, 109 F.3d 1375 (9th Cir. 1997)..................................................................11

*Walsh v. Honolulu*, 460 F. Supp. 2d 1207 (D. Haw. 2006) ....................................................10, 11

*Wang v. Reno*, 81 F.3D 808 (9th Cir. 1996) .................................................................................11

*Washington v. Glucksberg*, 521 U.S. 702 (1997) .....................................................................24, 25

*Whalen v. Roe*, 429 U.S. 589 (1977)............................................................................................23

*Witt v. Dep't of Air Force*, 527 F.3d 806 (9th Cir.2008)........................................................15, 25

# STATE CASES

*Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993).................................................................3

*In re Marriage Cases*, 43 Cal. 4th 757 (2008)........................................................20

*Strauss v. Horton*, 46 Cal. 4th 364, 411 (2009).....................................................9, 20

# FEDERAL STATUTES

Defense of Marriage Act (DOMA), 1 U.S.C. § 7 .................................................*passim*

26 U.S.C. § 152...................................................................................................*passim*

26 U.S.C. § 7702B(f) ..........................................................................................*passim*

26 U.S.C. § 4980C ....................................................................................................21

# STATE STATUTES

Cal. Gov't Code § 21661 .............................................................................................6

Cal. Fam. Code § 297.5 ...............................................................................................7

# LEGISLATIVE HISTORY

H.R. Rep. No. 104-664 at 16 (1996), reprinted in 996 U.S.C.C.A.N. 2905, 2906-07....................5

142 Cong. Rec. H7275 (daily ed. July 11, 1996).........................................................5

142 Cong. Rec. H7480 (daily ed. July 12, 1996).........................................................5

142 Cong. Rec. H7495 (daily ed. July 12, 1996).........................................................5

142 Cong. Rec. S10, 110 (daily ed. Sept. 10, 1996).....................................................5

142 Cong. Rec. S3578-01 (Apr. 18, 1996) ..................................................................2

Joint Committee on Taxation, "Description of Federal Tax Rules and Legislative Background Relating to Long-Term Care Scheduled for a Public Hearing Before the Senate Committee on Finance on March 27, 2001," at 2001 WL 36044116 (I.R.S.)................2, 3

**ADDITIONAL AUTHORITIES**

Fed. R. Evid. 201(b)..................................................................................................12

Fed. Reg., vol. 75, no. 104 (Jun. 1, 2010)..................................................................21

Report of the U.S. General Accounting Office, Office of General Counsel, 1/31/97
    (GAO/OGC-97-16)................................................................................................5

Bowman and Cornish, *A More Perfect Union: A Legal and Social Analysis of Domestic
    Partnership Ordinances*, 92 Colum. L. Rev. 1164 (June 1992)..........................4

**INTRODUCTION**

This case challenges the constitutionality of 26 U.S.C. § 7702B(f), a portion of HIPAA, as originally signed into law on August 21, 1996, and as amended shortly thereafter by 1 U.S.C. § 7 (the Defense of Marriage Act, or DOMA, signed September 21, 1996).  With no permissible rationale, this federal law excludes legally recognized domestic partners and spouses of gay and lesbian public employees from participation in state-provided long-term care plans, plans which provide benefits and security critical to the physical and financial wellness of families.  Because this exclusion bears no rational relationship to any legitimate governmental interest, it cannot pass constitutional muster.  This case also challenges the constitutionality of portions of the California Code that implement similarly unconstitutional exclusions.  As in *Gill v. Office of Personnel Management*, 699 F. Supp. 2d 374 (D. Mass. 2010) and *In re Levenson*, 560 F.3d 1145, 1149 (9th Cir. Judicial Council, 2009), the Plaintiffs here state valid claims under the Constitution.  The federal defendants' motion to dismiss must be rejected.

**BACKGROUND AND STATEMENT OF FACTS**

Plaintiffs are employees of the State of California and their spouses who are in long-term committed relationships legally recognized under California law as marriages and domestic partnerships.  As state employees and as members of the California Public Employees' Retirement System ("CalPERS"), Plaintiffs Michael Dragovich, Elizabeth Litteral, and Carolyn Light ("Plaintiff employees") are eligible to apply to join the CalPERS Long Term Care ("LTC") Program.  Under California and federal law, members of the Plaintiff employees' extended families are also eligible to apply to the CalPERS LTC Program – but their legally recognized partners of the same sex, Plaintiffs Michael Gaitley, Patricia Fitzsimmons, and Cheryl Light ("Plaintiff spouses") are not.  Plaintiffs argue that excluding the same-sex partners and spouses from the CalPERS LTC Program – while permitting virtually any other family member to participate – unconstitutionally discriminates against lesbians and gay men, and their families, by denying them the opportunity to plan for long-term care needs afforded to identically situated families of heterosexual couples.

**The Importance of Long-Term Care to Families**.

Long-term care insurance helps reduce the financial risk accompanying the cost of extended care by covering those who need assistance with basic activities of living due to chronic illness, injury, the frailty of old age, or a severe cognitive impairment such as Alzheimer's disease. CalPERS Ans. ¶ 3. In most instances, individuals and their families are not otherwise covered for this type of extended long-term care by health insurance, disability insurance, Medicare, or MediCal. Compl. ¶ 3. Long-term care insurance is thus an important benefit for individuals, couples, and families – regardless of sexual orientation – to enhance financial security, and to ensure access to appropriate care throughout the life cycle.

Without long-term care insurance, the high costs of care can force families to make painful choices such as selling a family home to pay the bills, or having a working adult give up a job and income to work without pay as a caretaker for a loved one. Compl. ¶ 4. The consequences of such steps can be financially and emotionally devastating, and in some cases insufficient, leaving individuals in poverty and dependent upon the limited services provided by Medicaid. *Id.* Long-term care insurance allows families to avoid such contingencies. *Id.* Here, through participation in the CalPERS Long-Term Care Program, Plaintiffs seek an adequate safety net for themselves and their families in the event that future debilitating illness or injury requires long-term care services.

Long-term care insurance also serves the public interest by spreading the risk of catastrophic expense, and helping individuals receive adequate assistance when they become unable to care for themselves, reducing the burden on publicly funded programs. Compl. ¶ 7.

**The Enactment of 26 U.S.C. § 7702b(f)**.

Recognizing the importance of long-term care insurance in protecting families, the federal government in 1996 adopted certain minimum standards for policies, including important tax advantages. "The legislation … provides tax deductibility for long term care insurance, making it possible for more Americans to avoid financial difficulty as the result of chronic illness." 142 Cong. Rec. S3578-01 at *3608 (Statement of Sen. McCain) (Apr. 18, 1996); *see also* Joint

Committee on Taxation, "Description of Federal Tax Rules and Legislative Background Relating to Long-Term Care Scheduled for a Public Hearing Before the Senate Committee on Finance on March 27, 2001," at 2001 WL 36044116 (I.R.S.) (provisions were adopted "to provide an incentive for individuals to take financial responsibility for their long-term care needs."). The legislation included 26 U.S.C. § 7702B(f), the provision challenged herein, which enables states to offer tax-shielded ("qualified") long term care insurance programs to public employees and their families. Section 7702B(f), as amended by 1 U.S.C. § 7, permits states to offer public employees a "qualified," tax-shielded, long-term care insurance plan that allows an employee to enroll himself or herself, as well as all conceivable family members, *except* legally recognized spouses and domestic partners who are the same sex as the employee.

Section 7702B(f) was enacted and first amended against a background of considerable congressional debate and agitation about the prospect of state and local governments recognizing the legal validity of the relationships of lesbians and gay men. The 1996 legislative session explicitly considered and reacted to the implications of *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993), a 1993 decision by the Hawaii Supreme Court indicating that lesbian and gay couples might be entitled to marry under the Hawaii state constitution. *See Gill*, 699 F. Supp. 2d at 377 ("In large part, the enactment of DOMA can be understood as a direct legislative response to *Baehr v. Lewin*.").[1] Along with the *Baehr* case, the 1996 Congressional debate occurred in the context of emerging legislative models for the legal recognition of such couples on the state and local levels. Local municipalities had begun to establish domestic partnership registries as a tool for granting lesbian and gay couples some of the legal rights and benefits historically afforded married couples. Such registries were established in West Hollywood (1985), Berkeley (1991), Ann Arbor (1985), San Francisco (1992), Minneapolis (1991), Washington, D.C. (1992), and

---

[1] *See id.* at 377-78 ("The House Judiciary Committee's Report on DOMA (the "House Report") referenced the *Baehr* decision as the beginning of an 'orchestrated legal assault being waged against traditional heterosexual marriage,' and expressed concern that this development 'threaten[ed] to have very real consequences... on federal law.' Specifically, the Report warned that 'a redefinition of marriage in Hawaii to include homosexual couples could make such couples eligible for a whole range of federal rights and benefits.'").

