William C. McNeill, III, State Bar No. 64392
Claudia Center, State Bar No. 158255
Elizabeth Kristen, State Bar No. 218227
LEGAL AID SOCIETY-
EMPLOYMENT LAW CENTER
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848
Facsimile:  (415) 864-8199
Email:       wmcneill@las-elc.org
             ccenter@las-elc.org
             ekristen@las-elc.org

Daniel S. Mason, State Bar No. 54065
Patrick Clayton, State Bar No. 240191
Zelle Hofmann Voelbel & Mason LLP
44 Montgomery St Ste 3400
San Francisco, CA 94104
Telephone:  (415) 693-0700
Facsimile:  (415) 693-0770
Email:       pclayton@zelle.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA (OAKLAND DIVISION)

| | |
|---|---|
| MICHAEL DRAGOVICH, MICHAEL GAITLEY, ELIZABETH LITTERAL, PATRICIA FITZSIMMONS, CAROLYN LIGHT, CHERYL LIGHT, DAVID BEERS, CHARLES COLE, RAFAEL V. DOMINGUEZ, and JOSE G. HERMOSILLO, on behalf of themselves and all others similarly situated,<br><br>  Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF THE TREASURY, TIMOTHY GEITHNER, in his official capacity as Secretary of the Treasury, United States Department of the Treasury, INTERNAL REVENUE SERVICE, DOUGLAS SHULMAN, in his official capacity as Commissioner of the Internal Revenue Service, BOARD OF ADMINISTRATION OF CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, and ANNE STAUSBOLL, in her official capacity as Chief Executive Officer, CalPERS,<br><br>  Defendants. | Case No. CV 4:10-01564-CW<br><br>**PLAINTIFFS' OPPOSITION TO THE FEDERAL DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br><br>DATE:  October 27, 2011<br>TIME:  2:00 p.m.<br>PLACE:  Courtroom of the Honorable Claudia Wilkin, U.S. District Court, Northern District of California, 1301 Clay Street, Courtroom 2 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................. 1

STATEMENT OF FACTS ................................................................................... 2

    History of 26 U.S.C. § 7702B(f) ................................................................ 2

    The Reenactment of 26 U.S.C. § 7702B(f) .................................................. 5

ARGUMENT ................................................................................................... 5

    I.   PLAINTIFFS HAVE STATED A CLAIM AGAINST THE FEDERAL DEFENDANTS FOR VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE OF EQUAL PROTECTION. ............................................... 6

        A.  The Classification at Issue Here is Subject to Heightened Scrutiny. ..................... 8

        B.  The Challenged Classification Is Not Neutral. ................................... 10

        C.  Even if Viewed as "Neutral," the Challenged Classification Reflects Invidious Discrimination. ................................................. 18

        D.  Although Heightened Scrutiny Applies Here, The Challenged Law Fails Even Rational Basis Review. ................................................. 19

        E.  The Challenged Law Impermissibly Excludes Legally Recognized Same-Sex-Partners Based Upon Animus Against Lesbians And Gay Men and Their Relationships. ................................ 20

    II.  PLAINTIFFS HAVE STATED A CLAIM AGAINST THE FEDERAL DEFENDANTS FOR SELECTIVELY BURDENING THEIR EXERCISE OF THEIR FUNDAMENTAL RIGHTS TO FAMILY AUTONOMY AND DECISIONMAKING. ……..………………………………..22

CONCLUSION ................................................................................................ 25

1

# TABLE OF AUTHORITIES

2

### Federal Cases

*Aetna Cas. & Sur. Co. v. British Petroleum*, Civ. A. Nos. 90-4595, 90-5003,

    1991 WL 148140 (E.D. La. July 30, 1991)..................................................................5

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..................................................6

*Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) ......................................24

*Califano v. Goldfarb*, 430 U.S. 199 (1977) ........................................................24

*Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977)........................................22

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)............................. passim

*Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632 (1974).........................................22 ,23

*Gill v. Office of Pers. Mgmt.*, 699 F. Supp. 2d 374 (D. Mass. 2010) ..................... passim

*Griswold v. Connecticut,* 381 U.S. 479 (1965)..................................................22

*Hartfield v. Comm'r*, No. 7439-05S,

    2006 WL 1280961 (U.S. Tax Ct. May 11, 2006) .........................................................4

*In re Levenson*, 560 F.3d 1145 (9th Cir. Jud. Council 2009) ...............................9, 20, 21

*Lawrence v Texas*, 539 U.S. 558 (2003)................................................. passim

*Lorillard v. Pons*, 434 U.S. 575 (1978) ...........................................................17

*Loving v. Virginia*, 388 U.S. 1 (1967) ..........................................................10, 22

*Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307 (1976).................................9

*McLaughlin v. State of Fla.*, 379 U.S. 184 (1964).............................................10

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ........................................................22

*Moore v. East Cleveland*, 431 U.S. 494 (1977)................................................22

*Moritz v. Comm'r of Internal Revenue*, 469 F.2d 466 (10th Cir. 1972)..........................24

*Palmore v. Sidoti*, 466 U.S. 429 (1984) ..........................................................21

*Perry v. Schwarzenegger*, 704 F. Supp.2d 921 (N.D. Cal. 2010) ........................ passim

*Perry v. Sindermann,* 408 U.S. 593 (1972), ...................................................23

*Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979) ...................11, 18

*Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) ..............................................22

*Plessy v. Ferguson*, 163 U.S. 537 (1896) .........................................................8

*Prince v. Massachusetts*, 321 U.S. 158 (1944) ...............................................22

*Pruitt v. Cheney*, 963 F.2d 1160 (9th Cir.1992) ..............................................21

*Rasco v. Comm'r*, No. 8935-98,

    1999 WL 311796 (U.S. Tax Ct. May 18, 1999) ...........................................5

*Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983), .........23, 24

*Rogers v. Lodge*, 458 U.S. 613 (1985) .............................................................18

*Romer v. Evans*, 517 U.S. 620 (1996) ....................................................... passim

*Schware v. Bd. of Bar Exam'r of New Mexico*, 353 U.S. 232 (1957) ......................24

*Speiser v. Randall*, 357 U.S. 513 (1958) ..........................................................24

*Tucson Woman's Clinic v. Eden*, 371 F.3d 1173 (9th Cir. 2004) .........................21

*U.S. Department of Agriculture v. Moreno*, 413 U.S. 528 (1973) ........................21

*United States v. Virginia*, 518 U.S. 515 (1996) ...............................................10

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*

    429 U.S. 252 (1977) ..................................................... 11, 12, 18, 19

*Washington v. Davis,* 426 U.S. 229 (1996) ......................................................18

*Washington v. Glucksberg*, 521 U.S. 702 (1997) .........................................22, 25

*Watkins v. U.S. Army*, 875 F.2d 699 (9th Cir. 1989) .........................................9

*Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975)................................................................24

*Whalen v. Roe*, 429 U.S. 589 (1977)..................................................................................22

*Witt v. Dep't of the Air Force*, 527 F.3d 806 (9th Cir. 2008)......................................9, 25

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ........................................................................11

## Federal Statutes

1 U.S.C. § 7 (Defense of Marriage Act) .................................................................. passim

26 U.S.C. § 152(b)(1) .............................................................................................................4

26 USC § 152(d)(2) .........................................................................................................5, 17

26 U.S.C. § 152(f)(4) .............................................................................................................4

26 U.S.C. § 501(c)(3).............................................................................................................23

26 U.S.C. § 7702B(f) ...................................................................................................... passim

26 U.S.C. § 1041....................................................................................................................8

26 U.S.C. § 2056 ...................................................................................................................8

26 U.S.C. §2523.....................................................................................................................8

## Federal Rules

Federal Rule of Civil Procedure 12(b)(6) ............................................................................5

## State Cases

*Arlington County v. White*, 259 Va. 708 (2000) ...............................................................4

*Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993)....................................................................3, 19

## State Constitution and Statutes

Cal. Const. Art. I, § 7.5 ........................................................................................................12

Cal. Fam. Code § 297(b)(5) ...............................................................................................12

Cal. Fam. Code § 308.5 .................................................................................12

**Legislative History**

138 Cong. Rec. 1712-01 (1992).......................................................................14

138 Cong. Rec. 2950-04 (1992).......................................................................14

138 Cong. Rec. 6120-02 (1992).......................................................................14

138 Cong. Rec. 9356-03 (1992).......................................................................15

138 Cong. Rec. 9401-02 (1992).......................................................................11

138 Cong. Rec. 10,876-01 (1992)..............................................................13, 15

139 Cong. Rec. 4353-01 (1993).......................................................................15

139 Cong. Rec. 9501-01 (1993)..............................................................13, 16

140 Cong. Rec. 5589-02 (1994).......................................................................16

141 Cong. Rec. 11,627-02 (1995)....................................................................16

142 Cong. Rec. 735-01 (1996).........................................................................13

142 Cong. Rec. 3578-01 (1996)..........................................................................3

142 Cong. Rec. 4851-02 (1996).......................................................................14

142 Cong. Rec. 7270-04 (1996).......................................................................19

142 Cong. Rec. 7480-05 (1996)..............................................................13, 19

142 Cong. Rec. 10,067-01 (1996)....................................................................19

142 Cong. Rec. 10,100-02 (1996)....................................................................13

142 Cong. Rec. 3578-01 (1996)..........................................................................3

144 Cong. Rec. 731-02 (1998).........................................................................17

144 Cong. Rec. 1959-02 (1998).......................................................................17

144 Cong. Rec. 6577-02 (1998).......................................................................16

144 Cong. Rec. 7335-03 (1998)........................................................................16

144 Cong. Rec. 7381-02 (1998)........................................................................16

144 Cong. Rec. 9597-03 (1998)........................................................................16

A.B. 2810 (1993) ..............................................................................................13

A.B. 627 (1995) ................................................................................................13

District of Columbia Appropriations Act, 1993, Pub. L. No. 102-382,

    106 Stat. 1422 (1992)................................................................................14

District of Columbia Appropriations Act, 2002, Pub. L. No. 107-96,

    115 Stat. 923 (2001)..................................................................................16

Exec. Order No. 10,450, 18 Fed. Reg. 2489 (Apr. 29, 1953) .........................18

