1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

| | |
|---|---|
| 4  MICHAEL DRAGOVICH; MICHAEL | No. C 10-01564 CW |
| 5  GAITLEY; ELIZABETH LITTERAL; | |
|    PATRICIA FITZSIMMONS; CAROLYN | ORDER GRANTING |
| 6  LIGHT; CHERYL LIGHT; DAVID BEERS; | PLAINTIFFS' MOTION |
|    CHARLES COLE; RAFAEL V. | FOR SUMMARY |
| 7  DOMINGUEZ; and JOSE G. | JUDGMENT AND |
|    HERMOSILLO, on behalf of | DENYING THE BLAG'S |
| 8  themselves and all others | AND FEDERAL |
|    similarly situated, | DEFENDANTS' CROSS- |
| 9  | MOTIONS FOR |
|         Plaintiffs, | SUMMARY JUDGMENT |
| 10 | (Docket Nos. 111, |
|       v. | 116 and 117) |
| 11 | |
|    UNITED STATES DEPARTMENT OF THE | |
| 12 TREASURY; TIMOTHY GEITHNER, in | |
|    his official capacity as | |
| 13 Secretary of Treasury, United | |
|    States Department of the | |
| 14 Treasury; INTERNAL REVENUE | |
|    SERVICE; DOUGLAS SHULMAN, in his | |
| 15 official capacity as Commissioner | |
|    of the Internal Revenue Service; | |
| 16 BOARD OF ADMINISTRATION OF | |
|    CALIFORNIA PUBLIC EMPLOYEES' | |
| 17 RETIREMENT SYSTEM; and ANNE | |
|    STAUSBOLL, in her official | |
| 18 capacity as Chief Executive | |
|    Officer, CalPERS, | |
| 19 | |
|         Defendants. | |
| 20 ═══════════════════════════════/ | |

21        Plaintiffs challenge the constitutionality of § 3 of the

22   Defense of Marriage Act (DOMA), 1 U.S.C. § 7, and § 7702B(f) of

23   the Internal Revenue Code, 26 U.S.C. § 7702B(f), to the extent

24   that these statutes limit Plaintiffs' participation in a long-term

25   care insurance program maintained by the California Public

26   Employees' Retirement System (CalPERS).  Plaintiffs contend that

27   these federal provisions violate the Constitution's guarantees of

28

equal protection and substantive due process by barring the same-sex legal spouses and registered domestic partners of California public employees from enrollment in the CalPERS long-term care plan, even though opposite-sex legal spouses are permitted to enroll.

Plaintiffs move for summary judgment on their claims against all Defendants.  Federal Defendants have submitted a brief partially supporting Plaintiffs' motion for summary judgment. Federal Defendants argue that gay men and lesbians should be found to be a suspect class and that § 3 of the DOMA infringes their equal protection rights.  However, Federal Defendants oppose Plaintiffs' motion and cross-move for summary judgment as to Plaintiffs' equal protection claim challenging § 3 of the DOMA on behalf of same-sex couples who are registered domestic partners under California law, and as to Plaintiffs' substantive due process challenge to § 3 of the DOMA.  Federal Defendants also cross-move for judgment that Title 26 U.S.C. § 7702B(f) is constitutionally valid.

Because Federal Defendants would not defend the validity of § 3 of the DOMA against the equal protection challenge by same-sex spouses, the Court granted the Bipartisan Legal Advisory Group of the United States House of Representatives (BLAG) leave to intervene to defend the law.  Accordingly, the BLAG has opposed Plaintiffs' motion for summary judgment that § 3 of the DOMA is unconstitutional as it affects same-sex spouses here, and has cross-moved for summary adjudication that the provision is constitutional.

United States District Court
For the Northern District of California

State Defendants have filed a response to Plaintiffs' motion, seeking guidance from the Court and a stay of any federal action disqualifying the CalPERS program, in the event that the Court grants Plaintiffs' motion for summary judgment.[1]

Having considered all of the parties' submissions and oral argument, the Court grants Plaintiffs' motion for summary judgment and denies Federal Defendants' and the BLAG's cross-motions.

BACKGROUND

I.   Long-term Care Insurance and the Challenged Provisions

Plaintiffs are California public employees and their same-sex spouses and registered domestic partners, who are in long-term committed relationships recognized and protected under California law.  As explained in this Court's previous orders, CalPERS provides retirement and health benefits, including long-term care insurance, to many of the state's public employees and retirees and their families.  Long-term care insurance provides coverage when a person needs assistance with basic activities of living due to injury, old age, or severe impairments related to chronic illnesses, such as Alzheimer's disease.

In 1996, Congress passed the DOMA, which, among other things, defined the terms "spouse" and "marriage" for federal law purposes in a manner limiting them to heterosexual couples.  As amended by § 3 of the DOMA, the United States Code provides,

---

[1] State Defendants assert that Federal Defendants could eliminate the need for a stay by agreeing that they will not seek to disqualify the CalPERS long-term care plan, in the event that the Court's order were later overturned.  However, Federal Defendants apparently have not agreed.

> In determining the meaning of any Act of Congress, or
> of any ruling, regulation, or interpretation of the
> various administrative bureaus and agencies of the
> United States, the word "marriage" means only a legal
> union between one man and one woman as husband and
> wife, and the word "spouse" refers only to a person of
> the opposite sex who is a husband or a wife.

1 U.S.C. § 7.

Title 26 U.S.C. § 7702B(f) was also enacted in 1996, as part of the Health Insurance Portability and Accountability Act (HIPAA), providing favorable federal tax treatment to participants in qualified state-maintained long-term care insurance plans for state employees.  26 U.S.C. § 7702B(f).  Currently, the CalPERS long-term care insurance program is a qualified state-maintained plan pursuant to § 7702B(f).

Section 7702B(f)(2) disqualifies a state-maintained plan from favorable tax treatment if it provides coverage to individuals other than those specified under its subparagraph (C).  The list of eligible individuals in § 7702B(f)(2)(C) includes state employees and former employees, their spouses, and individuals bearing a relationship to the employees or spouses which is described in subparagraphs (A) through (G) of 26 U.S.C. § 152(d)(2).  Id.

Section 152(d)(2), the part of the tax code from which subparagraph (C) draws its list of eligible relatives, defines the relatives for whom a taxpayer may claim a dependent exemption. See 26 U.S.C. §§ 151-52.  Section 152(d)(2), subparagraphs (A) through (H), identifies the following individuals as "qualifying relatives" for the dependent exemption:

(A)  A child or a descendant of a child.

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4

(B)   A brother, sister, stepbrother, or stepsister.

(C)   The father or mother, or an ancestor of either.

(D)   A stepfather or stepmother.

(E)   A son or daughter of a brother or sister of the
      taxpayer.

(F)   A brother or sister of the father or mother of
      the taxpayer.

(G)   A son-in-law, daughter-in-law, father-in-law,
      mother-in-law, brother-in-law, or sister-in-law.

(H)   An individual . . . who, for the taxable year of
      the taxpayer, has the same principal place of
      abode as the taxpayer and is a member of the
      taxpayer's household.

26 U.S.C. § 152(d)(2).

When it chose to incorporate subparagraphs (A) through (G),
Congress specifically chose not to carry over subparagraph (H) to
subparagraph (C) of § 7702B(f)(2).  Had Congress not chosen to
exclude subparagraph (H) from subparagraph (C) of § 7702B(f)(2),
registered domestic partners of California public employees would
have qualified as individuals eligible to enroll in the CalPERS
long-term care plan.

In addition to providing favorable tax treatment to state-
maintained long-term care plans, Congress approved such treatment
for long-term care coverage purchased through the private market.
26 U.S.C. § 7702B(a)-(b).