Seattle (1993).[2]   Bills to establish a state-wide domestic partnership registry were introduced in the California Legislature during the 1993-94 and 1995-96 sessions.  A.B. 2810 (1993); A.B. 627 (1995).

At issue in this case, the 1996 Congress excluded legally recognized domestic partners and same-sex spouses from eligibility for state-sponsored public employee long-term care plans. First, in enacting section 7702B(f), Congress permitted the participation of "employees and former employees," "the spouses of such employees," and "individuals bearing a relationship described in paragraphs (1) through (8) of section 152(a)."  26 U.S.C. § 7702B(f)(2)(C) (1997). In choosing to incorporate these particular subsections of section 152(a), Congress permitted the participation of "an array of relatives," *see* Fed. Defendants' Mot. at 1-2, and specifically sons, daughters, stepsons, stepdaughters, grandchildren, sisters and brothers (defined to include half-siblings[3]), stepsisters, stepbrothers, fathers, mothers, stepfathers, stepmothers, grandparents, nieces, nephews, aunts, uncles, sons-in-law, daughters-in-law, fathers-in-law, mothers-in-law, brothers-in-law, and sisters-in-law.  However, without identifying any legitimate purpose, Congress excluded a single subsection, subsection (9), describing "an individual … who, for the taxable year of the taxpayer, has as his principal place of abode the home of the taxpayer and is a member of the taxpayer's household."  This is the provision that would have permitted the enrollment of domestic partners.[4]  Second, through the Defense of Marriage Act, Congress limited the eligible "spouses" to different-sex spouses.

In using the DOMA to deny a vast array of federal rights and benefits to gay and lesbian couples, and in further excluding domestic partners from the laundry list of permitted relations in

---

[2] *See* Bowman and Cornish, *A More Perfect Union: A Legal and Social Analysis of Domestic Partnership Ordinances*, 92 Colum. L. Rev. 1164, 1189-91 & nn.119-130 (June 1992).
[3] 26 U.S.C. § 152(b)(1) (1996); 26 U.S.C. § 152(f)(4) (2010).
[4] *See Arlington County v. White*, 259 Va. 708, 716 (2000) (Kinser, J., concurring) ("[A]n individual satisfying Arlington County's definition of 'domestic partner' could also qualify as a 'dependent' under 26 U.S.C. § 152(a)(9)."); *see also Hartfield v. C.I.R.*, T.C. Summ.Op. 2006-77, 2006 WL 1280961 (U.S. Tax Ct., 2006); *Rasco v. C.I.R.*, T.C. Memo. 1999-169, 1999 WL 311796 (U.S. Tax Ct.,1999); *Aetna Cas. & Sur. Co. v. British Petroleum*, No. Civ. A. Nos. 90-4595, 90-5003, 1991 WL 148140 (E.D. La., July 30, 1991) (finding that unmarried woman "living together out of wedlock" with a man could be his dependent under sub(9)).  Through 2004, the provision was found at section 152(a)(9); it is now found at section 152(d)(2)(H).

1   section 7702B(f), Congress failed to identify any legitimate, non-discriminatory federal interest

2   that would be served.  (Indeed, it was only after the DOMA was enacted that the General

3   Accounting Office actually analyzed the federal laws affected by DOMA, finding that DOMA

4   implicated more than 1,000 laws.  Report of the U.S. General Accounting Office, Office of

5   General Counsel, 1/31/97 (GAO/OGC-97-16); *Gill*, 699 F. Supp. 2d at 379, 390 n. 116

6   (reviewing 1997 and 2004 reports).)  As discussed below, the interests identified by Congress in

7   excluding as a class same-sex spouses from a host of benefits, including tax-qualified state-

8   provided long-term care programs, have since been disavowed by the federal defendants,[5] and

9   determined by federal courts to be ultimately rooted in "the one purpose that lies entirely outside

10  of legislative bounds, to disadvantage a group of which [Congress] disapproves."  *Id.* at 396.

11          The motivating force of animus against lesbians and gay men, and their relationships, is

12  apparent from the legislative record.  Members of Congress repeatedly voiced their disapproval

13  of homosexuality, calling it "immoral," "depraved," "unnatural," "based on perversion" and "an

14  attack upon God's principles."  *Id* at 378.  Legislators argued that marriage by gays and lesbians

15  would "demean" and "trivialize" heterosexual marriage and might indeed be "the final blow to

16  the American family."  *Id* at 378-79.[6]  The official House report describes the purpose of the

17  DOMA to enshrine Congress's "moral disapproval of homosexuality, and a moral conviction that

18  heterosexuality better comports with traditionally (especially Judeo-Christian) morality."  H.R.

19  Rep. No. 104-664 at 16 (1996), *reprinted in* 996 U.S.C.C.A.N. 2905, 2906-07.

20

21  _____

    [5] Federal Defendants' Motion at 3; *see also Gill*, 699 F. Supp. 2d at 388.

22  [6] The district court's opinion in *Gill* compiles remarks made by members of Congress.  *See, e.g.*
    142 Cong. Rec. H7275 (daily ed. July 11, 1996) (statement of Rep. Barr:  marriage is "under

23  direct assault by the homosexual extremists all across this country"); 142 Cong. Rec. H7480
    (daily ed. July 12, 1996) (statement of Representative Henry Hyde, then-Chairman of the House

24  Judiciary Committee:  "Most people do not approve of homosexual conduct ... and they express
    their disapprobation through the law."); *id.* at H7495 (statement of Rep. Lipinski:  "Allowing for

25  gay marriages would be the final straw, it would devalue the love between a man and a woman
    and weaken us as a Nation."); 142 Cong. Rec. S10, 110 (daily ed. Sept. 10, 1996) (statement of

26  Sen. Helms: "[Those opposed to DOMA] are demanding that homosexuality be considered as
    just another lifestyle-these are the people who seek to force their agenda upon the vast majority

27  of Americans who reject the homosexual lifestyle ... Homosexuals and lesbians boast that they
    are close to realizing their goal-legitimizing their behavior.... At the heart of this debate is the

28  moral and spiritual survival of this Nation.").

1   **The Reenactment of 26 U.S.C. § 7702B(f).**

2          Section 7702B(f) was reenacted in 2004, again excluding gay and lesbian domestic

3   partners and spouses by adopting subparagraphs (A) through (G) of section 152(d)(2), as

4   amended.  By 2004, the existence of legal relationship recognition for gay and lesbian couples in

5   many jurisdictions was well established.  For example, California, New Jersey, Washington, and

6   Maine had enacted domestic partnership legislation, Vermont created civil unions, Hawaii

7   established reciprocal benefits for gay and lesbian couples, and in Massachusetts gay and lesbian

8   couples were legally permitted to marry.  Additionally, municipalities across the country in states

9   without state-wide relationship recognition for gay and lesbian couples continued to adopt their

10  own ordinances.  However, Congress, in again excluding legally recognized gay and lesbian

11  couples from this benefit, failed to offer any legitimate government rationale for doing so.  *See*

12  *Lorrillard v. Pons*, 434 U.S. 575, 580-81 (1978) ("Congress is presumed to be aware of an

13  administrative or judicial interpretation of a statute and to adopt that interpretation when it re-

14  enacts a statute without change.").[7]

15  **The CalPERS Long-Term Care Program.**

16         The CalPERS Long-Term Care Program is a state-provided, self-funded long-term care

17  insurance program under which benefits are not taxed.  CalPERS Ans. at ¶ 44.  The California

18  Government Code mandates that Defendant CalPERS Board of Administration offer public

19  employees and their families the opportunity to purchase qualified long-term care insurance

20  during periodic open enrollment periods.  Cal. Gov't Code § 21661(a).  A state employee may

21  enroll himself or herself, and his or her different-sex spouse, as well as brothers, sisters, father,

22  mother, father-in-law, and mother-in-law, in the qualified long-term care insurance program

23  offered to California public employees.  Cal. Gov't Code § 21661(d).  There is no limit to the

24  total number of family members who can enroll, so long as they fall into an approved family

25  _____

26  [7] Moreover, by 2004 California was excluding same-sex domestic partners from the CalPERS
    LTC Program, purportedly based upon the federal tax law requirements.  *See Southwest Marine,*
27  *Inc. v. U.S.*, 535 F.3d 1012, 1020 (9th Cir. 2008) (finding that because Congress was aware of
    how law had been applied but made no attempt to exclude that application when amending the
28  law, Congress intended the exclusion).

member category.  However, same-sex domestic partners are excluded under the terms of state and federal statutory law.  26 U.S.C. §§ 7702B(f)(1)-(2), 152(d)(2)(A)-(G); Cal. Fam. Code § 297.5(g).  Same-sex spouses of public employees are excluded by virtue of federal statutory law, 1 U.S.C. § 7, which CalPERS follows.  CalPERS Ans. at 2:10-16; 6 ¶¶10-11.