H.R. Rep. 107-321 (2001) ...............................................................................16

H.R. Rep. No. 102-1097 (1992)........................................................................14

H.R. Rep. No. 104-664 (1996)..........................................................................19

Joint Committee on Taxation, *Description of Federal Tax Rules and Legislative*

    *Background Relating to Long-Term Care Scheduled for a Public Hearing Before the*

    *Senate Committee on Finance on March 27, 2001*, 2001 WL 36044116 (I.R.S.).........3

Stats. 1999, ch. 588 (A.B. 26)..........................................................................12

Stats. 2001, ch. 893 (A.B. 25)..........................................................................12

Stats. 2003, ch. 421 (A.B. 205).........................................................................12

**Other Authorities**

Badgett, M. V. Lee, Unequal Taxes on Equal Benefits:  *The Taxation of Domestic*

    *Partner Benefits* (Ctr. for Am. Progress and the Williams Inst.), Dec. 2007 ...............7

Cain, Patricia A., *Litigating for Lesbian and Gay Rights: A Legal History,*

    79 Va. L. Rev. 1551 (1993) ....................................................................18

*D.C. Budget Passes In House By 2 Votes* (The Washington Post, July 1, 1993) ............16

*DC Domestic Partners Legislation Struck Down by Senate* (A.P., July 27, 1993) .........16

Department of the Treasury, Internal Revenue Service, Publication 555, Community

    Property (Rev. Dec. 2010) .........................................................................7, 8

Gates, Gary J., et al., *Marriage, Registration and Dissolution by Same-Sex Couples In*

    *The U.S.* (The Williams Institute, 2008) ...................................................12

GAO, GAO-04-353R, Report on DOMA to the United States Senate (Jan. 23, 2004).....7

Hope, Heather Ann *,Rep. Holloway Opposes Health Care Act,*

    States News Service, June 4, 1992 .............................................................14

Infanti, Anthony C., Deconstructing the Duty to the Tax System:

    Unfettering Zealous Advocacy on Behalf of Lesbian and Gay Taxpayers,

    61 Tax Law. 407 (Winter 2008) ...............................................................6

McCraw, Vincent & Clardy, Jim, Congress, *Crime Dim Luster of Kelly's first year,*

    Washington Times, Oct. 5, 1992, at B1......................................................15

National Taxpayer Advocate's 2010 Annual Report to Congress,

    Taxpayer Rights Issues, *State Domestic Partnership Laws Present Unanswered*

    *Federal Tax Questions* ..............................................................................8

NCLR, Summary of State Laws Regarding Same-Sex Couples.....................................17

Office of the Gen. Counsel, U.S. Gen. Accounting Office (GAO), GAO/OGC-97-16,

    Report on DOMA to the House Judiciary Committee (Jan. 31, 1997).........................7

Private Ltr. Ruling (PLR) Number 201021048 (May 28, 2010).......................................8

Wolberg, Alan, Morgan Stanley Smith Barney, *New IRS Private Letter Ruling:*

*Implications for Registered Domestic Partners* (Apr. 2011)........................................8

**INTRODUCTION**

Plaintiffs challenge the constitutionality of 26 U.S.C. § 7702B(f), a portion of the federal tax code enacted in 1996, amended by the Defense of Marriage Act (DOMA), and reenacted in 2004.  With no permissible rationale, this law excludes the legally recognized domestic partners and spouses of gay and lesbian public employees from participation in state-provided long-term care plans, plans which provide benefits and security critical to the physical and financial wellness of families.  Because this exclusion is rooted in animosity toward gays and lesbians, and their relationships and families, and bears no rational relationship to any legitimate governmental interest, it cannot pass constitutional muster.

This Court has already determined that the married Plaintiffs – those who were married during the 2008 marriage equality "window" in California – have stated claims against the federal defendants for violations of the constitutional guarantees of equal protection and due process.  The same analysis and conclusions apply to the claims brought by Plaintiffs Rafael V. Dominguez and Jose G. Hermosillo, two men who are registered domestic partners, on behalf of themselves and others similarly situated.  Under California law, domestic partnership is the only legal relationship status currently available to gay and lesbian couples.  With the exception of four months and 19 days in 2008, this has been the case since the first domestic partnership registry was made available in California in 2000.  Same-sex domestic partners in California are afforded all of the rights and privileges of married persons, other than access to the important institution of marriage.  As such, they are legal "spouses," but are excluded by the DOMA's definition of "spouse" in an equal fashion as are the gay and lesbian Plaintiffs who were married.

Moreover, as with gay and lesbian couples who are married, the federal government has repeatedly excluded domestic partners from the benefits afforded to heterosexual married couples – including a plethora of tax benefits such as the one at issue here.  Throughout, and on the basis of express and virulent animosity, Congress has considered and rejected any legal recognition or acknowledgement of committed gay and lesbian relationships, whether the status at issue has been marriage or domestic partnership.

Because the challenged exclusion is unfair, irrational and tainted by impermissible animus, Plaintiffs Dominguez and Hermosillo have stated the same viable claims as have the other Plaintiffs.  The federal defendants' third motion to dismiss should be denied.

## STATEMENT OF FACTS

Plaintiffs are employees of the State of California and their partners who are in long-term committed relationships legally recognized under California law as marriages and domestic partnerships.  As state employees and as members of the California Public Employees' Retirement System ("CalPERS"), Plaintiffs Michael Dragovich, Elizabeth Litteral, Carolyn Light, Dominguez, and David Beers ("Plaintiff employees") are eligible to apply to join the CalPERS Long Term Care ("LTC") Program.  Under California and federal law, members of the Plaintiff employees' extended families are also eligible to apply to the CalPERS LTC Program – but their legally recognized partners of the same sex, Plaintiffs Michael Gaitley, Patricia Fitzsimmons, Cheryl Light, Hermosillo, and Charles Cole ("Plaintiff partners") are not. Plaintiffs argue that the federal defendants' exclusion of legally recognized same-sex partners from the CalPERS LTC Program – while permitting virtually any other family member to participate – unconstitutionally discriminates against lesbians and gay men, and their families, by denying them the opportunity to plan for long-term care needs afforded to identically situated families of heterosexual couples.

**History of 26 U.S.C. § 7702B(f).**[1]

Recognizing the importance of long-term care insurance in protecting families, the federal government in 1996 adopted certain minimum standards for policies, including important tax

---

[1] Plaintiffs have previously articulated the importance of long-term care insurance, and have explained that it is a critical benefit for individuals, couples, and families – regardless of sexual orientation – to enhance financial security, and to ensure access to appropriate care throughout the life cycle.  (Pls.' Opp'n to the Fed. Defs.' [1st] Mot. to Dismiss, Docket No. 43, at 2.)  Plaintiffs have previously described the parameters of the CalPERS plan and its characteristics.  (*Id.* at 6-7.) Plaintiffs and a putative class member have articulated why they seek to participate in the CalPERS plan as opposed to other plans.  (*See* Decls. of Patricia Fitzsimmons, Charles Cole, Leslie Cooley, and Michael Dragovich, in Supp. of Pls.' Mot. for Class Certification, Docket No. 70.)  For the reasons stated in the Plaintiffs' first opposition, and in the previously filed declarations of the named plaintiffs, the CalPERS Long-Term Care Program affords public employees and their families unique benefits, opportunities, and conveniences.

1    advantages. "The legislation . . . provides tax deductibility for long term care and insurance,

2    making it possible for more Americans to avoid financial difficulty as the result of chronic

3    illness." 142 Cong. Rec. 3578-01, at 3608 (1996), 1996 WL 185495, at *S3608 (statement of

4    Sen. John McCain); *see also* Joint Committee on Taxation, *Description of Federal Tax Rules*

5    *and Legislative Background Relating to Long-Term Care Scheduled for a Public Hearing Before*

6    *the Senate Committee on Finance on March 27, 2001*, 2001 WL 36044116 at *7 (I.R.S.)

7    (provisions were adopted "to provide an incentive for individuals to take financial responsibility

8    for their long-term care needs."). Included in the legislation is 26 U.S.C. § 7702B(f), the

9    provision challenged herein, which enables states to offer tax-shielded ("qualified") long term

10   care insurance programs to public employees and their families. Section 7702B(f), as amended

11   by DOMA, permits states to offer public employees a "qualified," tax-shielded, long-term care

12   insurance plan that allows an employee to enroll himself or herself, as well as all conceivable

13   family members, *except* legally recognized partners who are the same sex as the employee.