Congress enacted these provisions because of the critical
role of long term care insurance in protecting families.  "The
legislation . . . provides tax deductibility for long term care
insurance, making it possible for more Americans to avoid
financial difficulty as the result of chronic illness."  142 Cong.

Rec. S3578-01 at *3608 (Statement of Sen. McCain) (Apr. 18, 1996);

see also Joint Committee on Taxation, "Description of Federal Tax

Rules and Legislative Background Relating to Long-Term Care

Scheduled for a Public Hearing Before the Senate Committee on

Finance on March 27, 2001," at 2001 WL 36044116 (provisions

granting tax advantages for long-term care plans were adopted "to

provide an incentive for individuals to take financial

responsibility for their long-term care needs.").

## II.   Congressional Denial of Federal Legal Recognition for Same-Sex Couples

For more than two decades, jurisdictions other than the

federal government have extended to same-sex couples legal

recognition in various forms, such as registered domestic

partnerships, civil unions, reciprocal beneficiary relationships

and, more recently, civil marriage.[2]  Over time, the number of

---

[2] As of 1992, registered domestic partnership benefits were
made available in Travis County, Texas; Dane County, Wisconsin;
the California counties of Alameda, San Mateo and Santa Cruz; and
the cities of Berkeley, Los Angeles, Oakland, Santa Cruz, San
Francisco, West Hollywood, New York, Ithaca, Cambridge, West Palm
Beach, Ann Arbor, East Lansing, Madison, Minneapolis, Seattle and
Tahoma Park.  138 Cong. Rec. S10876-01, 1992 WL 180795, at
*S10904.  In April 1992, the District of Columbia approved the
Health Care Benefits Expansion Act, D.C. Law 9-114, establishing a
local domestic partnership registry.  See also D.C. Code § 36-1401
(legislative history of Law 9-114).  As discussed later in this
order, Congress delayed implementation of the registry.

Since 1997, nineteen states have extended legal recognition
to same-sex couples for purposes of state law.  M.V. Lee Badgett,
Jody L. Herman, Patterns of Relationship Recognition by Same-Sex
Couples in the United States, the Williams Institute, University
of California, Los Angeles, School of Law, 1, n.1, Appendix 1,
(November 2011) (providing a detailed survey of the various
statuses, their effective dates and relevant statutory citations),
available at
http://williamsinstitute.law.ucla.edu/research/marriage-and-
couples-rights/patterns-of-relationship-recognition-by-same-sex-
couples-in-the-united-states/.

United States District Court
For the Northern District of California

jurisdictions granting these forms of legal recognition has increased.

Congress discussed registered domestic partnership laws prior to and during 1996, when the statutes challenged here were passed. These discussions occurred after the District of Columbia passed, in April 1992, the Health Care Benefits Expansion Act, which established a domestic partnership registry in that jurisdiction. Congress reacted to the new law by barring any local or federal funding to implement, enforce or administer the registry. District of Columbia Appropriations Act, 1993, Pub. L. No. 102-382, 106 Stat. 1422 (1992). Representative Clyde Holloway argued, "If there ever was an attack on the family in this country, it is [the District of Columbia's] Domestic Partnership Act . . . To me, this bill totally destroys the families of this country." 138 Cong. Rec. H2950-04, 1992 WL 96521, at *H2950. In arguing against the appropriations ban before the Senate, Senator Brock Adams entered into the Congressional record information detailing domestic partnership recognition in numerous jurisdictions, apart from the District of Columbia. 138 Cong. Rec. S10876-01, 1992 WL 180795, at *S10904.

In 1993, as part of a successful drive to renew the funding ban, Representative Ernst Istook argued, "Now, obviously this was passed by the District of Columbia to enable people, more than anything else, who are in a homosexual relationship to register an

---

Currently, nine states and the District of Columbia offer registered domestic partnerships or civil unions with legal rights comparable to marriage, and six states and the District of Columbia permit same-sex couples to marry. Id. at 3, Table 1.

United States District Court
For the Northern District of California

equivalent of a gay marriage.  That is one of the reasons that this particular proposal is abhorrent, in my view."  139 Cong. Rec. H4353-01, 1993 WL 236117, at *H4355, *H4358; District of Columbia Appropriations Act, 1994, Pub. L. No. 103-127, 107 Stat. 1336 (1993).

Other representatives echoed these arguments in favor of renewing the appropriations ban and the ban was renewed every year from 1993 through 2001.[3]  See e.g., 140 Cong. Rec. H5589-02, 1994 WL 363727, at *H5601 (Representative Robert Dornan proclaiming, "From my historical knowledge, this business of domestic partner benefits started in Seattle where they were trying to give privileged treatment to lesbian and homosexual partners . . . Let us get rid of this domestic partnership nonsense."); 141 Cong. Rec. H11627-02, 1995 WL 639923, at *H11659 (Representative Cliff Stearns asserting that domestic partnership registration laws "undermine the traditional moral values that are the bedrock of this Nation.").[4]

United States District Court
For the Northern District of California

---

[3] In 2001, Congress authorized a more limited appropriations ban, permitting the use of non-federal funds to institute and administer the District of Columbia domestic partnership registry. District of Columbia Appropriations Act, 2002, Pub. L. No. 107-96, 115 Stat. 923 (2001).  Accordingly, in 2002, the District of Columbia finally implemented its domestic partnership registry. See 49 D.C. Reg. 5419 (June 14, 2002).

[4] A more detailed explanation of Congress's actions to block implementation of the District of Columbia's domestic partnership registry is provided in this Court's January 26, 2012 order denying Federal Defendants' motion to dismiss Plaintiffs' constitutional challenge to § 7702B(f) on behalf of California registered domestic partners.

In 1996, as well as renewing the ban on funding for the District of Columbia domestic partnership registry, Congress enacted the DOMA and the HIPAA, containing the provisions challenged here.

It is undisputed that one significant consideration in enacting § 3 of the DOMA was Congress's desire to foreclose federal recognition of same-sex marriage.  Hawaii was on the verge of becoming the first state in the nation to grant marriage licenses to same-sex couples.[5]  The House Report on the pending bill to enact the DOMA stated, "Civil laws that permit only heterosexual marriage reflect and honor a collective moral judgment about human sexuality.  This judgment entails both moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality."  H.R. Rep. 104-664, at 15-16.  The report adopted the view that "'[S]ame-sex marriage, if sanctified by the law, if approved by the law, legitimates a public union, a legal status that most people . . . feel ought to be illegitimate.'"  Id. at 16 (alteration and omission in original) (quoting Representative Henry Hyde, Chairman of the Judiciary Committee).

Moreover, the limiting definition of marriage proposed in § 3 of the DOMA was viewed as necessary to exclude registered domestic partners from federal recognition and benefits.  When Senator Don

---

[5] The BLAG acknowledges that, when Congress enacted the DOMA, it recognized that Hawaii was on the verge of legalizing same-sex marriage.  BLAG Cross Mot. Summ. J. 4.

United States District Court
For the Northern District of California

Nickles introduced the bill that became the DOMA, he explained this, stating,

> Another example of why we need a Federal definition of the terms "marriage" and "spouse" stems from experience during debate on the Family and Medical Leave Act of 1993. Shortly before passage of this act, I attached an amendment that defined "spouse" as "a husband or wife, as the case may be." When the Secretary of Labor published his proposed regulations, a considerable number of comments were received urging that the definition of "spouse" be "broadened to include domestic partners in committed relationships, including same-sex relationships." When the Secretary issued the final rules he stated that the definition of "spouse" and the legislative history precluded such a broadening of the definition.