Defendant CalPERS serves 1.6 million California public employees, retirees, and their families, including employees within state agencies and universities, the California State Legislature, current and former judges, and public school teachers.[8]  The agency is governed by a Board of Administration with elected or appointed representatives from the various employee sectors, and has adopted as part of its mission to ensure that its members needs' are served well into retirement.[9]  More than 160,000 individuals are members of the CalPERS Long-Term Care Program.  *See* CalPERS' Ans. ¶ 10.  The coverage offered is tax-qualified and inflation protected.[10]  The Program provides guaranteed renewal of premiums with timely payments and the assurance that premiums cannot be increased due to age or health.[11]  Further, only the CalPERS' Board of Administration is authorized to raise premiums after assessing and voting on such a measure.[12]  Beneficiaries of the CalPERS Program are provided various premium payment options, including electronic fund transfer or directly from pension benefits.[13]  For these and other reasons, the CalPERS Long-Term Care Program affords public employees and their families unique benefits, opportunities, and conveniences.

## ARGUMENT

## I.     THE COMPLAINT ESTABLISHES PLAINTIFFS' STANDING.

Plaintiffs seek relief from the categorical and unconstitutional exclusion of same-sex

---

[8] *See* About CalPERS at http://www.calpers.ca.gov/eip-docs/about/facts/general.pdf (June 2010).
[9] *See* "CalPERS Long-Term Care Program Premium Increases Recommended to Stabilize Program," December 15, 2009, at http://www.calpers.ca.gov/index.jsp?bc=/about/press/pr-2009/dec/board-approves-premium.xml.  ("CalPERS Press Release"); About CalPERS at http://www.calpers.ca.gov/index.jsp?bc=/about/mission/home.xml.
[10] *See* CalPERS Long Term Care Program Fact Sheet at http://www.calpers.ca.gov/eip-docs/member/ltc/fact-sheet.pdf  ("CalPERS LTCP Fact Sheet").
[11] CalPERS LTC Fact Sheet, supra note 10.
[12] CalPERS LTC Fact Sheet, supra note 10; *see also* About CalPERS at http://www.calpers.ca.gov/index.jsp?bc=/about/organization/board/members/home.xml
[13] CalPERS State Handbook (2008 ed.), at http://www.calpers.ca.gov/eip-docs/employer/er-forms-pubs/pubs/manuals/sh08-gen-info.pdf.

spouses and domestic partners from the CalPERS Long-Term Care Program.  The Complaint adequately alleges that Plaintiffs were denied the opportunity to apply for a benefit based upon an impermissible governmental classification, and that they are able and ready to apply for that benefit once the barrier to it is lifted.  Plaintiffs' Complaint thus establishes an "injury in fact" – an invasion of a legally protected interest which is concrete, particularized and "actual or imminent, not 'conjectural' or 'hypothetical.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations omitted).

Plaintiffs have also established that the injury alleged is fairly traceable to the challenged action, and not the result of an independent action of a third party.  *See Allen v. Wright*, 468 U.S. 737, 759 (1984).  CalPERS's exclusion of same-sex spouses and domestic partners from enrollment in the Long-Term Care Program derives directly from the federal statutes challenged here.  Similarly, the Complaint satisfies the third element of the standing inquiry by demonstrating "a likelihood that the requested relief will redress the alleged injury."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  Plaintiffs seek relief from federal and state statutes that, if declared unconstitutional, remove all statutory impediments to the eligibility of same-sex spouses and domestic partners to enroll in the program.  The federal defendants' jurisdictional challenge should be denied.

**A.     Plaintiffs Have Alleged an "Injury In Fact" Based Upon the Categorical Exclusion of Same-Sex Spouses and Domestic Partners.**

The Complaint alleges an ongoing "injury in fact," the denial of the opportunity to participate in the enrollment process for CalPERS's Long-Term Care Program on equal footing with different-sex couples.  Whether an individual plaintiff will ultimately be enrolled in the plan, and whether Plaintiffs' pecuniary harm can be mitigated by resort to the private market, are neither relevant to nor dispositive of the standing determination.  Rather, the denial of equal treatment itself establishes Plaintiffs' standing:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the

imposition of the barrier, not the ultimate inability to obtain the benefit.

*Ne. Fla. Chapter of Assoc'd Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993); *see also Gratz v. Bollinger*, 539 U.S. 244, 261-63 (2003).

The federal Defendants seek to minimize the Plaintiffs' injury, describing the harm as the "purely speculative" "economic difference" between the cost of the CalPERS plan and those plans available in the private market. Def.'s Mot. at 11. As the Complaint makes plain, however, Plaintiffs allege a much broader injury: On the basis of sexual orientation, Plaintiffs are unconstitutionally denied the opportunity to purchase coverage through the state's long-term care insurance program that is made available to all other families of state workers. Compl. ¶ 1; *see also id.* ¶ 13; *cf. Strauss v. Horton*, 46 Cal. 4th 364, 411 (2009). When government barriers are erected that offend the Constitution, the fact that private entities may or may not provide comparable benefits does not undo the injury of the exclusion. *In re Golinski*, 587 F.3d 956, 960 (9th Cir. 2009) ("Even if the destination is the same, it's still the back of the bus."). Moreover, Plaintiffs identify significant advantages to the CalPERS program.

      *1.*     <u>*Plaintiffs Have Established Their Intent to Apply for the Long-Term Care Program When They are Deemed Eligible*</u>.

In a constitutional challenge, the intent of the plaintiff is relevant in determining whether he is "ready and able" to apply for the benefit at issue. *See Jacksonville*, 508 U.S. at 666; *Gratz*, 539 U.S. at 261.[14] In *Gratz*, the Court found standing where a student intended to apply to transfer, but had not done so because of the school's policy of taking race into account during its admission process. 539 U.S. at 261. The Complaint similarly establishes Plaintiffs' intent to enroll in the CalPERS Long-Term Care Program. Indeed, Plaintiff Dragovich is already enrolled. He made several attempts to enroll his spouse, Plaintiff Gaitley, but CalPERS refused to furnish an application for that purpose. Compl. ¶¶ 41-42, 46-47; *see also* Decl. of Michael

---

[14] Plaintiffs need not show that they ultimately would have been granted the benefit but for the discriminatory statute. *CC Distrib., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989) (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) and *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)).

Dragovich ¶¶ 3-18 and Exhs. A-B (Dragovich Decl.).[15]   The intent of Plaintiffs Litteral,

Fitzsimmons, Light and Light to enroll in the program when permitted is plain from the

Complaint.  Compl. ¶¶ 44, 45; *see also* Decl. of Patricia Fitzsimmons ¶¶ 1-14 (Fitzsimmons

Decl.); Decl. of Carolyn Light ¶¶ 1-14 (Light Decl.).  Plaintiffs have demonstrated that they are

"ready and able" to apply for enrollment once the unconstitutional barrier is removed.

   2.   <u>Because the Long-Term Care Program Categorically Excludes Same-Sex Spouses
      and Domestic Partners From Enrollment, Plaintiffs Need Not Apply.</u>

Because CalPERS, in reliance on federal law, explicitly excludes as a class same-sex

spouses and domestic partners from enrollment in its long-term care program, Plaintiffs may

demonstrate a cognizable injury in the absence of formal application for enrollment.[16]  For

example, a plaintiff may demonstrate that informal discussions occurred between the agency and

the would-be applicant.[17]  Similarly, the plaintiff may demonstrate that the effect of an

exclusionary policy is to render formal application an exercise in futility.[18]

Here, Plaintiffs Dragovich and Gaitley made repeated requests for an application, were

informed that Plaintiff Gaitley was ineligible to enroll, and were refused an application form.