14           Section 7702B(f) was enacted and first amended against a background of considerable

15   congressional debate and agitation about the prospect of state and local governments recognizing

16   the legal validity of the relationships of lesbians and gay men. The 1996 legislative session

17   explicitly considered and reacted to *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993), a 1993 decision

18   by the Hawaii Supreme Court indicating that lesbian and gay couples might be entitled to marry

19   under the Hawaii state constitution. *See Gill v. Office of Pers. Mgmt.*, 699 F. Supp. 2d 374, 377

20   (D. Mass. 2010) ("In large part, the enactment of DOMA can be understood as a direct legislative

21   response to *Baehr v. Lewin*."); *id.* at 377-78 ("The House Judiciary Committee's Report on

22   DOMA (the 'House Report') referenced the *Baehr* decision as the beginning of an 'orchestrated

23   legal assault being waged against traditional heterosexual marriage,' and expressed concern that

24   this development 'threaten[ed] to have very real consequences... on federal law.' Specifically, the

25   Report warned that 'a redefinition of marriage in Hawaii to include homosexual couples could

26   make such couples eligible for a whole range of federal rights and benefits.'"). Along with the

27   *Baehr* case, the 1996 Congressional debate occurred in the context of emerging legislative

28

models for the legal recognition of such couples on the state and local levels.  As reported to Congress, numerous local municipalities had begun to establish domestic partnership registries as a tool for granting lesbian and gay couples some of the legal rights and benefits historically afforded married couples.  The 1993 Congress amended the Family and Medical Leave Act to exclude use of the leave entitlement to care for same-sex domestic partners. As well, the District of Columbia adopted such a registry in 1992, which became a topic of intense debate by Congress throughout the annual appropriations process.  *See infra.*

At issue in this case, the 1996 Congress excluded legally recognized same-sex partners from eligibility for state-sponsored public employee long-term care plans.  In enacting section 7702B(f) at that time, Congress permitted the participation of "employees and former employees," "the spouses of such employees," and "individuals bearing a relationship described in paragraphs (1) through (8) of section 152(a)."  26 U.S.C. § 7702B(f)(2)(C) (1996).  In choosing to incorporate these particular subsections of section 152(a), Congress permitted the participation of "an array of relatives," *see* Fed. Defs.' Not. of Motion and Mot. to Dismiss 2d Am. Compl. (hereinafter Fed. Defs.' Mot.), Doc. No. 97, at 1-2, and specifically sons, daughters, stepsons, stepdaughters, grandchildren, sisters and brothers (defined to include half-siblings[2]), stepsisters, stepbrothers, fathers, mothers, stepfathers, stepmothers, grandparents, nieces, nephews, aunts, uncles, sons-in-law, daughters-in-law, fathers-in-law, mothers-in-law, brothers-in-law, and sisters-in-law.

However, Congress declined to include domestic partners such as Plaintiffs Dominguez and Hermosillo.  First, Congress did not include any category that explicitly reached legally recognized same-sex partners.  Second, Congress excluded a single subsection, subsection (9), describing "an individual … who, for the taxable year of the taxpayer, has as his principal place of abode the home of the taxpayer and is a member of the taxpayer's household."  Subsection (9) would have permitted the enrollment of domestic partners.[3]  Third, through the DOMA,

---

[2] 26 U.S.C. § 152(b)(1) (1996); 26 U.S.C. § 152(f)(4) (2010).
[3] *See Arlington County v. White*, 259 Va. 708, 716 (2000) (Kinser, J., concurring) ("[A]n individual satisfying Arlington County's definition of 'domestic partner' could also qualify as a 'dependent' under 26 U.S.C. § 152(a)(9)."); *see also Hartfield v. Comm'r*, No. 7439-05S, 2006 WL 1280961

Congress limited the eligible "spouses" to different-sex spouses, thereby foreclosing couples such as Plaintiffs Dominguez and Hermosillo– registered in a state that accords domestic partners all of the rights and privileges of marriage – from asserting that they are legal spouses.

In excluding same-sex partners from the laundry list of permitted relations in section 7702B(f), Congress failed to identify any legitimate, rational, or important purpose that would be served. The only interest ever expressed regarding the legal recognition of same-sex relationships has been "the one purpose that lies entirely outside of legislative bounds, to disadvantage a group of which [Congress] disapproves." *Gill*, 699 F. Supp. 2d at 396.

**The Reenactment of 26 U.S.C. § 7702B(f).**

Section 7702B(f) was reenacted in 2004, again excluding gay and lesbian partners by adopting subparagraphs (A) through (G) of section 152(d)(2), as amended, but excluding subparagraph (H). By 2004, the existence of legal relationship recognition for gay and lesbian couples at the state level was well established. For example, California, New Jersey, Washington, and Maine had enacted domestic partnership legislation, Vermont created civil unions, Hawaii established reciprocal benefits for gay and lesbian couples, and in Massachusetts gay and lesbian couples were permitted to legally marry. Additionally, municipalities across the country in states without state-wide relationship recognition for gay and lesbian couples continued to adopt their own ordinances. However, Congress, in again excluding legally recognized gay and lesbian couples from this benefit, failed to offer any legitimate government rationale for doing so.

## ARGUMENT

Defendants move to dismiss Plaintiffs' Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). In denying the federal defendants' first motion to dismiss, this Court noted that dismissal under 12(b)(6) is appropriate "only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests."

---

(T.C. May 11, 2006); *Rasco v. Comm'r*, No. 8935-98, 1999 WL 311796 (T.C. May 18, 1999); *Aetna Cas. & Sur. Co. v. British Petroleum*, Civ. A. Nos. 90-4595, 90-5003, 1991 WL 148140 (E.D. La. July 30, 1991). Through 2004, the provision was found at section 152(a)(9); it is now found at section 152(d)(2)(H).

(Docket No. 56 at 12 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).)[4]  Here, the federal defendants are well-aware of the factual and legal basis for plaintiffs' claims.  Plaintiffs' claims are legally cognizable based on precedent establishing that legislative classifications based on sexual orientation may be found to violate the constitutional guarantees of equal protection and due process.

### I.   PLAINTIFFS HAVE STATED A CLAIM AGAINST THE FEDERAL DEFENDANTS FOR VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE OF EQUAL PROTECTION.

Gay and lesbian Americans, and their families, are a discrete and insular minority that has been subjected to a history of purposeful unequal treatment.[5]  This history of purposeful exclusion is fully evident in myriad provisions of the federal tax code.  Its provisions reflect "the largely unstated assumption that heterosexuality is the essential and elemental ordering principal of society."  Anthony C. Infanti, *Deconstructing the Duty to the Tax System: Unfettering Zealous Advocacy on Behalf of Lesbian and Gay Taxpayers*, 61 Tax Law. 407, 413 (Winter 2008).  As a result, "lesbians and gay men do not experience the tax system in the same way that heterosexuals do.  In contrast to heterosexuals, lesbians and gay men are in the unique position of being the only group that is the object of both overt and covert invidious discrimination in the application of the tax laws."  *Id.* at 412.

The tax code's explicit discrimination against gay and lesbian couples was accelerated by the 1996 enactment of the "Defense of Marriage Act."  In addition to branding the relationships and families of gays and lesbians as inferior to those of straight couples, the DOMA amended more than 1,000 federal laws, including at least 179 provisions in the federal tax code:

> The distinction between married and unmarried status is pervasive in federal tax law; this is one of the largest categories, with 179 provisions…[W]e identified 59 provisions in income tax law under which tax liability depends in part on whether a taxpayer is married or single….Marital status also plays a key role in the estate and gift tax laws and in the

---

[4] This Court also denied defendants' motion to dismiss Plaintiff's First Amended Complaint.  Docket No. 92.

[5] *See, e.g, Perry v. Schwarzenegger*, 704 F. Supp.2d 921, 981-85 (N.D. Cal. 2010 (reviewing evidence of history of discrimination against gays and lesbians); Expert Affidavit of George Chauncey, Ph.D (Nov. 16, 2009), at ¶ 76, filed in *Gill v. Office of Pers. Mgmt.*, No. 1:09-cv-10309 (D. Mass.) ("It is my professional opinion that the historical record outlined above demonstrates that gay people have been subject to widespread and significant discrimination and hostility.").

part of the tax code dealing with taxation on the sale of property.…  These provisions permit married couples to transfer substantial sums to one another, and to third parties, without tax liability in circumstances in which single people would not enjoy the same privilege.

Office of the Gen. Counsel, U.S. Gen. Accounting Office (GAO), GAO/OGC-97-16, Report on DOMA to the House Judiciary Committee (Jan. 31, 1997), at Enclosure I, pp. 3-4, *available at* http://www.gao.gov/archive/1997/og97016.pdf ; *see also id.* at Enclosure II, pp. 10-18 (listing affected tax code provisions in table format, including provisions challenged herein); GAO, GAO-04-353R, Report on DOMA to the United States Senate (Jan. 23, 2004), at pp. 5-6 (Appendix 1, listing statutes), 16 (Appendix 4:  "While the distinction between married and unmarried status is pervasive in federal tax law, terms such as 'husband,' 'wife,' or 'married' are not defined.  However, marital status figures in federal tax law in provisions as basic as those giving married taxpayers the option to file joint or separate income tax returns.  It is also seen in the related provisions prescribing different tax consequences, depending on whether a taxpayer is married filing jointly, married filing separately, unmarried but the head of a household, or unmarried and not the head of a household."), *at* http://www.gao.gov/new.items/d04353r.pdf.