142 Cong. Rec. 4851-02, 1996 WL 233584, at *S4869-70.

A proposed amendment to the Defense of Marriage bill would have required the General Accounting Office to "undertake a study of the differences in the benefits, rights and privileges available to persons in a marriage and the benefits, rights and privileges available to persons in a domestic partnership resulting from the non-recognition of domestic partnerships as legal unions by State and Federal laws." 142 Cong. Rec. 7480-05, 1996 WL 392787, at *H7503. In opposition to the amendment, Representative Charles Canady stated, "This motion represents a transparent attempt to give some statutory recognition to domestic partnerships." 142 Cong. Rec. 7480-05, 1996 WL 392787, at *H7504. The amendment was defeated. 142 Cong. Rec. 7480-05, 1996 WL 392787, at *H7505.

Thus, legislative history that is relevant to both § 3 of the DOMA and § 7702B(f) of Title 26 contains evidence of moral condemnation and social disapprobation of same-sex couples.

10

PROCEDURAL BACKGROUND

In their first motion to dismiss, Federal Defendants addressed Plaintiffs' equal protection and substantive due process challenge to § 3 of the DOMA.  The Court denied the motion, finding that, under the rational basis standard of review, Plaintiffs had stated a cognizable constitutional claim.

At the time the Court considered the first motion to dismiss, Plaintiffs were all couples legally married under California law. Subsequently, however, Plaintiffs filed a Second Amended Complaint adding as Plaintiffs Rafael V. Dominguez and Jose G. Hermosillo, who are not legally married, but are registered as domestic partners in California.  Federal Defendants moved to dismiss this complaint, arguing that Dominguez and Hermosillo had not alleged a cognizable equal protection or substantive due process claim based on § 7702B(f)'s failure to include registered domestic partners. The Court denied the motion, holding that Ninth Circuit precedent precluded it from applying strict scrutiny, but finding that Plaintiffs had stated a claim that the exclusion violated the rational basis test.

In addition to denying Federal Defendants' motions to dismiss the Court granted Plaintiffs' unopposed motion to certify a class pursuant to Federal Rule of Civil Procedure 23(b)(2).  The certified class was defined as, "Present and future CalPERS members who are in legally recognized same-sex marriages and registered domestic partnerships together with their spouses and partners, who as couples and families are denied access to the CalPERS Long-Term Care Program on the same basis as similarly

United States District Court
For the Northern District of California

situated present and future CalPERS members who are in opposite-sex marriages, and their spouses."  Docket No. 92.

The Court now considers the parties' cross-motions for summary judgment.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

United States District Court

For the Northern District of California

DISCUSSION

I. Equal Protection

Plaintiff same-sex spouses claim that their rights to equal protection are violated by § 3 of the DOMA.  In addition, Plaintiff registered domestic partners assert that their equal protection rights are infringed by § 3 of the DOMA and § 7702B(f) of Title 26.  The doctrine of equal protection exists to ensure the Constitution's promise of equal treatment under the law. Romer v. Evans, 517 U.S. 620, 631 (1996).

The BLAG relies heavily on two cases, Baker v. Nelson, 409 U.S. 810 (1972), and Adams v. Howerton, 673 F.2d 1036 (9th Cir. 1982), to argue that Plaintiffs' equal protection challenge to § 3 of the DOMA is foreclosed.  In Baker, the Supreme Court summarily dismissed an appeal from the Minnesota Supreme Court's decision to uphold, against a federal equal protection challenge, a state law prohibiting same-sex civil marriage.  The Court resolved the appeal in a single sentence, stating that it was "dismissed for want of a substantial federal question."  409 U.S. at 810.

Mandel v. Bradley, 432 U.S. 173, 176 (1977), explains the precedential weight of a summary action by the Supreme Court. Mandel involved an independent candidate's claim that procedures under the Maryland Election Code violated his First and Fourteenth Amendment rights to access to the ballot by imposing an early deadline for filing nominating petitions.  Id. at 174.  Prior to Mandel, the Supreme Court had summarily affirmed a lower court's decision invalidating Pennsylvania's procedures for independent candidates to access the ballot.  In Mandel, the Court held that the summary affirmance in its prior case did not mandate the

**United States District Court**
For the Northern District of California

result reached by the district court because, unlike the Maryland procedure, the Pennsylvania requirements entailed both an early filing date and a twenty-one day limitation on signature gathering.  Id. at 177.  The Court stated that "a summary affirmance is an affirmance of the judgment only."  Id. at 176. The Court further explained, "Summary affirmances and dismissals for want of a substantial federal question . . . prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions."  Id.; cf. Hicks v. Miranda, 422 U.S. 332, 344-45 (1975) (holding that the Supreme Court's prior summary affirmance of a California appellate decision upholding the constitutionality of an obscenity statute precluded a three-judge federal court from finding that the same statute was unconstitutional.)

The Ninth Circuit recently addressed the precedential value of Baker, in the context of a constitutional challenge to Proposition 8, a ballot measure that eliminated the right to marry for same-sex couples in California.  There, the court considered Mandel and Hicks, and determined that Baker was "not pertinent," because "we do not address the question of the constitutionality of a state's ban on same-sex marriage."  Perry v. Brown, 671 F.3d 1052, 1082 n.14 (9th Cir. 2012). The Ninth Circuit reasoned that the case before it presented "a wholly different question: whether the people of a state may by plebiscite strip a group of a right or benefit, constitutional or otherwise, that they had previously enjoyed on terms of equality with all others in the state."  Id.

Likewise, this case is distinguishable from Baker.  Whereas the action in Baker addressed whether Minnesota violated the equal

protection clause by excluding same-sex couples from civil marriage, the married Plaintiffs here have already gained legal recognition under California law. The issue is instead whether a federal provision, § 3 of the DOMA, infringes Plaintiffs' rights under equal protection principles by denying them a benefit available to legally married heterosexual couples. Another judge in this district has distinguished Baker in the context of an action challenging § 3 of the DOMA. Golinski v. U.S. Office of Pers. Mgmt., 2012 WL 569685, *8 n.5 (N.D. Cal.) (granting summary judgment in favor of plaintiff). Baker does not foreclose Plaintiffs' equal protection claim.

In Adams, a United States citizen and an Australian national in a same-sex relationship secured a marriage license from a county clerk in Colorado. The citizen petitioned the Immigration and Naturalization Service to permit his spouse to remain in the country as an "immediate relative," pursuant to § 201(b) of the Immigration and Nationality Act of 1952 (INA), 8 U.S.C. § 1151(b). Following the agency's denial of his petition and a final administrative decision denying his appeal, the couple filed an action challenging the exclusion on constitutional grounds. The Ninth Circuit stated that, even if Colorado recognized the marriage, Congress did not intend to confer spousal status based on same-sex marriages under § 201(b). 673 F.2d at 1040-41. The court arrived at its statutory interpretation based on its view of the ordinary meaning of marriage, and a 1965 amendment to the INA establishing a mandatory exclusion of homosexuals as inadmissible aliens. The mandatory exclusion evidenced Congress's "clearly express[ed] [] intent to exclude homosexuals." Id. at 1040. The

court also determined that the legislative exclusion withstood constitutional scrutiny.  Id. at 1041-43.  The court found that the denial of legal recognition to same-sex spouses satisfied the rational basis test in that Congress manifested a concern for family integrity in passing laws facilitating the immigration of spouses in valid heterosexual marriages.  The court also determined, with little discussion, that Congress could have determined that legal recognition of same-sex marriages was not necessary in that such couples were not recognized in most, if any, states because they violate traditional and often prevailing social mores, or because they "never produce offspring."  Id. at 1042-43.