They received a letter reiterating the exclusionary policy.  Compl. ¶ 47; *see also* Dragovich Decl.

¶¶ 19-20, Exhs. C-D.  Plaintiff couples Litteral and Fitzsimmons and Carolyn and Cheryl Light

are aware that CalPERS deems Plaintiff Fitzsimmons and Plaintiff Cheryl Light ineligible for

---

[15] Plaintiffs may furnish affidavits or other evidence necessary to satisfy their burden of establishing subject matter jurisdiction.  *See Savage v. Glendale Union High Sch. Dist.*, 343 F.3d 1036, 1040 (9th Cir. 2003); *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989); *Assoc. of Amer. Med. Colls. v. United States*, 217 F. 3d 770, 778 (9th Cir. 2000).

[16] *See* Compl. ¶ 47; *see also* Defs. CalPERS' and Stausboll's Answer at 1 (filed July 2, 2010) ("Unfortunately, CalPERS and Stausboll have no choice but to comply with the federal tax laws challenged here.  Enrolling an employee's same-sex spouse or domestic partner would jeopardize the [Program's] status as a qualified 'State long-term care plan' under Internal Revenue Code (IRC) 26 U.S.C. § 7702B(f)(2).").

[17] *United States v. Baugh*, 187 F.3d 1037, 1042 (9th Cir. 1999) (informal negotiations with the Park Service sufficient even though protesters never applied for permit); *see also Ellison v. Connor*, 153 F.3d 247, 255 (5th Cir. 1998) (letter explaining that claimants would not be allowed to build sufficient without permit application); *Gordon v. State Bar*, No. C08-3341 SI, 2008 U.S. Dist. LEXIS 94672 at *8 (N.D. Cal. Nov. 20, 2008) (application unnecessary where representative told applicant via telephone that he was ineligible); *Walsh v. Honolulu*, 460 F. Supp. 2d 1207, 1212-13 (D. Haw. 2006) (application not required where state's website indicated that plaintiff would be ineligible).

[18] *Gordon*, 2008 U.S. Dist. LEXIS 94672 at *8; *see also Ellison*, 153 F.3d at 255.

enrollment.  Compl. ¶ 12; *see also* Fitzsimmons Decl. ¶ 9; Light Decl. ¶¶ 6-8.  Like the plaintiffs in *Walsh v. Honolulu*, 460 F. Supp. 2d 1207, 1213 (D. Haw. 2006), the state's policy of exclusion deterred them from applying.[19]  Plaintiffs' counsel attended a CalPERS Board of Administration Health Benefits Committee Meeting prior to filing this lawsuit, to no effect.  *See* Decl. of Claudia Center  ¶¶ 3, 5, Exhs. A, C (Tr. at 89:22-92:5) (Center Decl.).  Because Plaintiffs' inquiries revealed that they were ineligible for enrollment, a formal application was not required to establish an injury in fact.

In addition, the categorical exclusion of same-sex spouses and domestic partners renders any formal application futile.  *See Taniguchi v. Schultz*, 303 F.3d 950, 957 (9th Cir. 2002) ("We have consistently held that standing does not require exercises in futility.").  For the purposes of standing, futility exists when an "adverse decision by the agency is a certainty" because "the agency lacks, or believes itself to lack jurisdiction, or if an agency has 'articulated a very clear position on the issue which it has demonstrated it would be unwilling to reconsider.'"  *United States v. Dunifer*, 997 F. Supp. 1235, 1240 (N.D. Cal. 1998); *Wang v. Reno*, 81 F.3D 808, 815 (9th Cir. 1996).  Here, CalPERS has taken a position adverse to the Plaintiffs that it will not modify.  *See* Compl. ¶ 47; Answer at 1.[20]  Where an agency is unable or unwilling to exercise its discretion to address the plaintiff's request, the requirement of a formal application serves no purpose.  Therefore, given both the of CalPERS's exclusion of same-sex spouses and domestic partners from the Long-Term Care Program, and CalPERS's inability or unwillingness to modify

---

[19] *See also Walsh*, 460 F. Supp. 2d at 1212 ("[A] class of applicants suffers an injury if they are deterred from applying for a job because the State convinced them it would be futile to do so."); *Breiner v. Nev. Dep't of Corr.*, --- F.3d ----, 2010 WL 2681730 at *2 (9th Cir. July 8, 2010); *Bouman v. Block*, 940 F.2d 1211, 1221 (9th Cir. 1991) ("[A]n application would have been a useless act serving only to confirm a discriminatee's knowledge that the job he wanted was unavailable to him").

[20] Where, as here, there is an explicit policy of exclusion, and the plaintiffs are "ready and able" to apply, their exclusion as a class demonstrates that there is a real conflict between the parties. *Madsen v. Boise State Univ.*, 976 F.2d 1219, 1222 (9th Cir. 1992).  Cases cited by Defendants are not in conflict.  *Compare United States v. Hugs*, 109 F.3d 1375 (9th Cir. 1997) (no standing where agency may have granted the claimant a religious exception had he applied); *Madsen*, 976 F.2d 1219 (no standing where a university did not offer free accessible parking but voluntarily created such parking in response to the plaintiff's complaint); and *Black Faculty Ass'n of Mesa Coll. v. San Diego Cmty. Coll. Dist.*, 664 F.2d 1153 (9th Cir. 1981) (no standing where plaintiff did not apply for a teaching position based on belief of discriminatory practices but no explicit policy of discrimination).

1    its position, Plaintiffs have established standing in the absence of formal application.

2          3.    *Plaintiffs Need Not Demonstrate the Unavailability of Economic Alternatives.*

3          The federal defendants' assertion that the Plaintiffs' harm is self-imposed because the

4    Complaint does not allege the inadequacy of private insurance is unsupported by authority.  *See*

5    Defs.' Mem. at 11.  Defendants rely on materials outside the pleadings to speculate that

6    CalPERS's 2009 premium increase and decision not to establish an open enrollment period for

7    that year suggest that private plans may be more financially viable and procured at a lower cost as

8    compared to the CalPERS program, and are therefore more desirable to plaintiffs.[21]  However,

9    CalPERS' own records and publications, as well as its Answer to Plaintiffs' Complaint,

10   acknowledge the economic and other values of enrollment in the state-run plan.  *See, e.g.,*

11   CalPERS Long Term Care Program Fact Sheet ("Even with the proposed rate increase, the

12   CalPERS Long-Term Care Program compares favorably with two major commercially available

13   plans").[22]  Market comparisons published by CalPERS in 2009 and 2010 rank the CalPERS

14   program as having the lowest available premiums of the plans surveyed.  *See* Center Decl. ¶¶ 4,

15   6, Exhs. B, D.

16          As described in the Statement of Facts, there are significant differences between the

17   CalPERS program and plans available in the private market.  CalPERS's status as a trusted state

18   agency serving 1.6 million California public employees, retirees, and their families, whose

19   primary goal is to ensure its members' needs are served well into retirement, makes CalPERS

20   unique and qualitatively different from private insurers.  The CalPERS Long-Term Care Program

21   also provides benefits to members that are unavailable in the private market.  For example, only

22   the Board of Administration is authorized to raise premiums after assessing and voting on such a

23   ───────────────────
     [21]  Plaintiffs infer that the federal Defendants seek judicial notice of the California Department of

24   Insurance's ("CDI") Long-Term Care Rate and History Guide.  Def.'s Mot. at 11 n.12.  This
     material, however, is not appropriately judicially noticed for the truth of the matters set forth

25   therein.  *See Belodoff v. Netlist, Inc.*, No. SA CV 07-00677 DOC (MLGx), 2008 WL 2356699
     (C.D. Cal. May 30, 2008).  "[D]ocuments [ ] such as analysts reports, may only be

26   considered . . . to establish 'whether and when certain information was provided to the market'
     not the truth of the matter asserted in the reports."  *In re Wet Seal, Inc. Secs. Litig.,* 518 F. Supp.

27   2d 1148, 1157 (C.D. Cal. 2007).  Furthermore, the material contains disputed factual information
     that is not accurately and readily ascertainable.  *See* Fed. R. Evid. 201(b).

28   [22]  *See also* CalPERS LTCP Fact Sheet, supra note 10.