At the same time, several states including California have established legal status for same-sex relationships that entail all of the rights and obligations of marriage.  Same-sex couples who marry or enter into a domestic partnership in California are therefore treated the same as married different-sex couples for state tax purposes, but as "single" strangers for federal tax purposes.[6]  Gay and lesbian couples in relationships legally recognized under California law must pay federal income tax on marital and domestic partner benefits like health insurance, and cannot use pre-tax dollars to pay for a partner's benefits.  M. V. Lee Badgett, *Unequal Taxes on Equal Benefits:  The Taxation of Domestic Partner Benefits* (Ctr. for Am. Progress and the Williams Inst.), Dec. 2007, at 1, 7 ("[E]ven when partners are covered, the partner's coverage is taxed as income to the employee. …  [T]he total tax disadvantage is on average $1,069, or 11 percent of taxes paid by the typical single taxpayer."), *available at*

---

[6] *See* Department of the Treasury, Internal Revenue Service, Publication 555, Community Property (Rev. Dec. 2010), at http://www.irs.gov/pub/irs-pdf/p555.pdf ("RDPs (and individuals in California who are married to an individual of the same sex) are not married for federal tax purposes. They can use only the single filing status, or if they qualify, the head of household filing status.").

http://www.americanprogress.org/issues/2007/12/pdf/domestic_partners.pdf.  As well, same-sex couples in California cannot claim the benefit of provisions which allow spouses to transfer property within the couple tax-free.  *See* 26 U.S.C. §§ 1041, 2056, 2523.[7]  Moreover, in many contexts, the application of tax rules to gays and lesbians and their families has remained totally unclear, reflecting covert discrimination and disregard toward gays and lesbians.[8]

It is within this social, historical, and legal context of purposeful discrimination that the plaintiffs here – entitled to equal treatment as legally recognized couples under the California state constitution – bring their claim to strike down the arbitrary federal tax law provision that with no legitimate rationale prevents them from participating equally in an important, privately funded benefits program offered and mandated by state law.

A.    <u>The Classification at Issue Here is Subject to Heightened Scrutiny.</u>

The guarantee of equal protection found in the Fifth Amendment "'neither knows nor tolerates classes among citizens.'"  *Romer v. Evans*, 517 U.S. 620, 623 (1996) (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)); *Gill*, 699 F. Supp. 2d at 386 (quoting *Romer*).  "No single talisman can define those groups likely to be the target of classifications offensive to the [Constitution] and therefore warranting heightened or strict scrutiny; experience, not abstract logic, must be the primary guide."  *City of Cleburne v.*

---

[7] Because transactions within a same-sex couple are not disregarded for federal tax purposes, a same-sex couple must annually calculate and document their respective contributions to the economic pool and determine the amount, if any, of the net transfer from the higher-earning partner to the lower-earning partner that results from differing contributions to the pool (the net interspousal transfer).  In practice, this task is difficult, if not impossible, for same-sex couples to accomplish.  In 2011, this result was only partially remedied by new IRS rules permitting gay couples to "split" their income in three community property states, including California.  *See* Dep't of the Treasury, Internal Revenue Serv., Publication 555, Community Property (Rev. Dec. 2010), available at http://www.irs.gov/pub/irs-pdf/p555.pdf; *accord* Private Ltr. Ruling (PLR) Number 201021048 (May 28, 2010), available at http://www.irs.gov/pub/irs-wd/1021048.pdf; *see also* Alan Wolberg, Morgan Stanley Smith Barney, New IRS Private Letter Ruling:  Implications for Registered Domestic Partners (Apr. 2011), available at http://fa.smithbarney.com/public/projectfiles/c6727515-3af1-489e-a0ca-4b673ffcfeb0.pdf.

[8] *See* National Taxpayer Advocate's 2010 Annual Report to Congress, Taxpayer Rights Issues, "State Domestic Partnership Laws Present Unanswered Federal Tax Questions," at http://www.taxpayeradvocate.irs.gov/files/VOL%201_MSP%206_15_TaxpayerRights.pdf ("The IRS has not provided answers to these questions, requiring many taxpayers to file returns without knowing which rules apply and potentially subjecting them to audits and penalties, as well as costs for tax advice.").

*Cleburne Living Ctr.*, 473 U.S. 432, 472 n.24 (1985).  Key factors are a history of discrimination, and that the status shared by the group bears little relation to an individual's ability to contribute to society.  Additional relevant factors include being a minority and/or being relatively politically powerless, and whether the status shared by the group is immutable.  *Id.* at 441-42; *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313-14 (1976).

Plaintiffs here will present evidence showing that each of these factors counsels in favor of viewing sexual orientation as a suspect or quasi-suspect class.  *See, e.g.*, *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 943, 967, 981, 986 (N.D. Cal. 2010) (fact 74:  "Gays and lesbians have been victims of a long history of discrimination."; fact 75:  "Public and private discrimination against gays and lesbians occurs in California and in the United States."; fact 78: "Stereotypes and misinformation have resulted in social and legal disadvantages for gays and lesbians."; expert testified that "(1) gays and lesbians do not possess a meaningful degree of political power; [and] (2) gays and lesbians possess less power than groups granted judicial protection."; fact 47.b:  "Attorney General admits that sexual orientation bears no relation to a person's ability to perform in or contribute to society."; *see also* fact 47.f.); *Watkins v. U.S. Army*, 875 F.2d 699, 726 (9th Cir. 1989) (Norris, J. concurring in the judgment) ("scientific research indicates that we have little control over our sexual orientation and that, once acquired, our sexual orientation is largely impervious to change.").  Additional legal authority supports the proposition that classifications based upon sexual orientation should be subject to heightened constitutional scrutiny.[9]  The federal defendants agree.  Letter from Attorney General Holder, February 23, 2011, Docket No. 64-2 at 2-3.

---

[9] *See In re Levenson*, 560 F.3d 1145, 1149 (9th Cir. Jud. Council 2009) ("I believe it likely that some form of heightened constitutional scrutiny applies to Levenson's claims."); *Perry*, 704 F. Supp. 2d at 997 ("Although Proposition 8 fails to possess even a rational basis, the evidence presented at trial shows that gays and lesbians are the type of minority strict scrutiny was designed to protect. … [S]trict scrutiny is the appropriate standard of review to apply to legislative classifications based on sexual orientation."); *cf. Witt v. Dep't of the Air Force*, 527 F.3d 806, 816-21 (9th Cir. 2008) (applying heightened scrutiny on an "as applied" basis to a discharged service member's challenge to the military's "Don't Ask, Don't Tell" policy, holding that "[T]he Supreme Court applied a heightened level of scrutiny in Lawrence."); *id.* at 823-26 (Canby, J., concurring in part and dissenting in part) (arguing that discrimination based on sexual orientation is subject to strict scrutiny under equal protection and due process analyses).

The exclusion challenged here also classifies on the basis of sex, and is subject to heightened scrutiny on that basis.  If either plaintiff Dominguez or Hermosillo were female instead of male, the law would permit them to marry and enroll their spouse in the CalPERS LTC plan.  The same is true for the married Plaintiffs – if either member of each couple were a different sex, the couple would be included.  The equal protection clause prohibits such sex-based classifications unless they are "substantially related" to an "important" government interest.  *United States v. Virginia*, 518 U.S. 515, 533 (1996).  "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* at 533.  Defendants may argue that this classification does not treat men and women differently – all are prohibited from enrolling their same-sex partner in the LTC plan.  However, the U.S. Supreme Court rejected a similar argument in *Loving v. Virginia*, 388 U.S. 1 (1967).[10]  Similarly here, the challenged tax provision treats couples differently based on the sex of their partner.

Even if this Court determines that heightened scrutiny does not apply, the Complaint states a claim that the challenged law fails even rational basis review.  *Romer*, 517 U.S. at 634-35.  The exclusion of legally recognized same-sex partners from participation in state-provided long-term care plans – while including every other conceivable family member – advances no legitimate goal.  The exclusion of _only_ same-sex partners, together with a legislative record replete with venomous and vicious anti-gay remarks, demonstrates that the provision rests upon animus against lesbians and gays and thus is unconstitutional.  *See* Docket No. 56 at 24-25 (finding that moral condemnation of homosexuality is not a legitimate Constitutional basis for the DOMA).

**B.**     **The Challenged Classification Is Not Neutral.**

Plaintiffs challenge 26 U.S.C. § 7702B(f) as applied to their family and others similarly situated – that is, same-sex couples in registered domestic partnerships recognized by the State of

---

[10] The state defended its anti-miscegenation law arguing that it equally prohibited "both the white and Negro participants in an interracial marriage." *Loving*, 388 U.S. at 8.  However, the Court found that mere "equal application" did not "immunize the statute from the very heavy burden of justification which the [Constitution] has traditionally required of state statutes drawn according to race." *Id*. at 9; *see also McLaughlin v. State of Fla.*, 379 U.S. 184, 187 (1964) (striking down statute prohibiting cohabitation by interracial unmarried couple on equal protection grounds).

1    California who seek equal access to the CalPERS long-term care program.  The federal

2    defendants argue that the exclusion of registered domestic partners from the laundry list of

3    permitted relations is not a classification based on sex or sexual orientation, or based upon

4    protected family choices, because straight, opposite-sex couples can be registered domestic

5    partners.  (Fed. Def.'s Mot. at 13-14.)  Under these circumstances, the first question is whether

6    the statutory classification is indeed neutral, or is overtly or covertly discriminatory.  *See*

7    *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 274 (1979) ("When a statute gender-

8    neutral on its face is challenged on the ground that its effects upon women are disproportionably

9    adverse, a twofold inquiry is thus appropriate. The first question is whether the statutory

10   classification is indeed neutral in the sense that it is not gender-based."); *Village of Arlington*

11   *Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 266 (1977) ("Sometimes a clear pattern,

12   unexplainable on grounds other than race, emerges from the effect of the state action even when

13   the governing legislation appears neutral on its face.") (citing *Yick Wo v. Hopkins*, 118 U.S. 356

14   (1886)); *Yick Wo*, 118 U.S. at 374 ("[T]he conclusion cannot be resisted that no reason for it

15   exists except hostility to the race and nationality to which the petitioners belong.").