Adams does not control this case in light of Supreme Court and Ninth Circuit rulings and legislative developments since the decision.  In Miller v. Gammie, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc), the Ninth Circuit explained that a district court or a three-judge panel is free to re-examine the holding of a prior panel when the United States Supreme Court, or a controlling state Supreme Court ruling, has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable."  Id. at 900.  "[T]he issues decided by the higher court need not be identical in order to be controlling."  Id.

Similarly, under Ninth Circuit precedent, a prior determination by the court is not controlling if subsequent legislation has undermined the decision.  For example, in Zazueta-Carillo v. Ashcroft, 322 F.3d 1166, 1170-72 (9th Cir. 2003), the Ninth Circuit panel found that it was required to revisit an

existing rule "on a clean slate," because subsequent legislation by Congress changed the landscape of immigration law and alleviated the concerns that motivated the rule established in a prior Ninth Circuit decision.

Several developments since Adams demonstrate that the bases for its reasoning no longer apply, so that the case is not controlling.  First, the Supreme Court in Lawrence v. Texas struck down laws criminalizing homosexuality, holding that social disapproval of homosexuality on the basis of asserted tradition and mores is no longer accepted as sufficient justification for laws burdening gay men and lesbians.  539 U.S. 558, 577 (2003) (adopting Justice Stevens' dissenting opinion in Bowers v. Hardwick, 478 U.S. 186, 216 (1986)).  The Ninth Circuit recently held that "tradition alone is not a justification for taking away a right that had already been granted, even though that grant was in derogation of tradition."  Perry, 671 F.3d at 1092.

Further, in 1990, Congress removed the mandatory provision in the INA, upon which Adams relied, that barred gay and lesbian individuals from receiving visas and gaining admission into the United States.  Sec. 601, Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (amending 8 U.S.C. § 1182 to eliminate

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

subsection (a)(4), which had excluded those "afflicted with a psychopathic personality, sexual deviation, or a mental defect.").[6]

Moreover, in contrast to the state of the law in 1982, as Adams recited it, now several states, as well as the District of Columbia, offer legal recognition to same-sex couples in the form of registered domestic partnership, civil marriage or a similar designation.

Finally, Adams' rationale that same-sex couples never produce children has been proven false: same-sex couples use various methods to conceive and adopt children. The ability of same-sex couples to have children is recognized in the Ninth Circuit. See Perry, 671 F.3d at 1086-87 (noting a long line of California cases granting parental rights to gay and lesbian parents and that the state's "current policies and conduct recognize that gay individuals are fully capable of responsibly caring for and raising children.") (alterations omitted). Adams is not fatal to Plaintiffs' equal protection claims.

---

[6] Section 212(a)(4) of the INA of 1952 had excluded "[a]liens afflicted with a psychopathic personality, epilepsy, or a mental defect." In 1965, Congress eliminated epilepsy and added "sexual deviation." Pub. L. No. 414, 66 Stat. 163, 182, amended by Act of Oct. 3, 1965, Pub. L. No. 89-236, § 15(b), 79 Stat. 911, 919 (codified as amended at 8 U.S.C. § 1182(a)(4) (1988)). The entire provision was eliminated by the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990). See Shannon Minter, Sodomy and Public Morality Offenses Under U.S. Immigration Law: Penalizing Lesbian and Gay Identity, 26 Cornell Int'l L.J. 771, 775-83 (1993) (explaining the history of statutory provisions barring gay men and lesbians from immigrating to the United States).

**United States District Court**
For the Northern District of California

Under the doctrine of equal protection, certain classifications by statute or other government activity, such as classifications based on race, have been found to be suspect. Harris v. McRae, 448 U.S. 297, 322 (1980) (noting race as "the principal example" of a "suspect" classification). Where a challenged law burdens a suspect class, courts apply strict scrutiny to determine the constitutional validity of the provision. See Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 312 (1976). Such laws are "presumptively invalid and can be upheld only upon an extraordinary justification." Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 272 (1979). Courts apply an intermediate level of scrutiny to certain quasi-suspect classifications, such as those based upon sex, which "have traditionally been the touchstone for pervasive and often subtle discrimination." Id. at 273. A law that does not burden a protected class is subject to a lower standard of review and need only "bear[] a rational relationship to some legitimate end." Romer, 517 U.S. at 631.

The Ninth Circuit has held that gay men and lesbians do not constitute a suspect or quasi-suspect class. High Tech Gays v. Def. Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th Cir. 1990). Ninth Circuit panels have continued to utilize the rational basis standard applied in High Tech Gays, even after the Supreme Court's decisions in Romer, 517 U.S. at 620, and Lawrence, 539 U.S. at 577, which invalidated certain legislative enactments burdening gay men and lesbians. See e.g., Philips v. Perry, 106 F.3d 1420, 1425 (9th Cir. 1997) (holding that High Tech Gays was controlling and rejecting request by amici curiae to apply strict scrutiny); Witt v. Dep't of Air Force, 527 F.3d 806, 821 (9th Cir.

2008) (holding that because <u>Lawrence</u> declined to address equal
protection, it did not disturb <u>Philips</u>' equal protection ruling
under the rational basis standard of review). More recently, in
<u>Perry</u>, 671 F.3d at 1080 ns.13, 19, the Ninth Circuit stated that
it need not consider whether any form of heightened scrutiny was
necessary or appropriate with respect to the plaintiff same-sex
couples. <u>Perry</u> applied rational basis review based on <u>Romer</u> and
noted that <u>High Tech Gays</u> had held that heightened scrutiny did
not apply. Although the Ninth Circuit may revisit its ruling that
gay men and lesbians do not constitute a suspect or quasi-suspect
class, the Court tests the constitutionality of § 3 of the DOMA
and § 7702B(f) of Title 26, pursuant to current Ninth Circuit law,
by applying rational basis review.

Under this standard of review, a law that imposes a
classification must be rationally related to the furtherance of a
legitimate state interest. <u>Romer</u>, 517 U.S. at 631. This standard
of review accords a strong presumption of validity to legislative
enactments. <u>Heller v. Doe</u>, 509 U.S. 312, 319 (1993). "[I]t is
entirely irrelevant for constitutional purposes whether the
conceived reason for the challenged distinction actually motivated
the legislature." <u>FCC v. Beach Comm.</u>, 508 U.S. 307, 313 (1993).
Nevertheless, rational basis review is not "toothless." <u>Mathews
v. De Castro</u>, 429 U.S. 181, 185 (1976). "[E]ven in the ordinary
equal protection case calling for the most deferential of
standards, [courts] insist on knowing the relation between the
classification adopted and the object to be attained." <u>Gill v.
United States Office of Pers. Mgmt.</u>, 699 F. Supp. 2d 374, 387 (D.
Mass. 2010) (quoting <u>Romer</u>, 517 U.S. at 633).

**United States District Court**
For the Northern District of California

In _Romer_, the Supreme Court held that gay men and lesbians, as a class, are at least protected from burdensome legislation that is the product of sheer anti-gay animus and devoid of any legitimate government purpose.  517 U.S. at 632-35 (holding that Colorado's anti-gay ballot measure "fails, indeed defies, even this conventional inquiry" applied under the rational basis test).  In _Perry_, the Ninth Circuit applied _Romer_ and found that Proposition 8 was an enactment devoid of any rational relationship to a legitimate state interest and was unconstitutionally tainted by anti-gay animus.  671 F.3d at 1086-95.  Accordingly, in applying the rational basis test, this Court considers the evidence of anti-gay animus in the record of Congress's consideration of § 3 of the DOMA and § 7702B(f) of Title 26, along with possible justifications for the provisions.