1    measure.[23]  Beneficiaries are provided various premium payment options, including electronic

2    fund transfer or deduction from pension benefits.[24]  The program offers a higher daily benefit

3    amount as compared to most private plans.[25]  All plans offered by CalPERS are tax-qualified and

4    inflation protected.[26]  Indeed, CalPERS' Answer concedes that exclusion from the program

5    occasions a cognizable injury.[27]  As such, the program offers economic and other tangible

6    benefits not privately available, which must be considered as part of the standing inquiry:  "[I]t

7    might be impossible to find an insurance plan on the private market that provides exactly the

8    same benefits . . . [and] the hassle and expense of finding such as plan [must be considered]."  *In*

9    *re Golinski*, 587 F.3d 956, 960 (9th Cir. 2009).

10   **B.     Plaintiffs Satisfy the Remaining Elements of the Standing Inquiry.**

11           Plaintiffs have alleged an injury that is fairly traceable to the challenged action and that is

12   not the result of an independent action of a third party.  *See Allen*, 468 U.S. at 759.  Plaintiffs'

13   harm – their categorical exclusion from enrolling in the CalPERS Long-Term Care Program – is

14   directly traceable to the Internal Revenue Code, as amended by section 3 of the Defense of

15   Marriage Act.  *See* 1 U.S.C. § 7; 26 U.S.C. § 7702B(f)(2).  CalPERS has confirmed that its

16   policy with respect to same-sex spouses is dictated by the federal laws that Plaintiffs challenge.

17   *See* Compl. ¶ 9; Answer at 1.  The legislative history of California Family Code section 297.5(g),

18   which excepts domestic partners from enrollment in the program, makes clear that the California

19   legislature created the exception precisely to conform state law to the challenged federal

20   statutes.[28]

21   ---
     [23] CalPERS LTCP Fact Sheet, supra note 10; *see also* About CalPERS, supra note 12.
     [24] CalPERS State Handbook (2008 ed.), supra note 13.
22   [25] *See* Cal. Dept. of Insur. Policy Comparison Guide, at http://www.insurance.ca.gov/0100-
     consumers/0060-information-guides/0050-health/ltc-rate-history-guide/policy-comparison-
23   forms-long-term.cfm ("CDI Policy Guide"); *see also* CalPERS LTCP Fact Sheet, *supra* note 10.
     [26] CalPERS LTCP Fact Sheet, *supra* note 10.
24   [27] CalPERS states that enrolling same-sex spouses or domestic partners will "risk depriving
     current LTCP members of tax advantages like receipt of tax-free benefits and possible tax
25   deductions for premiums," tax provisions that were "adopted to provide an incentive for
     individuals to take financial responsibility for their long-term care needs."  Answer ¶¶ 1, 8.
26   CalPERS concedes the ongoing nature of the injury to the Plaintiffs, in that "an individual who
     enrolls at a younger age may pay lower premiums."  Answer ¶ 50.
27   [28] *See* Senate Appropriations Committee, Bill Summary, AB 205 (Aug. 21, 2003) ("Author's
     amendments … make a correction to the language to ensure that the bill does not jeopardize the
28

1   The federal Defendants argue that Plaintiffs' injury is traceable instead to CalPERS'

2   decision not to establish an open enrollment period in 2009, and to the Plaintiffs' decision not to

3   purchase coverage in the private market.  As discussed above, *supra* Part I.B.3, the argument that

4   Plaintiffs' injury is a result of their own failure to purchase private insurance misconstrues the

5   broader injury alleged by Plaintiffs.  Similarly, CalPERS's decision not to offer a 2009 open

6   enrollment period does not eliminate the cause of Plaintiffs' injury.  CalPERS admits that it has a

7   statutory obligation to periodically establish open enrollment periods for the LTCP and the Chair

8   of the Health Benefits Committee has signaled its intent to do so in the future.  Answer ¶ 10; *see*

9   *also* Cal. Gov't. Code § 21661(a); Center Decl. ¶ 5, Exh. C (Tr. at 80:24-84:2, 85:7-87:9

10   ("[W]e're trying to . . . make the appropriate decision as to when to reopen enrollment. . . .").

11   Defendants' arguments that Plaintiffs have failed to establish a "a likelihood that the

12   requested relief will redress the alleged injury" are similarly unavailing.  *Steel Co.,* 523 U.S. at

13   103.  Plaintiffs' Complaint establishes that the requested remedies will redress their injury, in

14   that they seek determinations from the Court that both the federal and state Defendants have

15   acted unconstitutionally.  Compl. ¶ 15.  An order striking the federal and state statutes preventing

16   Plaintiffs from enrolling in the program, along with a determination that CalPERS be required to

17   remove the categorical barrier to eligibility for same-sex spouses and domestic partners, fully

18   redresses Plaintiffs' injury.  Defendants again rely on the absence of a 2009 open enrollment

19   period to suggest that redress will not be forthcoming even if the Court orders the requested

20   relief, but the focus on the open enrollment period is misplaced.  CalPERS is statutorily required

21   to establish such periods and CalPERS has also demonstrated alternate methods of processing

22   applications for the LTCP.  *See* Center Decl. ¶ 7, Exh. E.  A determination that 26 U.S.C. §

23   7702B(f), as amended by 1 U.S.C. § 7, is unconstitutional and that CalPERS must open

24   enrollment to same-sex spouses will therefore redress the injury to lawfully married same-sex

25   spouses.  Because California law codifies the exclusion of domestic partners from eligibility for

26

27   tax-qualified status of the long-term care insurance plans provided by the CalPERS Long Term
    Care Program"), at http://www.leginfo.ca.gov/pub/03-04/bill/asm/ab_0201-
28   0250/ab_205_cfa_20030826_153607_sen_comm.html.

Plaintiffs' Opposition to Defendant's Motion to Dismiss
Case No. CV 4:10-01564-CW                                                            Page 14

1    enrollment in the LTC Program in compliance with federal law, a determination that both the

2    federal and state Defendants have acted unconstitutionally will also redress the injury to

3    registered domestic partners, a point the federal Defendants concede.  *See* Defs.' Mem. At 13.

4    **II.    PLAINTIFFS HAVE STATED A CLAIM AGAINST THE FEDERAL
           DEFENDANTS FOR VIOLATION OF THE FIFTH AMENDMENT'S
5           GUARANTEE OF EQUAL PROTECTION.**

6            The guarantee of equal protection found in the Fifth Amendment[29] "'neither knows nor

7    tolerates classes among citizens.'"  *Romer v. Evans*, 517 U.S. 620, 623 (1996) (quoting *Plessy v.*

8    *Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)); *Gill*, 699 F. Supp. 2d at 386

9    (quoting *Romer*).  These words are now understood to state a commitment to neutrality where the

10   rights of persons are at stake.  *Id.*   Equal protection is "essentially a direction that all persons

11   similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S.

12   432, 439 (1985).

13   **A.    Standard of Review For Purposes of This Motion.**

14           It is likely that some form of heightened constitutional scrutiny applies to classifications

15   based upon sexual orientation.[30]  However, the Court need not reach this issue for purposes of

16   this motion, because the Complaint states a claim that the challenged law fails even rational basis

---

17   [29] In *Bolling v. Sharpe*, 347 U.S. 497 (1954), and in other cases, the Supreme Court held that the
18   due process clause of the Fifth Amendment requires that the federal government comply with the
     requirements of equal protection.
19   [30] *See In re Levenson*, 560 F.3d at 1149 ("I believe it likely that some form of heightened
     constitutional scrutiny applies to Levenson's claims."); *Perry v. Schwarzenegger*, __ F. Supp. 2d
20   __, 2010 WL 3025614 at *72 (N.D. Cal., Aug. 4, 2010) ("Although Proposition 8 fails to possess
     even a rational basis, the evidence presented at trial shows that gays and lesbians are the type of
21   minority strict scrutiny was designed to protect. … [S]trict scrutiny is the appropriate standard
     of review to apply to legislative classifications based on sexual orientation."); *Lawrence v Texas*,
22   539 U.S. 558, 580 (2003) (O'Connor, J., concurring) ("When a law exhibits such a desire to
     harm a politically unpopular group, we have applied a more searching form of rational basis
23   review to strike down such laws under the Equal Protection Clause."); *Witt v. Dep't of Air Force*,
     527 F.3d 806, 816-21 (9th Cir.2008) (applying heightened scrutiny on an "as applied" basis to a
24   discharged service member's challenge to the military's "Don't Ask, Don't Tell" policy, holding
     that "[T]he Supreme Court applied a heightened level of scrutiny in *Lawrence*."); *id*. at 823-26
25   (Canby, J., concurring in part and dissenting in part) (arguing that discrimination based on sexual
     orientation is subject to strict scrutiny under equal protection and due process analyses); *but cf.*
26   *High Tech Gays v. Def. Indus. Sec. Clearance Office*, 895 F.2d 563 (9th Cir. 1990) (pre-
     *Lawrence*, pre-*Romer* ruling relying upon *Bowers v. Hardwick* in refusing to apply heightened
27   scrutiny to a claim of discrimination brought by gay and lesbian applicants seeking security
     clearances).  In several cases, advocates have presented evidence in support of the factors
28   supporting heightened or strict scrutiny.