16          Here, the exclusion of domestic partners is a proxy for the exclusion of gay and lesbian

17   partners, such that the challenged statute cannot be considered "neutral."  With respect to

18   California's domestic partnership law, registered same-sex couples are entitled to all of the

19   rights, privileges, and obligations of marriage.  But for the DOMA's restrictive and

20   discriminatory definition of "spouse," Plaintiffs Dominguez and Hermosillo could be deemed

21   "spouses" for purposes of section 7702B(f)(2)(C)(iii).  Moreover, there can be no serious debate

22   that a primary motivating force behind the establishment and maintenance of domestic

23   partnership laws in California and elsewhere is the exclusion of gay and lesbian couples from the

24   legal status of marriage.[11]  In California, with the exception of couples in which one partner is

---

[11]  *Cf. Perry*, 704 F. Supp. 2d at 1001 ("California may determine whether to retain domestic
partnerships or eliminate them in the absence of Proposition 8; the court presumes, however, that as
long as Proposition 8 is in effect, domestic partnerships and the accompanying administrative burden
will remain.");138 Cong. Rec. 9401-02, at 9409 (1992), 1992 WL 237539, at *H9409 (statement of
Representative Barney Frank during House floor debates regarding D.C. domestic partner registry:
"The question was whether this Government elected by the people of the District of Columbia should

1   over the age of 62, the relationship status of being registered domestic partners is limited to gay

2   and lesbian couples.  Cal. Fam. Code § 297(b)(5).  Indeed, about 95 percent of the couples who

3   have registered as domestic partners in California are gay and lesbian couples.[12]  Presently, the

4   **only** legal relationship status available to gay and lesbian couples in California is that of being

5   registered domestic partners.[13]  With the exception of four months and 19 days in 2008, this has

6   been the case since the first domestic partnership registry was made available in California in

7   2000.[14]  Given this "clear pattern," *see Arlington Heights*, 429 U.S. at 266, the exclusion is not

8   truly neutral and should be viewed as discriminatory.

9         Also unavailing is the federal defendants' argument that the challenged exclusion cannot

10   be viewed as discriminatory, as it was enacted at a time when domestic partnership registries did

11   not yet exist at the state level.  (Fed. Def's Mot. at 2.)  Congressional decisionmaking cannot be

12   presumed to exist in a bubble, separate from all state and local legal developments.  In any event,

13   Congress has repeatedly discussed and debated domestic partnership registries from at least 1992

14   to the present.  By 1996, Congress was well aware of emerging models for the legal recognition

15   of gay and lesbian couples on the state and local levels.[15]  Of course, it was the possibility of

16   such legal recognition – the Hawaii marriage case – that triggered the DOMA's proposal, debate,

17   and enactment.  As well, local municipalities had begun to establish domestic partnership

18   registries as a tool for granting lesbian and gay couples some of the legal rights and benefits

19   historically afforded married couples; these developments were reported to the Congress years

---

have been allowed some recognition of domestic partnership, particularly between people who are
not legally allowed marriage.  People say, 'Well, why don't people get married if they want those
kind of things?'  Well, because people of the same sex cannot get married.").

[12] Gary J. Gates, *et al.*, *Marriage, Registration and Dissolution by Same-Sex Couples in the U.S.*
(The Williams Inst.), July 2008, at 5, tbl. 2; *see also id.* at 2 ("In states that allow different-sex
couples to enter non-marital forms of recognition, the registration rate has been less than 6% of
eligible couples."), *available at* http://escholarship.org/uc/item/5tg8147x#page-1.

[13] Cal. Fam. Code § 297(b)(5); Cal. Const. art. I, § 7.5; *see also Perry*, 704 F.Supp.2d at 994
("California allows almost all opposite-sex couples only one option – marriage – and all same-sex
couples only one option – domestic partnership.  …  [D]omestic partnerships exist solely to
differentiate same-sex unions from marriages.").

[14] *See id.*; A.B. 26, 1999 Assemb. (Cal. 1999) (enacting Cal. Fam. Code § 297 *et seq.*); A.B. 25, 2001
Assemb. (Cal. 2001); A.B. 205, 2003 Assemb. (Cal. 2003); Cal. Fam. Code § 308.5 (added by Prop.
22, approved Mar. 7, 2000); *cf. Perry*, 704 F. Supp. 2d at 921.

[15] A Westlaw search of the Congressional record reveals hundreds of references to the issue of the
legal status of domestic partnership during the 1990s.

before the exclusion challenged here was adopted.[16]  In California, bills to establish a state-wide

domestic partnership registry were introduced in the Legislature during the 1993-94 and 1995-96

sessions.  A.B. 2810 (1993); A.B. 627 (1995).

During the heated debates regarding the Defense of Marriage Act, the status of domestic

partnership was repeatedly referenced.  For example, opponents of the DOMA introduced an

amendment requiring the GAO to "undertake a study of the differences in the benefits, rights and

privileges available to persons in a marriage and the benefits, rights and privileges available to

persons in a domestic partnership resulting from the non-recognition of domestic partnerships as

legal unions by State and Federal laws."[17]  The amendment was defeated.[18]  Also during the 1996

debates, Senator Nickles endorsed the DOMA by explaining that, by inserting similar language

into the FMLA, the federal government had been able to prohibit the use of the leave entitlement

for the care of same-sex domestic partners:

> Another example of why we need a Federal definition of the terms "marriage" and
> "spouse" stems from experience during debate on the Family and Medical Leave Act of
> 1993.  Shortly before passage of this act, I attached an amendment that defined "spouse"
> as "a husband or wife, as the case may be." When the Secretary of Labor published his
> proposed regulations, a considerable number of comments were received urging that the
> definition of "spouse" be "broadened to include domestic partners in committed
> relationships, including same-sex relationships." When the Secretary issued the final rules

---

[16] 138 Cong. Rec. 10,876-01, at 10,904 (1992), 1992 WL 180795, at *S10904 (statement of Sen.
Brock Adams entering into Congressional record report detailing domestic partnership recognition in
the following jurisdictions:  Alameda, San Mateo, and Santa Cruz counties in California; Travis
County, Texas; Dane County, Wisconsin; cities Berkeley, Los Angeles, Oakland, San Francisco,
Santa Cruz, West Hollywood, New York, Ithaca, Cambridge, West Palm Beach, Ann Arbor, East
Lansing, Madison, Minneapolis, Seattle, and Takoma Park; and the District of Columbia.); 139
Cong. Rec. 9501-01, at 9503 (1993), 1993 WL 280854, at *S9503 (statement of Sen. Herb Kohl:
"There are other cities which have domestic partner laws.…  The city of Seattle … [T]he cities of
San Francisco, Berkeley, and Santa Cruz have similar laws. . . . In my own State of Wisconsin, the
city of Madison has a similar law. And so do dozens of other cities in other States."); 142 Cong. Rec.
10,100-02, at 10,102 (1996), 1996 WL 511108, at *S10102 (statement of Sen. Edward Kennedy: "In
fact, States and local governments across the country are already dealing with this issue in their own
ways. Some have enacted domestic partnership laws."); *id.* at 10,113, *S10113 (statement of Sen.
Barbara Boxer: "Many communities in my State recognize domestic partnerships for those who
choose to make a commitment.").

[17] 142 Cong. Rec. 7480-05, at 7504 (1996), 1996 WL 392787, at *H7504; *see id*. (statement of Rep.
Charles Canady in opposition to study:  "This motion represents a transparent attempt to give some
statutory recognition to domestic partnerships.").

[18] 142 Cong. Rec. 735-01, at 735 (1996), 1996 WL 392924, at *D735; *see also* 142 Cong. Rec. 7480-
05, at 7503 (1996), 1996 WL 392787, at *H7492 (statement of Rep. David Skaggs: "[B]y refusing as
part of this legislation even to permit a formal study of disparate treatment of domestic partnerships
in these areas, the proponents of this legislation may reveal their real motivation.").

he stated that the definition of "spouse" and the legislative history precluded such a broadening of the definition.

142 Cong. Rec. 4851-02, at 4870 (1996), 1996 WL 233584, at *S4870.  As with the FMLA, same-sex partners are similarly excluded from state-sponsored long-term care plans.

Congress played a particularly active role in responding to the domestic partner registry adopted by the District of Columbia in 1992.  Congress immediately barred any local or federal funding of the registry:

> No funds made available pursuant to any provision of this Act shall be used to implement or enforce any system of registration of unmarried, cohabiting couples whether they are homosexual, lesbian, or heterosexual, including but not limited to registration for the purpose of extending employment, health, or governmental benefits to such couples on the same basis that such benefits are extended to legally married couples; nor shall any funds made available pursuant to any provision of this Act otherwise be used to implement or enforce D.C. Act 9–188, signed by the Mayor of the District of Columbia on April 15, 1992.

District of Columbia Appropriations Act, 1993, Pub. L. No. 102-382, 106 Stat. 1422 (1992); *see also* H.R. Rep. No. 102-1097, pt. 4, at 54 (1992), 1992 WL 404482, at *45 (recounting testimony of Professor Charles Rice, describing the D.C. registry as erecting "discrimination against members of traditional families").  Throughout years of appropriations cycles, Congressional leaders opposing the D.C. domestic partnership registry expressed precisely the same animus towards gays and lesbians and their families as was on view during the DOMA debates.