> A.   Application of Rational Basis Test to Same-Sex Spouses' Challenge to § 3 of the DOMA

Plaintiffs contend that § 3 of the DOMA impermissibly excludes same-sex spouses from the federal definition of marriage based on animus towards gay men and lesbians and their relationships.  The legislative history described above demonstrates that animus toward, and moral rejection of, homosexuality and same-sex relationships are apparent in the Congressional record.  The BLAG does not argue that the legislative record is free of moral condemnation of gay men and lesbians.  Rather, it asserts several rationales in defense of § 3 of the DOMA.

**United States District Court**
For the Northern District of California

1.   An Act of Caution to Preserve the Status Quo

The BLAG asserts that § 3 of the DOMA is a legitimate act of caution to protect the institution of traditional marriage.  This argument is faulty for two reasons.

First, the preservation of marriage as an institution that excludes gay men and lesbians for the sake of tradition is not a legitimate governmental interest.  As discussed above, the Ninth Circuit has disapproved "tradition" as a permissible policy goal in eliminating rights previously extended to same-sex couples. Perry, 671 F.3d at 1092-93.  Section 3 of the DOMA eliminated numerous established federal rights generally available to married couples by precluding federal recognition of same-sex couples legally married under state law.  Under equal protection jurisprudence, tradition is not a legally acceptable reason to prohibit a practice that historically has been the subject of social disapprobation.

In Palmore v. Sidoti, 466 U.S. 429, 433 (1984), the Supreme Court recognized that, while a child living with a stepparent of a different race may experience "pressures and stresses" that would not be present if the child were living with parents of the same racial origin, under the doctrine of equal protection, "the reality of private biases" is not a permissible consideration for the removal of a child from the custody of his or her natural parent.  The Court stated, "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."  Id.

Likewise, in the context of same-sex intimacy and relationships, the Supreme Court has held that "the fact that the

United States District Court
For the Northern District of California

governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice." _Lawrence_, 539 U.S. at 577 (adopting Justice Stevens' dissent in _Bowers_, 478 U.S. at 216).[7]  The Court observed that "neither history nor tradition could save a law prohibiting miscegenation from constitutional attack." _Id._

Furthermore, there is no principled distinction between anti-gay animus and a conception of civil marriage as an institution that cannot tolerate equally committed same-sex couples.  In _Perry_, the Ninth Circuit rejected the contention that Proposition 8, eliminating the designation of civil marriage for same-sex couples, but not the substantive rights associated with marriage, was intended only to disapprove of same-sex marriage.  671 F.3d at 1093.  Rather, the elimination of the right sent "a message that gays and lesbians are of lesser worth as a class--that they enjoy a lesser societal status." _Id._  Similarly, the Supreme Court in _Lawrence_ discussed the "stigma" generated by laws criminalizing

---

[7] Although the majority in _Lawrence_ invalidated state laws criminalizing sodomy on substantive due process grounds, and did not rely on equal protection arguments pertaining to gays and lesbians as a class, the Ninth Circuit in _Perry_ cited the decision in its equal protection ruling.  671 F.3d at 1092-93.  _Perry_ reasoned that "laws affecting gays and lesbians' rights often regulate individual conduct--what sexual activity people may undertake in the privacy of their own homes, or who is permitted to marry whom" and, thus, such laws regulate status as much as they regulate conduct.  _Id._ at 1093 (citing _Christian Legal Soc'y v. Martinez_, ___ U.S. ___, 130 S. Ct. 2971, 2990 (2010) (declining "to distinguish between status and conduct" in the context of sexual orientation)).  Accordingly, _Perry_ found _Lawrence_ relevant to its equal protection analysis.

homosexual conduct and stated that such laws are "an invitation to
subject homosexual persons to discrimination both in the public
and in the private spheres."  539 U.S. at 575.  The notion that
civil marriage may only sanction a union between a man and a woman
posits that there is something inherently objectionable about
homosexuality or that same-sex intimate relationships are
irreconcilable with the core characteristics of marriage.
Singling out same-sex spouses for exclusion from the federal
definition of marriage amounts to a bare expression of animus on
the basis of sexual orientation and, under Romer, this rationale
does not satisfy rational basis review.

    Nor was § 3 of the DOMA a cautious legislative step.  The
measure established an across-the-board federal definition of
marriage limiting it to heterosexual couples, and preempting any
opportunity to test the impact of state laws evolving to recognize
same-sex marriage.  The General Accounting Office has identified
1,138 federal statutory provisions in which marital status is a
factor in determining "benefits, rights, and privileges."  General
Accounting Office, Defense of Marriage Act: Update to Prior
Report, GAO-04-353R, at 1 (January 23, 2004),
www.gao.gov/new.items/d04353r.pdf.  Through a single federal law,
enacted before any state granted marriage licenses to same-sex
couples, Congress foreclosed the recognition of same-sex spouses
for any purpose under a sweeping range of federal provisions.

    In Perry, the Ninth Circuit found that Proposition 8 was not
plausibly a measure of caution for it erected a barrier to
incremental policy-making and did not include a means of careful
consideration, such as a time-specific moratorium on same-sex

United States District Court
For the Northern District of California

marriage.  Given the federal government's long-standing deference to state law in the area of domestic relations, the BLAG's rationale that the provision was a cautionary measure is not plausible.  671 F.3d at 1090; see Golinski, 2012 WL 569685 at *24 ("The passage of DOMA marks a stark departure from tradition and a blatant disregard of the well-accepted concept of federalism in the area of domestic relations."), appeals docketed, Nos. 12-15388 and 12-15409 (9th Cir.); Gill, 699 F. Supp. 2d at 392 (finding that DOMA "mark[ed] the first time the federal government has ever attempted to legislatively mandate a uniform federal definition of marriage--or any other core concept of domestic relations, for that matter").  Section 3 of the DOMA did not prevent the states from allowing non-traditional, same-sex marriages and, thus, it created a new schism between state and federal domestic relations law.

In sum, Congress's hypothesized desire to exercise caution by preserving the traditional definition of marriage is not a legitimate justification; § 3 of the DOMA marked a significant departure from federal deference to the states' authority in defining marriage.

       2.   Protecting the Public Fisc

The BLAG further argues that § 3 of the DOMA is justified as an enactment designed to conserve scarce government resources. The effectiveness of § 3 of the DOMA as a cost-saving measure is a subject of debate.  For example, as the BLAG has recognized, the Congressional Budget Office has opined that federal recognition of same-sex marriage would result in a net benefit to the federal treasury.  BLAG's Cross Mot. Summ. J. at 21 n.6 (citing Douglas

United States District Court
For the Northern District of California

Holtz-Eakin, <u>The Potential Budgetary Impact of Recognizing Same-Sex Marriage</u>, at 1, June 21, 2004).[8]  However, even crediting cost-savings as a conceivable policy goal, groups selected to bear the burden of legislative enactments to save money must be rationally, not arbitrarily, chosen.  <u>Golinksi</u>, 2012 WL 569685 at *22 n.8 (citing <u>Plyler v. Doe</u>, 457 U.S. 202, 227, 229 (1982)).