1   review.  The exclusion of same-sex domestic partners and spouses from participation in state-

2   provided long-term care plans – while including every other conceivable family member –

3   advances no legitimate goal.  The exclusion thus contravenes the Fifth Amendment to the

4   Constitution and is unconstitutional.

5   **B.     The Challenged Law Bears No Rational Relationship to Any Legitimate Interest.**

6              Under rational basis review, any government action resting upon a distinction between

7   discrete classes "must be rationally related to a legitimate governmental purpose." *Cleburne*, 473

8   U.S. at 446.  "By requiring that the classification bear a rational relationship to an independent

9   and legitimate legislative end, we ensure that classifications are not drawn for the purpose of

10  disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633.  "[E]ven in the

11  ordinary equal protection case calling for the most deferential of standards, we insist on knowing

12  the relation between the classification adopted and the object to be attained. The search for the

13  link between classification and objective gives substance to the Equal Protection Clause." *Id.* at

14  632; *Perry v. Schwarzenegger*, __ F. Supp. 2d __, 2010 WL 3025614 at *70 (N.D. Cal., Aug. 4,

15  2010) (quoting *Romer*); *Gill*, 699 F. Supp. 2d at 387 (same).  Further, "[t]he State may not rely

16  on a classification whose relationship to an asserted goal is so attenuated as to render the

17  distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446; *Gill*, 699 F. Supp. 2d at

18  388 (quoting *Cleburne*).  In other words, a challenged law can only survive this constitutional

19  inquiry if it is "narrow enough in scope and grounded in a sufficient factual context for the court

20  to ascertain some relation between the classification and the purpose it serves." *Gill*, 699 F.

21  Supp. 2d at 387. Here, as in *Gill*, "there exists no fairly conceivable set of facts that could ground

22  a rational relationship" between a legitimate government interest and the exclusion of same-sex

23  spouses and domestic partners from state-provided long-term care plans.  *See id.*

24  *Congress's Stated Interests in Procreation, Child-Rearing, Traditional Marriage, and*
    *Traditional Morality.*

25              In enacting the DOMA, Congress identified various interests purportedly advanced by its

26  terms: "encouraging responsible procreation and child-rearing," "defending and nurturing the

27  institution of traditional, heterosexual marriage;" "defending traditional notions of morality;" and

28

1    "preserving scarce government resources."  H.R. Rep. No. 104-664, at *12-*18; *see also Gill*,

2    699 F. Supp. 2d at 388.  As to the first interest in "responsible procreation and child-rearing," the

3    federal government has conceded that there is no rational relationship between the DOMA and

4    this interest.[31]  Additionally, procreation has never been a prerequisite for marriage.[32]  Indeed,

5    access to long-term care plans enhances responsible procreation and child-rearing by protecting

6    the children of gay and lesbian couples from the devastating financial and emotional costs of

7    caring for ill or elderly parents.

8            Similarly, Congress's stated interests in "defending traditional marriage" and "defending

9    traditional notions of morality" are not grounded in sufficient factual context for this Court to

10   ascertain some relation between it and the classification challenged here.  Gay people will not be

11   encouraged to enter into marriages with members of the opposite sex by the government's refusal

12   to permit same-sex spouses to participate in state-provided long-term care programs.  Nor will

13   the exclusion discourage same-sex couples from entering into marriages or domestic

14   partnerships; the Plaintiffs here are already married to persons of the same sex.  *Gill*, 699 F.

15   Supp. 2d at 389; *In re Levenson*, 560 F.3d at 1150.  Moreover, there is no basis for asserting that

16   excluding gay and lesbian couples from the benefits afforded other couples will encourage the

17   stability of heterosexual marriage.  *See Gill*, 699 F. Supp. 2d at 389 ("And denying marriage-

18   _____

19   [31] Fed. Defs' Mot. at 19, n.16; *Gill*, 699 F. Supp. 2d at 388 ("[T]he government concedes that
     this objective bears no rational relationship to the operation of DOMA.  Since the enactment of
20   DOMA, a consensus has developed among the medical, psychological, and social welfare
     communities that children raised by gay and lesbian parents are just as likely to be well-adjusted
21   as those raised by heterosexual parents." … [The denial of federal recognition of same-sex
     marriage] does nothing to promote stability in heterosexual parenting.  Rather, it prevents
22   children of same-sex couples from enjoying the immeasurable advantages that flow from the
     assurance of a stable family structure."); *Perry*, 2010 WL 3025614 at *55 ("Children raised by
23   gay or lesbian parents are as likely as children raised by heterosexual parents to be healthy,
     successful and well-adjusted. The research supporting this conclusion is accepted beyond serious
     debate in the field of developmental psychology.")
24   [32] *Perry*, 2010 WL 3025614 at *31 ("California, like every other state, has never required that
     individuals entering a marriage be willing or able to procreate."); *Gill*, 699 F. Supp. 2d at 389
25   (quoting from *Lawrence*, 539 U.S. at 605 (Scalia, J., dissenting)); *Lawrence*, 539 U.S. at 604-05
     (Scalia, J, dissenting) ("If moral disapproval of homosexual conduct is 'no legitimate state
26   interest' for purposes of proscribing that conduct … what justification could there possibly be for
     denying the benefits of marriage to homosexual couples exercising 'the liberty protected by the
27   Constitution'? Surely not the encouragement of procreation, since the sterile and the elderly are
     allowed to marry.").

28

1    based benefits to same-sex spouses certainly bears no reasonable relation to any interest the

2    government might have in making heterosexual marriages more secure."); *Perry*, 2010 WL

3    3025614, at *47 ("Permitting same-sex couples to marry will not affect the number of opposite-

4    sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect

5    the stability of opposite-sex marriages.").

6            In any event, the exclusion defends "traditional notions of morality …  only by punishing

7    same-sex couples who exercise their rights under state law, and thus exhibits the 'bare desire to

8    harm' same-sex couples that is prohibited under *City of Cleburne* and *Romer*."  *In re Levenson*,

9    560 F.3d at 1150; *accord Gill*, 699 F. Supp. 2d at 389 (punishment of same-sex couples to

10   promote heterosexual marriage is impermissible).  Denying same-sex spouses and domestic

11   partners the opportunity to participate in a state-provided long-term care plan "is far too

12   attenuated a means of achieving the objective of 'defending traditional notions of morality,' as it

13   also is with respect to achieving the objective of 'defending and nurturing the institution of

14   traditional, heterosexual marriage.'" *See In re Levenson*, 560 F.3d at 1150; *accord Gill*, 699 F.

15   Supp. 2d at 389-90 ("[T]he fact that the governing majority in a State has traditionally viewed a

16   particular practice as immoral is not a sufficient reason for upholding a law …") (citing *Romer*

17   and *Lawrence*); *Perry*, 2010 WL 3025614 at **73, 77 ("Tradition alone, however, cannot form a

18   rational basis for a law. …  A private moral view that same-sex couples are inferior to opposite-

19   sex couples is not a proper basis for legislation."); *Stanton v. Stanton*, 421 U.S. 7, 14 (1975)

20   (finding a Utah statute defining age of majority as 18 for females and 21 for males violated equal

21   protection, and rejecting state Supreme Court's reliance on traditional gender roles:

22   "Notwithstanding the 'old notions' to which the Utah court referred, we perceive nothing rational

23   in the distinction drawn").

24           <u>*Congress's Stated Interest in Preserving Government Resources*</u>.