For example, Representative Clyde Holloway, the sponsor of a 1992 resolution disapproving of the D.C. registry, declared on the House floor:  "If there ever was an attack on the family in this country, it is this Domestic Partnership Act."[19]  He added:

> [I]t would undermine the institution of marriage and will send shock waves through society.  …  I think the fact that disturbs me the most is the fact that both heterosexual, homosexual, lesbian are all allowed to be, and I think they feel very strongly that the original intent of this bill was to make it legal to have same-sex marriages in this country.  …  Mr. Chairman, I do not think anyone that is homosexual can stand here on this floor and openly tell me that homosexuality is good for the future of America.

138 Cong. Rec. 6120-02, at 6129 (1992), 1992 WL 156371, at *H6129.  Supporting the

---

[19] 138 Cong. Rec. 2950-04, at 2950 (1992), 1992 WL 96521, at *H2950; *see also* Heather Ann Hope, *Rep. Holloway Opposes Health Care Act*, States News Service, June 4, 1992 ("This act would 'radically alter the cultural values' of this nation, Holloway said, because 'it covers shack-ups, homosexuals and lesbians.'"); 138 Cong. Rec. 1712-01, at 1712 (1992), 1992 WL 120746, at *E1712 (statement of Hon. Clyde C. Holloway: "[T]he Congress, as a matter of policy, should not equate gay and lesbian relationships with the relationships between men and women in marriage.").

amendment which banned the use of any federal or local funding to implement the registry,

Senator Trent Lott stated:

> [A]ll lifestyles are not equal.  …  The bill is intended as a means to officially recognize and sanction gay unions and cohabitation outside of marriage. That is what the real impact is.  …  When we talk in America about traditional family values and traditional families, I think we all know what we are talking about.  This legitimizes homosexual and lesbian couples living together, as well as unmarried heterosexuals.  …  This is wrong.  …  Its real purpose is to serve as the first step toward officially sanctioning homosexual marriages or unions in the Nation's Capital and, indeed, across the country.

138 Cong. Rec. 10,876-01, at 10,903-04, 10,906 (1992), 1992 WL 180795, at *S10903-04, *S10906.   Additional Congressional leaders expressed much the same sentiment.[20]

In 1993, Representative Ernest Istook led the House's successful effort to extend the funding ban.  He described the domestic partnership law as "abhorrent" for reaching the relationships of gays and lesbians:

> Now, obviously this was passed by the District of Columbia to enable people, more than anything else, who are in a homosexual relationship to register an equivalent of a gay marriage.  That is one of the reasons that this particular proposal is abhorrent, in my view. . . . Do not let the District authorize homosexual marriages, or a new concept of heterosexual relations, which is also in their definition of domestic partner.

139 Cong. Rec. 4353-01, at 4355, 4358 (1993), 1993 WL 236117, at *H4355, *H4358.  In support of the extended funding ban, Representative Tom DeLay similarly stated:  "Let us not kid ourselves. What this is all about is this act was promoted by the homosexual lobby in this town as the same-sex marriage act. The intent was and still is to legitimize the concept of same-sex marriage, undermining the traditional marriage of one man and one woman."  *Id.* at 4357, *H4357.  Other leaders made similar remarks in extending the ban.[21]

---

[20] *See, e.g.*, 138 Cong. Rec. 10,876-01, at 10,905 (1992), 1992 WL 180795, at *S10905 (statement of Sen. Dan Coates: "The [D.C. domestic partnership legislation] is a direct attack on the family and its values.  … [I]t undermines the legal importance of marriage. . . . What this really is … is a symbol … of disdain for the traditional family."); 138 Cong. Rec. 9356-03, at 9360 (1992), 1992 WL 237521, at *H9360 (statement of Rep. Thomas Bliley: "By giving official status to these relationships, this legislation forces the residents of the District and indeed all Americans to accept the devaluation of marriage."); *Id.* at 9363 (statement of Rep. Cliff Stearns: "Just as slavery eroded the freedoms outlined in our Constitution, so too would recognition of domestic partners further erode the family values so important to Americans."); Vincent McCraw & Jim Clardy, *Congress, crime dim luster of Kelly's first year*, Washington Times, Oct. 5, 1992, at B1 ("Critics said the initiative would encourage homosexual lifestyles.").

[21] *See, e.g.*, 139 Cong. Rec. 4353-01, at 4357 (1993), 1993 WL 236117, at *H4357 (statement of Rep. Duncan L. Hunter: "[T]he District action amounts to a societal endorsement of homosexual marriage."); *id.* at 4356 (statement by Rep. Thomas J. Bliley) ("By giving official status to these

The bar on federal and local funding to implement the registry continued to be adopted by Congress on an annual basis until 2002, with similar statements of animus.[22]  The ban continues to this day with respect to federal funding.[23]  In 1998, Congress similarly sought to prevent San Francisco from spending federal funds on its domestic partnership ordinance.[24]  That same year, Senate Wellstone introduced a bill to provide benefits to the domestic partners of federal

---

relationships, this legislation forces the residents of the District and indeed all Americans to accept the devaluation of marriage."); 139 Cong. Rec. 9501-01, at 9502, 9504 (1993), 1993 WL 280854, at *S9502, *S9504 (statement of Sen. Trent Lott: "[A]ll lifestyles are not equal … the institution of marriage is preferable and superior, and our policies should reflect that conclusion. . . . The Domestic Partners Act came as a direct result of a D.C. judge's decision not to grant a marriage license to homosexual couples. That is the history on this legislation in the District of Columbia."); *D.C. Budget Passes In House By 2 Votes*, Washington Post, July 1, 1993, at A1 ("[O]pponents argued that anyone who supported domestic partners would be voting in favor of homosexual rights."); *DC Domestic Partners Legislation Struck Down by Senate*, Associated Press, July 27, 1993 ("Sen. Trent Lott, R-Miss., who led the debate against the measure, called it 'a precursor to the breakup of American families' that encouraged nontraditional homosexual and lesbian liaisons.'")

[22] *See, e.g.*, 140 Cong. Rec. 5589-02, at 5601 (1994), 1994 WL 363727, at *H5601 (Statement of Rep. Robert Dornan: "From my historical knowledge, this business of domestic partner benefits started in Seattle where they were trying to give privileged treatment to lesbian and homosexual partners. . . . This law denigrates marriage and family. . . . Let us get rid of this domestic partnership nonsense."); *id.* at 5594 (statement of Rep. Joe Barton: "If we go to Webster's Dictionary at the back of this Chamber and look up the definition of family, we do not see the definition that is in this act."); *id.* at 5607, 5609 ("[W]e are suspending reality to say that there is no organized effort to have some of these domestic partnership agreements recognized somewhere in the country and that there is an organized effort to do that. . . . [T]he definition of family in the ordinance that is on the books in the District of Columbia does not meet any currently acceptable legal definition of family or of marriage anywhere else in the country."); 141 Cong. Rec. 11,627-02, at 11,657 (1995), 1995 WL 639923, at *H11657 (Rep. Bob Barr opposing law "that places "so-called domestic partners … on par with the traditional family structure of men and women, in marriage, with children[.]"); *id.* at 11,659 (statement of Rep. Cliff Stearns describing domestic partner laws as "undermin[ing] the traditional moral values that are the bedrock of this Nation."); 144 Cong. Rec. 7335-03, at 7343 (1998), 1998 WL 454432, at *H7343 (statement of Rep. Frank Riggs: "[W]e as Federal lawmakers have a duty to oppose policies and laws that confer partner benefits or marital status on same-sex couples."); *id.* (Rep. Frank Riggs opposing DC registry as "wrong ... on the part of those who would seek to legitimize same-sex activity"); 144 Cong. Rec. 7381-02, at 7383 (1998), 1998 WL 454434, at *H7383 (statement of Rep. Steve Largent: "But since they can't get same-sex marriage written into law, … they work for things like domestic partner benefits.").  *Cf.* 141 Cong. Rec. 11,627-02, at 11,660 (1995), 1995 WL 639923, at *H11660 (statement of Rep. Barney Frank: "This [objection to the D.C. registry] is about people who want to show a dislike and disapproval of gay men and lesbians, and for some odd reason, apparently they find gay men and lesbians more obnoxious if we happen to be in a stable relationship than if we are not.").

[23] District of Columbia Appropriations Act, 2002, Pub. L. No. 107-96, 115 Stat. 923, 950 (2001) (prohibiting the use of federal funds but allowing the use of District funds to implement the measure); H.R. Rep. No. 107-321, at 29, 2001 WL 1554096 (2001) (Conf. Rep.).

[24] *See* 144 Cong. Rec. 6577-02, at 6578 (1998), 1998 WL 425532, at *H6578 (statement of Rep. Frank Riggs in support of provision barring the use of federal funding by San Francisco on its ordinance:  "We should not sanction domestic partner relations."); 144 Cong. Rec. 9597-03 (1998), 1998 WL 689454 (reporting that the House provision regarding domestic partners that would have restricted funds available to the City of San Francisco has been dropped).