<u>Diaz v. Brewer</u>, 656 F.3d 1008, 1015 (9th Cir. 2011), <u>reh'g en banc denied</u>, is also instructive.  There, the Ninth Circuit affirmed a district court's preliminary injunction barring enforcement of a state provision eliminating health insurance benefits for registered domestic partners of Arizona state employees.  In Arizona, couples were permitted to register as domestic partners, whether they were same-sex or heterosexual.  In rejecting the state's rationales of cost-savings and reducing administrative burdens, the court observed that the savings depended upon a distinction between same-sex and similarly situated heterosexual couples, because the heterosexual couples could preserve their benefits by marrying, whereas same-sex couples were barred from marriage by Arizona constitutional law.  Citing <u>Eisenstadt v. Baird</u>, 405 U.S. 438 (1972), the court held that a provision to save funds based on such a distinction could not survive rational basis review because it amounted to the "selective application of legislation to a small group."  <u>Id.</u> at 1014.

_____

    [8] This report is <u>available at</u> http://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/55xx/doc5559/06-21-samesexmarriage.pdf.

United States District Court
For the Northern District of California

The desire to save money is not sufficient to justify § 3 of the DOMA.

### 3.   Establishing Uniformity

According to the BLAG, § 3 of the DOMA promotes uniformity in eligibility for federal benefits.  However, the federal government has accepted variations and inconsistencies in state marriage laws by recognizing for federal purposes any heterosexual marriage that is valid under state law.  Gill, 699 F. Supp. at 391 (citing Dunn v. Comm'r of Internal Revenue, 70 T.C. 361, 366 (1978) ("recognizing that whether an individual is 'married' is, for purposes of the tax laws, to be determined by the law of the State of the marital domicile"); 5 C.F.R. § 843.102 (defining "spouse" for purposes of federal employee benefits by reference to state law); 42 U.S.C. § 416(h)(1)(A)(i) (defining an "applicant" for purposes of Social Security survivor and death benefits as "the wife, husband, widow or widower" of an insured person "if the courts of the State" of the deceased's domicile "would find such an applicant and such insured individual were validly married"); 20 C.F.R. § 404.345 ("If you and the insured were validly married under State law at the time you apply for . . . [social security] benefits, the relationship requirement will be met."); 38 U.S.C. § 103(c) (veterans' benefits); 20 C.F.R. § 10.415 (workers' compensation); 45 C.F.R. § 237.50(b)(3) (public assistance); 29 C.F.R. §§ 825.122 and 825.800 (Family Medical Leave Act); 20 C.F.R. §§ 219.30 and 222.11 (benefits under the Railroad Retirement Act)).  An enactment that precludes federal recognition of certain marriages because they involve same-sex couples cannot be justified as promoting uniformity where federal law otherwise

accepts wide variation in state marriage law.  In considering the DOMA, Congress acknowledged the long-standing disposition of the federal government to accept state definitions of civil marriage.  HR. Rep. 104-664 at 2 ("The determination of who may marry in the United States is uniquely a function of state law.").  Instead, § 3 of the DOMA undermines uniform recognition of marriage, by requiring federal agencies to discern which state law marriages are acceptable for federal recognition and which are not.[9]

> 4.   Encouraging Responsible Procreation and Preserving the Social Link Between Marriage and Children

The BLAG asserts that Congress could rationally have enacted § 3 of the DOMA to encourage marriage for heterosexual couples who, unlike same-sex couples, are generally at risk of accidentally conceiving children outside of marriage.  The BLAG contends that the provision serves to incentivize the creation, stability, and closeness of heterosexual marriage, or the raising of children in that marital context, while declining to extend similar incentives to other relationships.

Here, the relationship between § 3 of the DOMA and the policy goal of steering child-bearing into the context of heterosexual marriage is too attenuated to be credited as a plausible rationale

---

[9] The BLAG argues that Congress has approved numerous provisions in the areas of taxation, Social Security, immigration and federal benefits that define marriage for purposes of federal law.  However, these provisions do not purport to establish a federal definition of marriage, but instead impose additional requirements to further the legislative goals of the provisions, while accepting the state definitions of marriage.  Golinski, 2012 WL 569685 at *25 n.10 (citing 42 U.S.C. § 416 (requiring marriage of at least one year to obtain certain Social Security benefits); 8 U.S.C. § 1186a(b)(1) (discrediting sham marriages for purposes of immigration)).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

for the law.  The law carries no incentivizing effect for
heterosexual couples.  The BLAG acknowledges that marriage has
long been understood as a relationship between a man and a woman.
Section 3 of the DOMA enacted an express exclusion, barring
federal recognition of same-sex marriages under state law.  There
is no reasonable basis to believe that heterosexual couples are
more inclined to marry and have children or to enter into a
marriage after accidentally conceiving a child, due to this
limiting federal definition enacted in 1996.[10]  Golinski, 2012 WL
569685 *23 ("Denying federal benefits to same-sex married couples
has no rational effect on the procreation practices of opposite-
sex married (or unmarried) couples.").  See also Lawrence, 539
U.S. at 605 (Scalia, J., dissenting) (observing, "what
justification could there possibly be for denying the benefits of

---

[10] The BLAG's reliance on Johnson v. Robison, 415 U.S. 361
(1974), is not persuasive.  There the Supreme Court upheld,
against an equal protection challenge, a provision that granted
educational benefits to drafted individuals who performed military
service, but withheld such benefits from drafted religious,
conscientious objectors who performed mandatory civilian service
as an alternative to military service.  Id. at 382-83.  The Court
determined that the educational benefits made military service
more "palatable" and deterred drafted servicemen from skirting
their duties, whereas individuals with deeply held religious
convictions against military service would not be drawn to serve
through the availability of educational benefits.  Here, § 3 of
the DOMA impacts an expansive body of laws that touch upon marital
status.  These laws concern diverse benefits, privileges,
responsibilities and obligations which, collectively, are not
readily analogous to the simple educational benefit present in
Johnson.  Thus, the incentivizing effect in Johnson does not apply
here.  Nor are same-sex couples like the conscientious objectors,
because they are seeking to join the institution of marriage or
have their existing marriages or legal relationships recognized by
the federal government and they desire to assume the attending
benefits and responsibilities.  Johnson is inapposite.

marriage to homosexual couples . . . [s]urely not the
encouragement of procreation, since the sterile and the elderly
are allowed to marry") and <u>Perry</u>, 671 F.3d at 1088 ("There is no
rational reason to think that taking away the designation of
'marriage' from same-sex couples would advance the goal of
encouraging California's opposite-sex couples to procreate more
responsibly.").

The BLAG also argues that § 3 of the DOMA could have been
passed to preserve the social link between marriage and child-
rearing. The BLAG contends that Congress could have reasonably
concluded that expanding the definition of marriage could weaken
society's view that the central purpose of marriage is to raise
children and could contribute to the number of children born
outside of marriage. This rationale is not plausible because, as
noted earlier, child-rearing is not the core attribute of
marriage, and there is no reasonable connection between the
exclusion of same-sex spouses from the federal definition of
marriage and minimizing the number of children born outside of
wedlock.

The provision did not extend new marital rights and
privileges to heterosexual couples. Rather, it blocked the
application of existing federal rights to married same-sex couples
to whom such privileges could have otherwise been accorded. Thus,
the law did not establish an incentive for heterosexual couples to
marry; they were able to do so and enjoy federal recognition,
prior to the enactment of the DOMA.

There is no reasonable relationship between § 3 of the DOMA
and the policy goal of encouraging heterosexual couples to

procreate while married or enter into marriage if they accidentally conceive a child.  Because there is no rational relationship to this policy goal, the Court need not resolve whether fostering child-rearing by heterosexual, rather than same-sex couples, serves a legitimate governmental interest.

### 5. Summary

In sum, the legislative record contains evidence of anti-gay animus and the BLAG has failed to establish that § 3 of the DOMA is rationally related to a legitimate government interest. Accordingly, Plaintiff same-sex spouses are entitled to summary judgment that § 3 of the DOMA is invalid under the Constitution's equal protection principles to the extent that the law blocks their access to the CalPERS long-term care plan.