25           As to the fourth stated interest in "preserving scarce government resources," the long-

26   term care plan at issue here is funded entirely by participant contributions; no state or federal

27

28

dollars are at issue.[33]  The benefits provided by the tax-protected nature of the plan – made available to an unlimited array of relations other than same-sex partners – are insufficient to justify the discriminatory exclusion.  *In re Levenson*, 560 F.3d at 1150-51 ("[T]hat a government policy incidentally saves the government an insignificant amount of money does not provide a rational basis for that policy if the policy is, as a cost-saving measure, drastically underinclusive, let alone founded upon a prohibited or arbitrary ground.").  Moreover, as the federal defendants underscore, see Fed. Defendants' Mot. at 6, the Internal Revenue Code permits these same tax protections in other long-term care plans available on the private market.  Under these circumstances, the relationship of the exclusion of same-sex domestic partners and spouses from the plan to a stated interest in preserving financial resources is "so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446; *accord Reed v. Reed*, 404 U.S. 71, 76 (1971) (mandatory preference for male estate administrators, purportedly to ease the burden of probate courts, is "very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment").

### *The Federal Defendants' Post-Hoc Interest in Preserving the Status Quo, and Allowing the States to Decide.*

Here, as in *Gill*, the federal defendants do not rely upon any of these stated interests, but instead assert a fifth reason, that of "preserving the status quo of the definition of marriage for purposes of federal law" while "allow[ing] each state to decide the underlying policy question for itself[.]"  Federal Defs.' Mot. at 3; *see also Gill*, 699 F. Supp. 2d at 390; *Perry*, 2010 WL 3025614 at *78 ("While the Equal Protection Clause does not prohibit post-hoc rationales [for purposes of rational basis review], they must connect to the classification drawn.").  As an initial matter, the historic deference of Congress to state family law, including changing state law definitions of marriage, casts doubt upon the legitimacy of the stated interest a uniform, federal definition of marriage (which actually marked a departure from the "status quo").[34]  Moreover,

---

[33] In any event, "a concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources." *Gill*, 699 F. Supp. 2d at 390 (quoting from *Plyler v. Doe*, 457 U.S. 202, 227 (1982)).

[34] Although domestic relations generally, and marriage, specifically, had always decisively been the domain of the states, through DOMA, Congress purported to define familial relationships at

1   "consistency" or preserving the status quo is not an "interest" independent of some legitimate

2   governmental objective that preservation of the status quo might help to achieve.  "Staying the

3   course is not an end in and of itself, but rather a means to an end."  *Gill*, 699 F. Supp. 2d at 393.

4   The sweeping changes rendered by the 1996 Congress are so far removed from the goal of

5   "consistency" that it is impossible to credit this justification as the motivating force for the

6   statute's enactment.  *Id* at 394; *see also Perry*, 2010 WL 3025614 at *74 ("Proposition 8 is thus

7   not rationally related to proponents' purported interests in proceeding with caution when

8   implementing social change.").

9           Important here, the asserted interest in "allowing each state to decide" is not rationally

10  advanced by the exclusion of same-sex spouses and domestic partners from state-provided long-

11  term care plans.  California has had a state law granting rights to same-sex domestic partners

12  since 1999.  In 2004, California enacted legislation that increased the rights, benefits and

13  responsibilities associated with domestic partnership, which became effective in 2005.  Since

14  2008, California has recognized, under its state Constitution, that same-sex couples (whether

15  married or in domestic partnerships) are entitled to the same rights as heterosexual couples.  *In re*

16  *Marriage Cases*, 43 Cal. 4th 757 (2008) (holding that denial of the right to marry to same-sex

17  couples violated the California Constitution); *Strauss v. Horton*, 46 Cal. 4th 364, 411 (2009)

18  (holding that, after Proposition 8, "as a matter of constitutional right," California law continues

19  to accord same-sex couples, whether in legally recognized marriages or domestic partnerships,

20  the same respect and dignity and the same substantive legal rights and attributes as married

21  _____

22  the federal level for the first time and to preclude same-sex couples from accessing any federal
    rights and benefits that might otherwise have been available to them as legally recognized
    spouses.  *See Gill*, 699 F. Supp. 2d at 378 (The House [Judiciary Committee's] Report

23  acknowledged that…'[t]he determination of who may marry in the United States is uniquely a
    function of state law.'  Nonetheless, it asserted that Congress was not 'supportive of (or even

24  indifferent to) the notion of same-sex 'marriage,'' and, therefore, embraced DOMA as a step
    toward furthering Congress's interests in 'defend[ing] the institution of traditional heterosexual

25  marriage.'"), *id.* at 392 ("[T]he passage of DOMA marks the *first* time that the federal
    government has ever attempted to legislatively mandate a uniform federal definition of marriage-

26  or nay other core concept of domestic relations, for that matter.  … "[T]he status quo *at the*
    *federal level* was to recognize, for federal purposes, any marriage declared valid according to

27  state law.  Thus, Congress' enactment of a provision denying federal recognition to a particular
    category of valid state-sanctioned marriages was, in fact, a significant *departure* from the status
    quo at the federal level.").

28

opposite-sex couples).  California legally recognizes the marriages of approximately 18,000 same-sex couples who married in 2008, including the Plaintiffs here.  California may well have marriage equality again.  *See Perry*, 2010 WL 3025614.[35]  Yet under current federal law, California cannot follow its own state Constitution without risking the tax-qualified status of the entire long-term care plan serving more than 160,000 persons.  *See generally, Commonwealth*, 698 F. Supp. 2d at 248-49, 251-53 (reviewing threats to Commonwealth-administered programs caused by federal law prohibiting recognition of marriages between persons of the same sex, and discussing such federal law as imposing an "unconstitutional condition" upon the receipt of federal funds).  Despite the purported interest in "allowing each state to decide," the challenged exclusion prevents the state of California from following its own public policy and constitutional law, which would otherwise mandate the inclusion of same-sex partners and spouses in its long-term care plan.[36]  As in *Commonwealth of Massachusetts v. U.S. Dept. of Health and Human Services*, 698 F. Supp. 2d 234, 236 (D. Mass. 2010), the federal government is forcing the State of California to "engage in invidious discrimination against its own citizens."[37]  Thus, the exclusion severely injures and in no way advances the federalism interest asserted.

---

[35] *See also id.* at *77 ("California may determine whether to retain domestic partnerships or eliminate them in the absence of Proposition 8; the court presumes, however, that as long as Proposition 8 is in effect, domestic partnerships … will remain.").

[36] On May 28, 2010, the U.S. Office of Personnel Management issued a final rule expanding eligibility for coverage under the Federal Long Term Care Insurance Program (FLTCIP) to cover same-sex domestic partners of eligible Federal and U.S. Postal Service employees and annuitants.  75 Fed. Reg. 30267-68 (Jun. 1, 2010).  Thus, the federal government is permitted to make its own decision about including the legally recognized same-sex domestic partners of its employees in its long-term care plan, but nor the state of California.

[37] The important interest of the states in following their own laws was acknowledged in other contexts associated with the statutes here.  In enacting and amending section 7702B, Congress adopted by reference portions of the Model Act promulgated by the National Association of Insurance Commissioners as a minimum floor of protection for consumers, see 26 U.S.C. §§ 7702B(g), 4980C(c), but acknowledged the continued force of state law requirements.  *See* 26 U.S.C. §§ 7702B(g)(5) ("For coordination of the requirements of this subsection with State requirements, see section 4980C(f)"), 4980C(f) ("If a State imposes any requirement which is more stringent than the analogous requirement imposed by this section or section 7702B(g), the requirement imposed by this section or section 7702B(g) shall be treated as met if the more stringent State requirement is met.").  In enacting and amending section 152, Congress deferred to state law in construing the definition of a "member of the taxpayer's household."  *See* 26 U.S.C. § 152(b)(5) (1986) ("An individual is not a member of the taxpayer's household if at any time during the taxable year of the taxpayer the relationship between such individual and the taxpayer is in violation of local law."), 26 U.S.C. § 152(f)(3) (2010) (same).