---

1   employees, and reported on the cities, states, counties, and other entities offering domestic

2   partner benefits.[25]

3        Moreover, section 7702B(f) was reenacted in 2004, and again excluded gay and lesbian

4   domestic partners by adopting subparagraphs (A) through (G) of section 152(d)(2), as amended,

5   but excluding subparagraph (H).  By 2004, the existence of legal relationship recognition for gay

6   and lesbian couples in many jurisdictions including at the state level was well established.  For

7   example, California, New Jersey, Washington, and Maine had enacted domestic partnership

8   legislation, Vermont created civil unions, Hawaii established reciprocal benefits for gay and

9   lesbian couples, and in Massachusetts gay and lesbian couples were legally permitted to marry.

10  Additionally, municipalities across the country in states without state-wide relationship

11  recognition for gay and lesbian couples continued to adopt their own ordinances.  However,

12  Congress, in again excluding legally recognized gay and lesbian couples from this benefit, failed

13  to offer any legitimate government rationale for doing so.  *See Lorillard v. Pons*, 434 U.S. 575,

14  580-81 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation

15  of a statute and to adopt that interpretation when it re-enacts a statute without change[.]").  And,

16  since 2004, additional states have provided legal recognition of same-sex relationships.  Today,

17  six states recognize marriage (Connecticut, District of Columbia, Iowa, Massachusetts, New

18  Hampshire, and Vermont), three states recognize out-of-state same-sex marriages (Maryland,

19  New Mexico, and New York), and nine states that recognize domestic partners and/or civil

20  unions (California, District of Columbia, Delaware (starting 1/1/12), Illinois, Hawaii (starting

21  1/1/12), Nevada, New Jersey, Oregon, and Washington), and additional states that have some

22  level of statewide protection (Colorado, Hawaii, Maine, Maryland, and Wisconsin).[26]  *See*

23

24  [25] 144 Cong. Rec. 1959-02 (1998), 1998 WL 109601 (introduction by Wellstone of S. 1636, a bill to
    provide benefits to domestic partners of Federal employees); 144 Cong. Rec. 731-02, at 733, 1998
25  WL 55803, at *S733 (testimony of Wellstone in support of The Domestic Partnership Benefits and
    Obligations Act of 1998, and reviewing numbers of cities, states and counties, and other entities
    offering domestic partner benefits).
26  [26] National Center for Lesbian Rights, Summary of State Laws Regarding Same-Sex Couples,
    *available at*
27  http://www.nclrights.org/site/DocServer/Relationship_Recognition_State_Laws_Summary.pdf?doc
    ID=6841.
28

*Rogers v. Lodge*, 458 U.S. 613, 622-23 (1982) (sustaining district court's finding that at-large electoral system, though "neutral in origin," was being maintained for invidious purpose).

## C.   Even if Viewed as "Neutral," the Challenged Classification Reflects Invidious Discrimination.

"If the classification itself, covert [or] overt, is not based upon [sexual orientation or] gender, the second question is whether the adverse effect reflects invidious [sexual orientation- or] gender-based discrimination." *Feeney*, 442 U.S. at 274 (citing *Arlington Heights v. Metropolitan Housing Dev. Corp*, 429 U.S. 252 (1977)).  In this second inquiry, impact provides an "important starting point." *Id.*; *Washington v. Davis,* 426 U.S. 229, 242 (1976) ("Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another.").  Here, the discriminatory effects of the exclusion are plain.  Gay and lesbian couples, whether married during the marriage equality "window" or registered as domestic partners, cannot participate equally in the CalPERS program.  All other couples can participate through marriage under California law.

The challenged provision's historical background is also relevant, "particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267.  Here, before, during, and after the 1996 congressional session, the federal government has repeatedly expressed its antipathy towards gays and lesbians and their relationships through official actions.  These include, *inter alia*:  the DOMA, discussed herein and in Plaintiffs' prior opposition; a ban on gays in federal employment from the 1940s through the 1970s;[27] a ban on gays in the military which was only repealed last year; the discriminatory provisions of the tax code; the 1993 exclusion of same-sex spouses and domestic partners from the protections of the FMLA; and the refusal to fund the D.C. domestic partnership law.

---

[27] In 1953, the Eisenhower administration issued Executive Order 10,450, which urged the dismissal of all government employees who were "sex perverts," including homosexuals, from both the civilian and military branches of the federal government and federal contractors. Executive Order 10,450, 18 Fed. Reg. 2489 (Apr. 29, 1953); *see also* Patricia A. Cain, *Litigating for Lesbian and Gay Rights: A Legal History*, 79 Va. L. Rev. 1551, 1566 (1993) ( "Shortly after his inauguration in 1953, President Eisenhower issued Executive Order 10,450 calling for the dismissal of all government employees who were 'sex perverts.'"). This ban remained in effect until 1975.

The legislative history of the challenged provision is also relevant.  *Arlington Heights*, 429 U.S. at 268.  As has been reviewed in this matter previously, the 1996 legislative session enacted the DOMA in response to *Baehr*, 852 P.2d 44, a Hawaii Supreme Court decision indicating that lesbian and gay couples might be entitled to marriage equality under the Hawaii state constitution.  Members of Congress repeatedly voiced their disapproval of homosexuality, calling it "immoral," "depraved," "unnatural," "based on perversion" and "an attack upon God's principles."  *Gill*, 699 F. Supp. 2d at 378.  Legislators argued that marriage by gays and lesbians would "demean" and "trivialize" heterosexual marriage and might indeed be "the final blow to the American family."  *Id* at 378-79.[28]  The official House report describes the purpose of the DOMA to enshrine Congress's "moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality."  H.R. Rep. No. 104-664, at 16 (1996), 1996 WL 391835, *11.  It is the DOMA that prevents Plaintiff Hermosillo from seeking to enroll in the CalPERS plan as a "spouse."

## D. <u>Although Heightened Scrutiny Applies Here, The Challenged Law Fails Even Rational Basis Review.</u>

Plaintiffs contend that heightened scrutiny applies to the challenged classification. However, the law fails even a rational basis review.  Under rational basis review, any government action resting upon a distinction between discrete classes "must be rationally related to a legitimate governmental purpose." *Cleburne*, 473 U.S. at 446.  "By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by

---

[28] The district court's opinion in *Gill* compiles remarks made by members of Congress. *See, e.g.*, 142 Cong. Rec. 7270-04, at 7275, 1996 WL 388595, at *H7275 (statement of Rep. Bob Barr: "[marriage is] under direct assault by homosexual extremists all across this country"); 142 Cong. Rec. 7480-05, at 7501 (1996), 1996 WL 392787, at *H7501(statement of Rep. Henry Hyde: "Most people do not approve of homosexual conduct. . . . and they express their disapprobation through the law."); *id.* at 7495, *H7495 (statement of Rep. Bill Lipinski: "Allowing for gay marriages would be the final straw, it would devalue the love between a man and a woman and weaken us as a Nation."); 142 Cong. Rec. 10,067-01, at 10,068 (1996), 1996 WL 508329, at *S10068 (statement of Sen. Jesse Helms: "[Those opposed to DOMA] are demanding that homosexuality be considered as just another lifestyle-these are the people who seek to force their agenda upon the vast majority of Americans who reject the homosexual lifestyle. . . . Homosexuals and lesbians boast that they are close to realizing their goal-legitimizing their behavior. . . . At the heart of this debate is the moral and spiritual survival of this Nation.").

the law." *Romer*, 517 U.S. at 633.  "[E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained.  The search for the link between classification and objective gives substance to the Equal Protection Clause." *Id.* at 632; *Perry v. Schwarzenegger*, 704 F. Supp. 2d at 995 (quoting *Romer*); *Gill*, 699 F. Supp. 2d at 386 (same).  Further, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne*, 473 U.S. at 446; *Gill*, 699 F. Supp. 2d at 388 (quoting *Cleburne*).  In other words, "a challenged law can only survive this constitutional inquiry if it is narrow enough in scope and grounded in a sufficient factual context for [the court] to ascertain some relation between the classification and the purpose it serves[.]" *Gill*, 699 F. Supp. 2d at 387.  Here, as in *Gill*, "there exists no fairly conceivable set of facts that could ground a rational relationship" between a legitimate government interest and the exclusion of legally recognized same-sex partners from state-provided long-term care plans.

## E.    The Challenged Law Impermissibly Excludes Legally Recognized Same-Sex Partners Based Upon Animus Against Lesbians and Gay Men and their Relationships.

In enacting and amending section 7702B in 1996, Congress set forth no particular interest in excluding legally recognized same-sex partners from state-provided long-term care plans, while including every other conceivable family member.  But in enacting the DOMA which amended section 7702B (along with hundreds of other laws) to exclude same-sex spouses, Congressional leaders expressed deep hostility toward gay people, their relationships, and their families. The exclusion of same-sex domestic partners and spouses from state-provided long-term care plans "cannot be justified as an expression of the government's disapproval of homosexuality, preference for heterosexuality, or desire to discourage gay marriage." *In re Levenson*, 560 F.3d at 1150; *accord Perry*, 704 F. Supp. 2d at 930-931 ("The state does not have an interest in enforcing private moral or religious beliefs without an accompanying secular purpose.") (citing *Lawrence v. Texas*, 539 U.S. 558 (2003)); *id.* at 1003 ("Moral disapproval alone is an improper basis on which to deny rights to gay men and lesbians."); *Gill*, 699 F. Supp.