### B. Registered Domestic Partners' Challenge to § 3 of the DOMA

Plaintiffs assert that the restrictive definition of "spouse" in § 3 of the DOMA precludes registered domestic partners from enrollment in the CalPERS long-term care plan, contravening their rights to equal protection under federal law and their entitlement to all of the rights, privileges, and obligations of marriage under California law.  Plaintiffs contend that, if not for § 3 of the DOMA, Plaintiffs Dominguez and Hermosillo, who are registered domestic partners, but not married under California law, would be deemed "spouses" under state law for purposes of Hermosillo's enrollment in CalPERS' long-term care program.

State Defendants do not say that § 3 of the DOMA, in particular, precludes California registered domestic partners from enrolling in the CalPERS long-term care plan.  Rather, they

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

represent that they would "admit same-sex spouses and domestic partners to [the CalPERS long-term care plan] but for federal law."  State Defendants contend that enrollment of Plaintiff domestic partners in the plan would jeopardize the plan's status as a qualified state long-term care plan under § 7702B(f)(2).

Federal Defendants dispute Plaintiffs' contention that, but for § 3 of the DOMA, California registered domestic partners would necessarily be treated as spouses under the federal tax code. Fed. Defs.' Cross Mot. Summ. J. 2, 20-21 and Reply 1.  The Court notes that § 3 of the DOMA does not expressly address registered domestic partners and it is clear that § 7702B(f) omits domestic partners.

Plaintiffs have not demonstrated that § 3 of the DOMA blocks CalPERS from enrolling California domestic partners in its long-term care plan.  Plaintiffs contend hypothetically that if § 3 of the DOMA were invalidated, but § 7702B(f) were upheld, California registered domestic partners, who are legally entitled to be treated as spouses under California law, would be permitted to enroll in the CalPERS long-term care plan, without triggering disqualification of the plan for favorable tax treatment under § 7702B(f).  In effect, Plaintiffs ask the Court to issue an advisory opinion, which would be improper.  See Coal. for a Healthy Cal. v. F.C.C., 87 F.3d 383, 386 (9th Cir. 1996) (citing Flast v. Cohen, 392 U.S. 83, 96 (1968), for the proposition that federal courts are not authorized to issue advisory opinions). Accordingly, the Court finds moot Plaintiffs' claim that the equal protection rights of California registered domestic partners have been infringed by § 3 of the DOMA.

**United States District Court**
For the Northern District of California

C.   Application of Rational Basis Test to Registered
     Domestic Partners' Challenge to § 7702B(f)

In addition to challenging § 3 of the DOMA, Plaintiffs claim
that § 7702B(f) infringes the equal protection rights of
California same-sex registered domestic partners by excluding them
from enrollment in qualified state-maintained long-term care
plans.  As explained above, subparagraph (C) of § 7702B(f)(2) does
not include registered domestic partners in the list of relatives
eligible to enroll in state-maintained long-term care plans.  The
list of eligible participants incorporates all relatives
qualifying for a dependency exemption under 26 U.S.C. § 152(d)(2)
except for those individuals who are eligible because they are
members of the same household as the taxpayer.  Had Congress
incorporated subparagraph (H) of § 152(d)(2), in the list of
individuals eligible under § 7702B(f), CalPERS would have been
authorized to enroll the registered domestic partners of
California public employees in its long-term care plan.

Federal Defendants oppose Plaintiffs' challenge to
§ 7702B(f), arguing, first, that registered domestic partners do
not constitute a quasi-suspect or suspect class.  For the reasons
discussed above in connection with the non-suspect class status of
gay men and lesbians, the Court cannot conclude that domestic
partners constitute such a class.  Although, as explained below,
laws excluding registered domestic partners use that status as a
proxy for homosexuality, gay men and lesbians still do not
constitute a suspect or quasi-suspect class under current Ninth
Circuit precedent.

Federal Defendants contend that the exclusion of registered
domestic partners from § 7702B(f) does not amount to a

United States District Court
For the Northern District of California

classification based on sexual orientation because many states permit heterosexual couples to register as domestic partners. The Court previously rejected this argument, reasoning that same-sex couples are relegated to domestic partnership because they are barred from civil marriage by California law.[11]  January 26, 2012 Order at 16. Laws limiting same-sex couples to registered domestic partnerships, while precluding them from marriage, turn on sexual orientation, and the availability of registered domestic partnership to different-sex couples does not negate the burdens faced by same-sex registered domestic partners.

The Court's prior ruling relied on the Ninth Circuit's decision in Diaz. There, as noted above, the Ninth Circuit considered a challenge to a state law provision that eliminated health care insurance benefits for the registered domestic partners of Arizona public employees. Arizona law allows heterosexual couples, as well as same-sex couples, to register as domestic partners. Although heterosexual registered domestic partners were also affected by the restriction, the court found that the law was tainted by a bare desire to harm same-sex couples because, unlike heterosexual couples, they could not marry under Arizona law. 656 F.3d at 1014-1015.

Federal Defendants argue that Diaz is inapposite because the case concerned the withdrawal of an existing benefit that an

---

[11] Only five to six percent of registered domestic partners in California are different-sex partners. At least one partner must be sixty-two years old or older to register, limiting the eligible pool. Declaration of Claudia Center, Ex. M, Gary J. Gates, M.V. Lee Badgett, Deborah Ho, Marriage, Registration and Dissolution by Same-Sex Couples in the United States, at 14 (July 1, 2009).

unpopular group had previously enjoyed.  This, however, was not the crux of the Ninth Circuit's reasoning.  The court explained that "when a state chooses to provide such benefits, it may not do so in an arbitrary or discriminatory manner that adversely affects particular groups that may be unpopular."  Id. at 1013 (citing U.S. Dep't. of Agric. v. Moreno, 413 U.S. 528, 534-35 (1973)).

Federal Defendants also argue that § 7702B(f) is neutral as to sexual orientation because other relatives, such as cousins, and individuals who share a close, family-like relationship are omitted from the list of eligible relatives.  However, the relevant comparison is between § 7702B(f)'s treatment of domestic partners and its treatment of spouses because domestic partners are more comparable to spouses than to distant relatives, such as cousins.  Congress viewed registered domestic partnership as a quasi-marital status, such as when Representative Istook referred to domestic partnership as the "equivalent to gay marriage," 1993 WL 236117, at *H4355, and Representative Stearns asserted that the District of Columbia domestic partnership registry was intended to give same-sex couples the legal and social benefits associated with marriage, 1995 WL 639923, at *H11659.  The fact that cousins are also affected does not undercut the Court's finding that § 7702B(f)'s exclusion of registered domestic partners is a classification based on sexual orientation.  See Feeney, 442 U.S. at 275 ("If the impact of this statute could not be plausibly explained on a neutral ground, impact itself would signal that the real classification made by the law was in fact not neutral.").

Therefore, in applying rational basis review to Plaintiffs' equal protection challenge to § 7702B(f), as with § 3 of the DOMA,

the Court considers evidence of anti-gay animus and the existence
of any other rational basis for § 7702B(f)'s exclusion of
registered domestic partners.  Neither party points to legislative
history illuminating the reasons that Congress limited the
eligible relatives contained in subparagraph (C).  Thus, there is
no direct evidence of either animus or a benign purpose in the
record pertaining to § 7702B(f).  However, information about
Congress's views regarding legal recognition of registered
domestic partnerships, recorded at the same time as it considered
and approved § 7702B(f), is relevant to the Court's determination.
In Arlington Heights v. Metropolitan Housing Development
Corporation, 429 U.S. 252, 267 (1977), the Supreme Court
explained, "The historical background of the decision is one
evidentiary source, particularly if it reveals a series of
official actions taken for invidious purposes . . . The specific
sequence of events leading up to the challenged decision may also
shed some light on the decisionmaker's purposes."  Thus, facts
beyond the legislative record directly pertaining to § 7702B(f)
are relevant to discern Congress's intent.  The legislative
history of provisions that Congress considered contemporaneously
with the passage of § 7702B(f) is relevant.