**C.      The Challenged Law Impermissibly Excludes Same-Sex Spouses and Domestic Partners Based Upon Animus Against Lesbians and Gay Men and their Relationships.**

In enacting and amending section 7702B in 1996, Congress set forth no particular interest in excluding same-sex domestic partners and spouses from state-provided long-term care plans, while including every other conceivable family member.  But in enacting the DOMA during the same Congressional session, which amended section 7702B (along with hundreds of other laws) to exclude same-sex spouses, Congressional leaders expressed deep hostility toward gay people, their relationships, and their families. The exclusion of same-sex domestic partners and spouses from state-provided long-term care plans "cannot be justified as an expression of the government's disapproval of homosexuality, preference for heterosexuality, or desire to discourage gay marriage."  *In re Levenson*, 560 F.3d at 1150; *accord Perry*, 2010 WL 3025614 at *5 ("The state does not have an interest in enforcing private moral or religious beliefs without an accompanying secular purpose.") (citing *Lawrence*), *79 ("Moral disapproval alone is an improper basis on which to deny rights to gay men and lesbians."); *Gill*, 699 F. Supp. 2d at 396 ("animus alone cannot constitute a legitimate government interest"); *Lawrence*, 539 U.S. at 582 (O'Connor, J., concurring) ("Moral disapproval of this group, like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause," citing *Moreno* and *Romer*); *Romer*, 517 U.S. at 633 (legal classifications must not be "drawn for the purpose of disadvantaging the group burdened by the law.").[38]

---

[38] *Accord Cleburne*, 473 U.S. at 446-47 ("[S]ome objectives – such as a bare desire to harm a politically unpopular group – are not legitimate state interests."), 450 ("The short of it is that requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded[.]"), 452 & n.4 (Stevens, J., concurring) ("The term 'rational,' of course, includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class.  …  If the adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality would be suspect."); *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) ("[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."); *Tucson Woman's Clinic v. Eden*, 371 F.3d 1173, 1185-86 (9th Cir. 2004) ("[S]ome laws are so irrational or absurd on their face it is clear they can be motivated by nothing other than animus or prejudice against a group," citing *Romer* and *Cleburne*); *Pruitt v. Cheney*, 963 F.2d 1160, 1165 (9th Cir.1992) (quoting *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.")).

1    As *Romer* makes clear, "the differential treatment of gay people is not, in and of itself, a

2    proper justification for government actions."  *In re Levenson*, 560 F.3d at 1150; *cf. Perry*, 2010

3    WL 3025614 at 122 ("No evidence at trial illuminated distinctions among lesbians, gay men and

4    heterosexuals amounting to "real and undeniable differences" that the government might need to

5    take into account in legislating.").  Here, as in *Romer*, the circumstances underlying the

6    enactment of the exclusion challenged raise "the inevitable inference that the disadvantage

7    imposed [was] born of animosity toward the class of persons affected."  *See Romer*, 517 U.S. at

8    634-36; *see also Lawrence*, 539 U.S. at 571 (the existence of "powerful voices" condemning

9    homosexuality as immoral does not determine the definition of liberty for all).

**III.    PLAINTIFFS HAVE STATED A CLAIM AGAINST THE FEDERAL
DEFENDANTS FOR SELECTIVELY BURDENING PLAINTIFFS' EXERCISE
OF A FUNDAMENTAL RIGHT ON THE BASIS OF SEXUAL ORIENTATION
IN VIOLATION OF THE DUE PROCESS CLAUSE.**

12    The Supreme Court has long recognized that the due process clause embodies substantive

13    rights and liberties.  *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) ("Without a doubt, it

14    denotes . . . the right of the individual to contract, to engage in any of the common occupations of

15    life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship

16    God according to the dictates of his own conscience, and generally to enjoy those privileges long

17    recognized at common law as essential to the orderly pursuit of happiness by free men.").  These

18    rights and liberties include a fundamental interest in independence from undue government

19    influence when making certain highly personal decisions in "matters relating to marriage,

20    procreation, contraception, family relationships, and child rearing and education."  *Whalen v.*

21    *Roe*, 429 U.S. 589, 599-600 & n. 24, n. 26 (1977); *accord Prince v. Massachusetts*, 321 U.S.

22    158, 166 (1944) (The Constitution protects "the private realm of family life which the state

23    cannot enter.").

24    Numerous government intrusions affecting family life, including the right to live together

25    as a family unit, *see Moore v. East Cleveland*, 431 U.S. 494 (1977) (striking down occupancy

26    restrictions and recognizing "larger conception of the family"), and the right to work during

27    pregnancy, *see Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 640 (1974) (striking down

28

1    forced maternity leave), have been held to violate the substantive due process rights enjoyed by

2    all persons.[39]  Here, Congress has chosen to list an array of "acceptable" family members for

3    participation in state-provided long-term care plans – from different-sex spouses, to parents and

4    grandparents, to children and step-children, to aunts and uncles, to in-laws (father-in-law,

5    mother-in-law, sister-in-law, brother-in-law, son-in-law, daughter-in-law), to aunts and uncles, to

6    siblings (including half- and step-siblings) – but has intentionally excluded same-sex spouses and

7    domestic partners.  This unprecedented intrusion into the definition of family burdens families of

8    gay and lesbian couples seeking to exercise their fundamental rights to engage in family decision-

9    making and planning.  By preventing same-sex partners and spouses from participating in a

10   critical government-sponsored tool for family planning, Congress places a selective, and

11   unconstitutional, burden on these families.

12          Despite the Congressional history underscoring the importance of long-term care to

13   families, family planning, and family stability, the federal defendants attempt to recast the

14   Plaintiffs' allegations as describing nothing more than a mere "incidental economic burden."

15   Fed. Defendants' Mot. at 16.  Citing *Regan v. Taxation with Representation of Wash.*, 461 U.S.

16   540, 549 (1983), the federal defendants contend that a legislature need not "subsidize" the

17   exercise of a fundamental right, and that therefore there can be no infringement of the Plaintiffs'

18   constitutional rights here.  Fed. Defendants' Mot. at 16.  But the *Regan* case also holds that

19   "government may not place obstacles in the path of a [person's] exercise" of those rights.  *Id.*

20   Plaintiffs allege that their ability and autonomy to engage in financial and long-term care

21   planning with their lawful spouses and domestic partners is unfairly and selectively constrained

22   by operation of section 7702B(f).  *See* Compl. ¶ 70.  Solely because of their status as same-sex

23   couples, they face a discriminatory barrier placed upon them by the government that prevents

24   them from fully and equally exercising their familiar rights.

25   _____

26   [39] *See Loving v. Virginia*, 388 U.S. 1 (1967) (striking down marriage restrictions); *Griswold v.
     Connecticut*, 381 U.S. 479 (1965) (striking down restrictions on contraceptives); *Carey v.

27   Population Servs. Int'l*, 431 U.S. 678 (1977) (same); *Pierce v. Society of Sisters*, 268 U.S. 510
     (1925) (striking down prohibition on private school attendance); *see also Washington v.

28   Glucksberg*, 521 U.S. 702, 720 (1997) (collecting cases).

Plaintiffs' Opposition to Defendant's Motion to Dismiss
Case No. CV 4:10-01564-CW                                                              Page 24

This kind of sexual orientation-based burdening of fundamental rights and liberties is recognized as impermissible today. *Lawrence*, 539 U.S. at 578 (holding that same-sex couples have the constitutional right to engage in intimate relationships "without the intervention of the government."); *Witt*, 527 F.3d at 816 ("We cannot reconcile what the Supreme Court did in *Lawrence* with the minimal protections afforded by traditional rational basis review."). In *Witt,* the Ninth Circuit made clear that adverse employment actions – such as the refusal to permit same-sex couples to enroll in a state-sponsored LTC Plan – constitute sufficient injury to give rise to an actionable due process claim. *Witt*, 527 F.3d at 812 (concluding that suspension from work resulting in loss of pay and points toward promotion and retirement is sufficient grounds for *Lawrence*-based claim). While such intrusions have often been reviewed under heightened scrutiny, the unnecessary intrusion by the government here into the private family lives of each of the Plaintiffs violates the Constitution under any standard. *See Glucksberg*, 521 U.S. at 728 ("The Constitution also requires, however, that [the challenged law] be rationally related to legitimate government interests."). Here, with no legitimate or rational basis, *see* pages 12 to 19, *supra*, Section 7702B places an impermissible obstacle to the Plaintiffs' ability to access long-term care insurance and thereby ensure family stability throughout the life cycle.

## CONCLUSION

For all of the reasons stated, Section 7702B violates the equal protection and substantive due process guarantees of the Fifth Amendment to the Constitution. The plaintiffs have stated claims for relief, and the federal defendants' motion to dismiss should be rejected.

Dated: August 12, 2010                    Respectfully submitted,

                                          THE LEGAL AID SOCIETY
                                          EMPLOYMENT LAW CENTER


                                          By:    /s/ Claudia Center
                                                 Claudia Center


                                          By:    /s/ Shelley A. Gregory
                                                 Shelley A. Gregory

                                          Attorneys for Plaintiffs