2d at 396 ("animus alone cannot constitute a legitimate government interest"); *Lawrence*, 539 U.S. at 580 (O'Connor, J., concurring) ("When a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the equal protection clause. … Moral disapproval of this group, like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause.") (citing *U.S. Department of Agric. v. Moreno*, 413 U.S. 528 (1973) and *Romer*); *Romer*, 517 U.S. at 633 (legal classifications must not be "drawn for the purpose of disadvantaging the group burdened by the law.").[29]

As *Romer* makes clear, "the differential treatment of gay people is not, in and of itself, a proper justification for government actions." *In re Levenson*, 560 F.3d at 1150 (citing *Romer*); *cf. Perry*, 704 F. Supp. 2d, at 997 ("No evidence at trial illuminated distinctions among lesbians, gay men and heterosexuals amounting to "real and undeniable differences" that the government might need to take into account in legislating."). Here, as in *Romer*, the circumstances underlying the enactment of the exclusion challenged raise "the inevitable inference that the disadvantage imposed [was] born of animosity toward the class of persons affected." *See Romer*, 517 U.S. at 634-36; *see also Lawrence*, 539 U.S. at 571 (the existence of "powerful voices" condemning homosexuality as immoral does not determine the definition of liberty for all).

---

[29] *Accord Cleburne*, 473 U.S. at 446-47 ("[S]ome objectives – such as a bare desire to harm a politically unpopular group – are not legitimate state interests."); *id.* at 450 ("The short of it is that requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded[.]"); *id.* at 452 & n.4 (Stevens, J., concurring) ("The term 'rational,' of course, includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class. . . . If the adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality would be suspect."); *Moreno*, 413 U.S. at 534 ("[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."); *Tucson Woman's Clinic v. Eden*, 371 F.3d 1173, 1185-86 (9th Cir. 2004) ("[S]ome laws are so irrational or absurd on their face it is clear they can be motivated by nothing other than animus or prejudice against a group," citing *Romer* and *Cleburne*); *Pruitt v. Cheney*, 963 F.2d 1160, 1165 (9th Cir.1992) (quoting *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.")).

## II.    PLAINTIFFS HAVE STATED A DUE PROCESS CLAIM AGAINST THE FEDERAL DEFENDANTS FOR SELECTIVELY BURDENING THEIR EXERCISE OF THEIR FUNDAMENTAL RIGHTS TO FAMILY AUTONOMY AND DECISIONMAKING.

The Supreme Court has long recognized that the due process clause embodies substantive rights and liberties.  *See*, *e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) ("Without doubt, it denotes … the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.").  These rights and liberties include a fundamental interest in independence from undue government influence when making certain highly personal decisions in "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education."  *Whalen v. Roe*, 429 U.S. 589, 599-600 & n. 24, n. 26 (1977); *accord Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (The Constitution protects "the private realm of family life which the state cannot enter.").

Numerous government intrusions affecting family life, including the right to live together as a family unit, *see Moore v. East Cleveland*, 431 U.S. 494, 505 (1977) (striking down occupancy restrictions and recognizing "larger conception of the family"), and the right to work during pregnancy, *see Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 640 (1974) (striking down forced maternity leave), have been held to violate the substantive due process rights enjoyed by all persons.[30]  Here, Congress has chosen to list an array of "acceptable" family members for participation in state-provided long-term care plans – from different-sex spouses, to parents and grandparents, to children and step-children, to aunts and uncles, to in-laws (father-in-law, mother-in-law, sister-in-law, brother-in-law, son-in-law, daughter-in-law), to aunts and uncles, to siblings (including half- and step-siblings) – but has intentionally excluded legally

---

[30] *See Loving*, 388 U.S. 1 (striking down marriage restrictions); *Griswold v. Connecticut*, 381 U.S. 479 (1965) (striking down restrictions on contraceptives); *Carey v. Population Servs., Int'l.*, 431 U.S. 678 (1977) (same); *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) (striking down prohibition on private school attendance); *see also Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (collecting cases).

recognized same-sex partners.  With no permissible basis, this exclusion selectively burdens and penalizes the Plaintiffs' exercise of their right to family autonomy and decision-making, on the basis of sexual orientation, and in so doing demeans their lives and intimate decisions.  *See LaFleur*, 414 U.S. at 640 (finding that restrictive maternity leave regulations unconstitutionally "penalize the pregnant teacher for deciding to bear a child," constituting "a heavy burden on the exercise of these protected freedoms"); *Lawrence*, 539 U.S. at 574 (precedent permitting the criminalization of same-sex sexual activity "demeans the lives of homosexual persons").  By preventing same-sex partners and spouses from participating in a critical government-sponsored tool for family planning, Congress places a selective, and unconstitutional, burden on these families.

Despite the Congressional history underscoring the importance of long-term care to families and family stability, the federal defendants attempt to recast the Plaintiffs' allegations as describing nothing more than a mere "incidental economic burden."  (Federal Defendants' Motion at 16.)  Citing *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 549 (1983), the federal defendants contend that a legislature need not "subsidize" the exercise of a fundamental right, and that therefore there can be no infringement of the Plaintiffs' constitutional rights here.  Federal Defendants' Motion at 13.  The *Regan* case reviewed the lawfulness under the First Amendment of the lobbying restrictions imposed by 26 U.S.C. § 501(c)(3), a provision which regulates equally all organizations (save veterans' organizations) receiving tax-deductible donations.  It did not consider tax burdens and exclusions selectively placed upon individuals and groups of individuals subjected to discrimination on the basis of status and family formation.  Thus, *Regan*'s deference to congressional decision-making cannot be imported and applied to the facts of this case.  Indeed, *Regan* distinguished and reaffirmed the Court's opinion in *Perry v. Sindermann*, 408 U.S. 593 (1972), which holds that the government may not deny a benefit to an individual because he exercises a constitutional right.[31]

---

[31] *See Regan*, 461 U.S. at 546; *Perry v. Sindermann*, 408 U.S. at 597 ("For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.  This would allow the government to 'produce a result which (it) could not command directly.'") (citing and quoting from

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Far more persuasive than *Regan* here are cases regarding federal tax and benefits rules discriminating against, and penalizing the protected family choices of, men and women. *See*, *e.g.*, *Califano v. Goldfarb*, 430 U.S. 199, 203 (1977) (striking down social security provision requiring widowers but not widows to demonstrate economic dependence upon their spouse); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 645 (1975) (striking down social security provision denying survivor's benefit to widower raising infant son) ("[While] the notion that men are more likely than women to be the primary supporters of their spouses and children is not entirely without empirical support, … such a gender-based generalization cannot suffice to justify the denigration of the efforts of women who do work and whose earnings contribute significantly to their families' support"); *Moritz v. Comm'r of Internal Revenue*, 469 F.2d 466, 469-70 (10th Cir. 1972), *cert. denied, Comm'r of Internal Revenue v. Moritz*, 412 U.S. 906 (1973) (striking down tax law granting dependent care deduction to women, widowers, divorced and separated men, and men with wives who are incapacitated, but denying deduction to single man who cared for his disabled mother) ("[I]f the Congress determines to grant deductions of a general type, a denial of them to a particular class may not be based on an invidious discrimination").

Moreover, the *Regan* case also holds that "government may not place obstacles in the path of a [person's] exercise" of those rights. *Reagan*, 461 U.S. at 549. Plaintiffs allege that their ability and autonomy to engage in financial and long-term care planning with their lawful spouses and domestic partners is unfairly and selectively constrained by operation of section 7702B(f). *See* Complaint ¶ 70. They experience this discriminatory government barrier solely on the basis of their status as lesbians and gay men who have entered into legally recognized same-sex partnerships. This kind of sexual orientation-based burdening of fundamental rights and liberties is recognized as impermissible. *Lawrence*, 539 U.S. at 578 (holding that same-sex couples have the constitutional right to engage in intimate relationships "without intervention of

---

*Speiser v. Randall*, 357 U.S. 513 (1958)); *Speiser*, 357 U.S. at 518 ("To deny [a tax] exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech."); *accord Schware v. Bd. of Bar Exam. of State of New Mexico*, 353 U.S. 232, 243-47 (1957) (finding that past membership in Communist Party could not bar licensure of attorney applicant); *see also Bob Jones Univ. v. United States*, 461 U.S. 574, 595-96 (1983) (upholding IRS policy denying charitable tax exemption to racially discriminatory university as contrary to public policy).

1  the government."); *Witt*, 527 F.3d at 816 ("We cannot reconcile what the Supreme Court did in

2  *Lawrence* with the minimal protections afforded by traditional rational basis review."); *id.* at 812

3  (concluding that suspension from work resulting in loss of pay and points toward promotion and

4  retirement is sufficient to state due process claim under *Lawrence*).

5        While such intrusions have often been reviewed under heightened scrutiny, the

6  unnecessary intrusion by the government here into the private family lives of each of the

7  Plaintiffs violates the Constitution under any standard.  *See Glucksberg*, 521 U.S. at 728 ("The

8  Constitution also requires, however, that [the challenged law] be rationally related to legitimate

9  government interests.").  Here, with no legitimate or rational basis, *see* pages 12 to 19, *supra*,

10  Section 7702B places an impermissible obstacle to the Plaintiffs' ability to access long-term care

11  insurance and thereby ensure family stability throughout the life cycle.

12  **CONCLUSION**

13        For all of the reasons stated, Section 7702B violates the equal protection and substantive

14  due process guarantees of the Fifth Amendment to the Constitution.  The plaintiffs have stated

15  claims for relief, and the federal defendants' motion to dismiss should be rejected.

16  Dated:  September 29, 2011          Respectfully submitted,

17                                  THE LEGAL AID SOCIETY
                                EMPLOYMENT LAW CENTER

18

19                       By:    /s/ Claudia Center
                              Claudia Center

20

21                           Attorneys for Plaintiffs

22

23

24

25

26

27

28