    Plaintiffs point to Congress's contemporaneous consideration
of § 3 of the DOMA and its obvious animosity towards same-sex
couples in those proceedings, as well as its ban on funding of the
District of Columbia's domestic partnership registry, as indirect
evidence that this animus was the reason for its exclusion of a
provision applicable to registered domestic partners from the list
of eligible relatives under subparagraph (C) of § 7702B(f).  The

United States District Court
For the Northern District of California

DOMA and § 7702B(f) were enacted in the same legislative session, within a month of each other.  Congress had been banning the funding of the District of Columbia's domestic partnership registry for years.  In 1996, Congress not only knew that a number of localities and entities across the country had recognized and protected same-sex couples by offering registered domestic partnerships, it limited the federal definition of marriage to heterosexual married couples.  Thwarting federal recognition of registered domestic partnerships was a consideration in approving § 3 of the DOMA's limiting definition of marriage.  The statements reflecting animus towards gay men and lesbians in these contexts are relevant to show anti-gay animus in connection with § 7702B(f)'s exclusion of registered domestic partners.  The Court infers that Congress acted on anti-gay animus in refusing to include registered domestic partners in the list of relatives eligible to enroll in state-maintained long term care plans.

In addition to pointing out evidence of anti-gay animus in the legislative record, Plaintiffs have refuted the existence of any rational basis for § 7702B(f)'s exclusion of registered domestic partners.

Federal Defendants argue that the exclusion of registered domestic partners from § 7702B(f) was rational because, in 1996, no state recognized such relationships.  As noted earlier, Congress was actually aware of, and thwarted, the District of Columbia's domestic partnership registry.  Congress was informed of domestic partnership registries established in various other jurisdictions.  Accordingly, Federal Defendants' asserted

rationale that the exclusion was reasonable because registered
domestic partnership was a novel legal status cannot be credited.

Next, Federal Defendants contend that it was not irrational
to exclude registered domestic partners from qualified state long-
term care plans because, in 1996, no state treated registered
domestic partners as spouses for state law purposes.  Federal
Defendants point out that California extended to registered
domestic partners the full range of spousal rights and
responsibilities available under state law only after a 2003
legislative enactment.  This argument, however, is not persuasive
because treating registered domestic partners as eligible for
enrollment in a state-maintained, long-term care plan does not
entail extending to registered domestic partners all rights and
responsibilities attached to marriage under a given state's law.

Federal Defendants also argue that Congress reasonably
decided that the category of household members described in
§ 152(d)(2)(H) was not a suitable basis to determine eligibility
for inclusion in a state long-term care plan because such
relationships may change from year to year.  This justification,
however, cannot be credited because the eligibility of spouses,
step-relatives and relatives-in-law, which depends on the
existence of a marital relationship, may likewise change between
one year and the next.

Federal Defendants further contend that the exclusion of
registered domestic partners simplifies for state officials
administering long-term care plans the task of verifying
eligibility.  This rationale is not plausible because the
relationships of distant relatives who are eligible for long-term

**United States District Court**
For the Northern District of California

care coverage through state-maintained plans are likely at least as difficult to verify as the residence of individuals who live in the same household as the taxpayer for the taxable year.  Thus, the exclusion of subparagraph (H) does not rationally relate to efforts to ease administration of state-maintained long-term care plans.  In Moreno, 413 U.S. at 537-38, the Court held that a provision that limited eligibility for food stamps to households comprising "related" rather than "non-related" individuals was not rationally connected to efforts to curb abuse of the program.  In addition, the Ninth Circuit in Diaz recently rejected the argument that a state law eliminating health care benefits for domestic partners served the interest of easing administrative burdens where the challenged law amounted to a "selective" burden on a small group of individuals.  656 F.3d at 1014.

Finally, Federal Defendants assert that Congress reasonably could have assumed that there would not be any significant disparity between qualified state long-term care plans and private § 7702B plans, so that domestic partners of state employees would not be discouraged from purchasing long-term care coverage simply because they are ineligible for state-maintained long-term care coverage.  This does not amount to a rationale for excluding household members under subparagraph (H) from the list of relatives eligible for state-maintained plans.  The availability of long-term care coverage, with tax benefits, for purchase on the private market does not explain this federally mandated exclusion from state plans.

Section 7702B(f) is actually inconsistent with Congress's expressed policy goal of encouraging the purchase of long-term

1  care coverage generally.  Congress's broad extension of favorable

2  tax treatment to private plans was consistent with its policy

3  goal.  However, Congress imposed, pursuant to § 7702B(f), a

4  penalty, namely disqualification of state-maintained plans from

5  favorable federal tax treatment, if they extended long-term care

6  coverage to household members and relatives beyond the list of

7  individuals sanctioned by Congress.

8      Thus, none of the explanations put forth by Federal

9  Defendants satisfies the rational basis test.

10     Because Congress's restriction on state-maintained long-term

11 care plans lacks any rational relationship to a legitimate

12 government interest, but rather appears to be motivated by anti-

13 gay animus, the exclusion of registered domestic partners of

14 public employees from § 7702B(f)'s list of individuals eligible to

15 enroll in state-maintained long-term care plans violates the

16 Constitution's equal protection guarantee.

17 V. Substantive Due Process

18     The Court need not address Plaintiffs' substantive due

19 process challenge to the disputed provisions because Plaintiffs

20 prevail on their motion for summary judgment with respect to their

21 equal protection challenge.  Plaintiffs' meritorious equal

22 protection challenge redresses their injuries by invalidating

23 federal law thwarting their enrollment in the CalPERS long-term

24 care plan and, thus, their substantive due process attack is moot.

25                          CONCLUSION

26     The Court finds that § 3 of the DOMA violates the equal

27 protection rights of Plaintiff same-sex spouses, and

28 subparagraph (C) of § 7702B(f) violates the equal protection

rights of Plaintiff registered domestic partners.  Therefore, both provisions are constitutionally invalid to the extent that they exclude Plaintiff same-sex spouses and registered domestic partners from enrollment in the CalPERS long-term care plan. Thus, Plaintiffs' motion for summary judgment is granted with respect to their equal protection claims and the BLAG's and Federal Defendants' cross-motions for summary judgment that § 3 of the DOMA and § 7702B(f) of Title 26 are constitutional are denied.

Accordingly, the Court permanently enjoins State Defendants, and those acting at their direction or on their behalf, from denying Plaintiff class members enrollment in the CalPERS long-term care plan on the basis of § 3 of the DOMA or § 7702B(f)'s exclusion of same-sex spouses and registered domestic partners, respectively.  Federal Defendants are enjoined from disqualifying the CalPERS long-term care plan under § 7702B(f) based on State Defendants' compliance with the terms of this injunction.  A stay on State Defendants' compliance with this order will be granted, if a timely appeal is filed.

The Clerk is directed to enter judgment in favor of the Plaintiff class and against Defendants and Intervenors.

In their Prayer for Relief, Plaintiffs indicated their intent to seek attorneys' fees and costs.  They may submit a motion making such a request.

IT IS SO ORDERED.

Dated: 5/24/2012

CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California